# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| **f/u/b THE LANE CONSTRUCTION** | |
| **CORPORATION d/b/a SENATE ASPHALT** | * |
| **Plaintiff** | * |
| **v.** | *     **Case No. 1:07-cv-01576** |
| | **Judge: Reggie B. Walton** |
| **WILLIAM V. WALSH** | *     **Contract** |
| **CONSTRUCTION CO., INC., et al.** | |
| | * |
| **Defendants** | |
| | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, TO STAY PENDING EXHAUSTION OF MANDATORY DISPUTES PROCEDURES

William V. Walsh Construction Co., Inc. ("Walsh") and St. Paul Fire & Marine Insurance Company ("St. Paul") (collectively "Defendants"), by undersigned counsel, file this Motion to Dismiss, or in the Alternative, to Stay Pending Exhaustion of Mandatory Disputes Procedures, including a Statement of Points and Authorities in Support of Motion. As set forth in detail below, the Amended Complaint filed by The Lane Construction Co., Inc. d/b/a Senate Asphalt ("Lane") must be dismissed, or in the alternative stayed, because such Amended Complaint was filed prior to the exhaustion of contractually imposed disputes procedures.

## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

### 1.    MATERIAL FACTS NOT IN DISPUTE

#### A.    INTRODUCTION

The construction project that is the subject of this action is the Lincoln Circle and Approach Way Rehabilitation, Task Order 7 (the "Project"). The owner of the Project is the National Park Service (the "Owner"). The Owner entered into a contract (the "McKissack/Owner Contract") with McKissack & McKissack of Washington, Inc.

("McKissack"), an architectural and design firm, for construction management services related to the Project. A true and correct copy of relevant pages from the McKissack/Owner Contract are attached hereto as **EXHIBIT 1**. McKissack entered into a contract with William V. Walsh Construction Co., Inc. (the "Walsh/McKissack Contract") for Walsh to perform the construction work at the Project. A true and correct copy of relevant pages from the Walsh/McKissack Contract are attached hereto as **EXHIBIT 2**. Walsh entered into a subcontract with The Lane Construction Co., Inc. d/b/a Senate Asphalt ("Lane"), for Lane to perform asphalt work on the Project (the "Subcontract"). A true and correct copy of the Subcontract is attached hereto as **EXHIBIT 3**. (A copy of which was also attached to Lane's original Complaint as Exhibit A.) See Declaration of James V. Walsh, filed contemporaneously with this Motion, at ¶ 2.

Pursuant to 40 U.S.C. § 3131 (the "Miller Act"), Walsh, as the contractor performing the construction work on the Project, was required to provide a payment bond for the protection of all persons supplying labor and materials to the Project, in accordance with the terms of the Miller Act. Accordingly, Walsh, together with St. Paul Fire and Marine Insurance Company ("St. Paul"), as surety, furnished a payment bond for the project, Bond No.400U0997 (the "Bond"). A true and correct copy of the Bond is attached hereto as **EXHIBIT 4**. See Declaration of James V. Walsh at ¶ 3.

### B.    THE COMPLAINT AND AMENDED COMPLAINT

Lane filed its original Complaint in this action on September 4, 2007. Count I of the Complaint was a breach of contract action by Lane against Walsh in the amount of $336,160.18. Count II of the Complaint was a payment bond action by Lane against Walsh and St. Paul, also in the amount of $336,160.18. Count III was a payment bond action in the amount of $336,160.18 against McKissack.

After the original Complaint was filed, Walsh made two payments to Lane totaling $342,288 -- an amount exceeding the damages sought in the original Complaint. Walsh filed a

Motion to Dismiss Counts I and II of the Complaint based on payment.  McKissack filed a Motion to Dismiss Count III of the Complaint because it was not an obligor under the Bond and because the alleged debt was paid.  Thereafter, Lane filed Oppositions to the Motions to Dismiss, filed an Amended Complaint against Walsh and St. Paul, and dismissed Count III of its Complaint against McKissack; thereby dropping McKissack from the case.

In the Amended Complaint, Lane continued to assert a breach of contract action against Walsh in Count I and a payment bond action against Walsh and St. Paul in Count II.  In the Amended Complaint, however, Lane asserts Walsh was indebted to it in the amount of $560,050.44 prior to Walsh's payments totaling $342,288.  Based on this accounting, Lane now claims in the Amended Complaint that Walsh and St. Paul still owe Lane $217,762.44.

## C.    LANE'S DELAY CLAIM AND WALSH'S REQUESTS FOR EQUITABLE ADUSTMENT

In the Spring of 2006, Walsh requested Lane to submit updated pricing for the remaining work Lane had to perform on the Project.  The updated pricing was needed due to Owner caused delays on the Project which had significantly extended the contract performance period.  On April 17, 2006, Lane submitted the requested pricing (the "April 17, 2006 Price Proposal").  A copy of Lane's April 17, 2006 Price Proposal is attached hereto as **EXHIBIT 5**.[1]  During the Spring of 2006, Walsh discussed the April 17, 2006 Price Proposal with Lane.  During these discussions, it was discussed that, in order to determine the delay claim, the unit prices in the April 17, 2006 Price Proposal had to be reduced by the unit prices in the Subcontract (see Attachment B to Exhibit 3) in order to derive the price escalation caused by the Owner delays.  Once that was done, Lane's alleged delay costs totaled $216,734.   See Declaration of James V. Walsh at ¶ 4.

---

[1] The amount on the April 17, 2006 Price Proposal is $678,469.40.  It appears the math on the proposal is incorrect and should total $678,513.

Lane agreed that Lane's increased costs were caused by delays to the project caused by the Owner.   Lane authorized Walsh to include Lane's claim for $216,734 in Walsh's claim to McKissack on the basis that Walsh would request McKissack to pass the claim on to the Owner because the Owner was responsible for the alleged damages Lane incurred.  See Declaration of James V. Walsh at ¶ 4.

Lane's Account Summary dated August 9, 2007 lists an amount due of $216,734 with an invoice date of July 31, 2007 and Lane's Application and Certification for Payment No. 10 lists an amount due of $216,734 under Time Extension/Material Escalation on the attached Continuation Sheet.   True and correct copies of the Account Summary and Application and Certification for Payment No. 10, with attached Continuation Sheet, are attached hereto as **EXHIBIT 6**.   The $216,734 amount listed in these documents under time extension/material escalation corresponds to the amount Lane had agreed for Walsh to include in its claim to McKissack and the Owner for Lane's claimed delay costs. [2]

Walsh has submitted a series of Requests for Equitable Adjustment ("REA") to McKissack seeking an equitable adjustment for design defects, owner changes, and the delays on the project caused by design errors, conflicts and changes.  A copy of REA No. 2 and REA No. 3R, with Subcontractor Pricing information attached thereto,[3] are attached as **EXHIBITS 7 and 8** respectively.  Each of the REAs supplemented and superseded previous REA submissions and each REA included a request for Lane's escalation costs based on the information then known

---

[2] It is unclear why the amount claimed to be due in the Amended Complaint is approximately $1,028 higher than the $216,734 amount listed on the Account Summary.  Walsh is unable to reconcile Lane's accounting with its accounting.  Walsh's accounting of Lane's subcontract indicates all amounts Lane has invoiced have been paid with the exception of the $216,734 delay claim amount.

[3] The Subcontractor Pricing information for both REA 2 and REA 3R is redacted so that only the amount included for Lane is showing.  In addition, other attachments were attached to REA No. 2 and REA No. 3R.  These attachments and the information that is redacted on the Subcontractor Pricing information are not relevant to this motion or this case and they contain proprietary pricing information that Walsh seeks to protect from release in the public domain for use by its competitors.

about Lane's costs.  REA No. 2 and REA No. 3R were certified by Walsh and included a request in the amount of $216,734 for Lane's costs.  See Declaration of James V. Walsh at ¶ 5.

On September 25, 2007, McKissack submitted a certified claim to the Contracting Officer requesting a Contracting Officer's final decision.  A true and correct copy of the September 25, 2007 certified claim, without attachments, is attached hereto as **EXHIBIT 9**. McKissack's certified claim included Walsh's certified REA 3R, which incorporated Lane's claim.  See Exhibit 9 at p. 13.  In accordance with the Contract Disputes Act, McKissack's certified claim requested a final decision of the Contracting Officer within 60 days.  It has not yet been 60 days from the submittal of McKissack's certified claim requesting a Contracting Officer's final decision.  The Contracting Officer has not yet provided a final decision on the claim.  See Declaration of James V. Walsh at ¶6.

Pursuant to the Contract Disputes Act, 41 U.S.C. § 609 (a) (1), should the Contracting Officer deny the claim and/or should the Contracting Officer fail to issue the requested final decision, then McKissack will appeal the claim to the United States Court of Federal Claims or the Civilian Board of Contract Appeals.  See Declaration of James V. Walsh at ¶ 6.

D.    **CONTRACT PROVISIONS SETTING FORTH THE MANDATORY DISPUTES PROCEDURES**

The Subcontract sets forth the following mandatory disputes procedures:[4]

Paragraph 5 of the Subcontract states in part:

> The Subcontract price shall be paid in partial payments, when received by the Contractor from the Owner, to Subcontractor for the payment for work in place and material on jobsite.  Payment from the Owner is a specific condition precedent to the Contractor's obligation to pay the Subcontractor, the risks of nonpayment by the Owner being on the Subcontractor for its portion of the work in place or material on the job site. . . . Subcontractor agrees that it will not be paid by the Contractor for

---

[4] The Subcontract and Walsh's contract with McKissack both state disputes are to be resolved by arbitration.  Walsh reserves all rights to move for a stay of this matter pending arbitration in the event this case is not dismissed or stayed pursuant to this motion.

work and materials in place until ten (10) days after the Contractor's receipt of payment from the Owner.

Paragraph 11 of the Subcontract states in part (emphasis added):

> **The contractor shall not be independently liable to Subcontractor for any unforeseeable delay or interference occurring beyond the Contractor's control or for delay or interference caused by Owner or other subcontractors or suppliers.   Subcontractor shall only be entitled to reimbursement for any damages for delays recovered on its behalf by the Contractor from the Owner or others.** The Subcontractor shall have the right, at its expense, to exercise all provisions of the Prime Contract to recover said damages against the Owner. . . .  **A time extension shall be the sole and exclusive remedy of the Subcontractor for delays or suspensions caused by Contractor, even if the delays or suspensions were: (1) of a kind not contemplated by the parties, (2) amounted to an abandonment of the contract, or (3) were caused by active interference.**

Paragraph 15 of the Subcontract states:

> Changes ordered by Owner shall be performed and paid for in accordance with the terms of the Prime Contract, including all rights of dispute and appeal, provided reservation and exercise of said rights do not interfere with the progress of the work.  Payment for Owner changes shall be made in accordance with Paragraph 5, Price and Payment, and payment for Owner changes shall not be due the Subcontractor as a specific condition precedent until the Contractor from the Owner receives said payment.

Paragraph 17 of the Subcontract states in part (emphasis added):

> **Disputes arising out of Owner acts, omissions or responsibilities shall be resolved in accordance with the disputes procedure in the Prime Contract.   Subcontractor shall have the right to exercise the Contractor's rights at the Subcontractor's sole cost and shall be bound thereby.  The Contractor shall have no direct liability to the Subcontractor except to give the Subcontractor the opportunity to exercise the rights in the Prime Contract.** The Subcontractor shall be required as a condition precedent to submitting a claim against the Owner to certify its claim in accordance with all certification requirements in the Prime Contract. . . . In the event that arbitration is provided for in the Prime Contract for disputes between the Owner and the Contractor, Subcontractor specifically agrees to submit its dispute arising out of said Owner acts, omissions or responsibilities in any arbitration proceeding between the Owner and the Contractor. . . .  All disputes between the Contractor and Subcontractor, not involving the Owner's acts, omissions or responsibilities shall, at the Contractor's sole option be resolved in arbitration in accordance with the rules of the American Arbitration Association.

The Subcontract provisions set forth above specifically refer to the disputes procedures in the prime contract.  The Walsh/McKissack Contract provides the following disputes procedures:

Section 12.1.1 of the Walsh/McKissack Contract states in part:

> General Contractor shall only be entitled to adjustments in its Contract Price and Contract Time(s) attributable to such Owner-generated changes to the extent Design-Builder actually receives such adjustments from Owner.  If General Contractor disputes the adjustment, such dispute shall be resolved pursuant to Section 13.3 of this Agreement

Section 13.3.1 of the Walsh/McKissack Contract states in part:

> To the extent a claim, dispute or controversy arises out of, or relates to, problems caused by Owner or for which Owner is responsible (Owner Disputes), such Owner Disputes shall be resolved pursuant to the dispute resolution clause set forth in the Design-Build Agreement.  Both Design-Builder and General Contractor agree to cooperate in the presentation and prosecution or defense of Owner Disputes.  If, after a request for an extension of time or additional compensation from General Contractor, Design-Builder believes that the event causing the delay or additional compensation is the responsibility of Owner, then Design-Builder will cooperate with and assist General Contractor in presenting a request for an extension of time or additional compensation to Owner.

Section 13.3.2 of the Walsh/McKissack Contract states in part:

> Notwithstanding any other provisions herein to the contrary, Design-Builder and General Contractor each agree to accept the relief as to the time extension or additional compensation obtained from Owner, if any, as well as all other aspects of the final decision following appeal or the expiration of the time for appeal, as full and final resolution of any Owner Dispute.

McKissack's contract with the Owner incorporates the Federal Acquisition Regulation ("FAR") disputes clause, 48 C.F. R. 52.233.1 (the "FAR Disputes Clause").  The FAR Disputes Clause states in part:

> (a)  This contract is subject to the Contract Disputes Act of 1978, as amended (41 U.S. C. 601-613).
>
> (b) Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.

(c) Claim, as used in this clause, means a written demand or written assertion by one of the contracting parties seeking as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract. However, a written demand or written assertion by the Contractor seeking the payment of money exceeding $100,000 is not a claim under the Act until certified. . . .

(d) (1)   A claim by a Contractor shall be made in writing and, unless otherwise stated in this contract, submitted within 6 years after accrual of the claim to the Contracting Officer for a written decision. . . .
. . . .
(e)        .   .   .   .   For Contractor-certified claims over $100,000, the Contracting Officer must, within 60 days, decide the claim or notify the Contractor of the date by which the decision will be made.

2.    **LEGAL AUTHORITY IN SUPPORT OF MOTION**

   A.    **UNDER THE SUBCONTRACT, WALSH, AND BY EXTENSION ST. PAUL, HAVE NO LIABILITY TO LANE FOR DELAY DAMAGES UNLESS THE OWNER IS ULTIMATELY DETERMINED TO BE LIABLE FOR LANE'S DAMAGES**

Lane's Subcontract provides Walsh is not "independently liable to Subcontractor for any unforeseeable delay or interference occurring beyond the Contractor's control or for delay or interference caused by Owner."  Subcontract Paragraph 11.  Both Walsh and Lane agreed at the time of discussing Lane's delay claim that the delay was caused by the Owner and that Walsh would be permitted to include Lane's claim in its REA to McKissack for pass through to the Owner.   See Declaration of James V. Walsh at ¶ 4.  Further, even if the delays were caused by Walsh, which is not the case here, the Subcontract provides that Lane is only entitled to a time extension for such delays.  Subcontract Paragraph 11.

Lane is only "entitled to reimbursement for any damages for delays recovered on its behalf by the Contractor from the Owner" through McKissack.   Subcontract Paragraph 11. Because St. Paul's liability under the bond is coextensive with the liability of Walsh, if Walsh is not liable for delay damages, then St. Paul is not liable for delay damages.  *Lehndorff U.S. Equities, Inc. v. The George Hyman Construction Co.*, 1992 WL 135907, *10 (D.D.C. 1992)

("[G]enerally speaking, the liability of a surety is coextensive with that of its principal."); *Johnson v. Taylor*, 73 F. Supp. 537, 538 (D.D.C. 1947) ("The liability of the principal and the surety is coextensive.").

The only circumstance in which Walsh would be liable for delay damages would be if Walsh collects delay damages from McKissack (if McKissack collects delay damages from the Owner) for Lane's delay claim. As such, as a matter of law, Walsh and St. Paul cannot be liable for Lane's delay damages unless Walsh's certified claim, which has been passed through to the Owner, is ultimately successful.

At this time, it is unclear whether it will be successful. The disputes procedure must be concluded before that fact is known. As such, Lane's claim must be dismissed, without prejudice or, at a minimum, stayed until the disputes process involving the Owner is concluded because at this time, Walsh and St. Paul have no liability to Lane for its alleged delay damages.

The Subcontract also specifically states "[d]isputes arising out of Owner acts, omissions or responsibilities shall be resolved in accordance with the disputes procedure in the Prime Contract" and Walsh "shall have no direct liability to [Lane] except to give [Lane] the opportunity to exercise the rights in the Prime Contract." Subcontract Paragraph 17. The Walsh/McKissack Contract states that all Owner disputes will be resolved pursuant to the disputes procedure set forth in McKissack's contract with the Owner. Walsh/McKissack Contract Paragraph 13.3.1.

McKissack's contract with the Owner incorporates the FAR Disputes Clause which requires the submittal of certified claims to the Contracting Officer. The contract disputes procedures of the prime contract were specifically incorporated into the Subcontract to prevent Lane from filing suit against Walsh and its surety, St. Paul, for claims involving the Owner at the same time Walsh, through McKissack, was pursuing the same claims against the Owner on Lane's behalf. Thus, as a matter of law, Lane cannot pursue its delay claim against Walsh and

St. Paul until the disputes procedure between McKissack and the Owner is concluded.   As such,

on the basis of the Subcontract's specific incorporation of the prime contract's disputes

procedure, Lane's Complaint should be dismissed, without prejudice or, at a minimum, stayed

until such time as the dispute between McKissack and the Owner is concluded.

As shown by the foregoing, based on the Subcontract, at this time, Lane is not entitled to

any amount for its claimed damages for delay because Walsh and St. Paul do not have any direct

liability to Lane for its claimed delay damages.   Walsh and McKissack have both fulfilled their

contractual obligations in passing Lane's claim on to the Owner in a certified claim to the

Contracting Officer.   Unless and until the Owner is found to be liable for Lane's alleged delay

damages, then Walsh and St. Paul have no liability to Lane for its delay claim.

### B.      CASE LAW SUPPORTING DISMISSAL OR A STAY

In *Seal & Co., Inc. v. A.S. McGaughan Co., Inc*., 907 F.2d 450, 454 (4th Cir. 1990), the

Court of Appeals for the Fourth Circuit found:

> The general rule is that parties are free to contract for dispute resolution
> procedures which, in effect, turn breach of contract claims into claims for
> relief under the contract. *See United States v. Utah Constr. & Mining Co.,*
> 384 U.S. 394, 404, n. 6, 86 S.Ct. 1545, 1551, n. 6, 16 L.Ed.2d 642 (1966).
> Parties are bound to exhaust such procedures unless they are "inadequate
> or unavailable," as, for example, where the Contracting Officer or the
> Appeals Board is unwilling to act.   *United States v. Grace & Sons,* 384
> U.S. 424, 430, 86 S.Ct. 1539, 1543, 16 L.Ed.2d 662 (1966). In addition,
> the "inadequacy or unavailability of administrative relief must clearly
> appear before a party is permitted to circumvent his own contractual
> agreement." *Id.*

This Court, just three months ago, citing the *Seal* decision, faced the very question posed

in this Motion.  *Norment Security Group, Inc. v. Travelers Casualty and Insurance Company*,

505 F.Supp.2d 97, 104-05 (D.D.C. 2007).   In *Norment*, a glass and glazing subcontractor (PCC)

filed a counterclaim against the general contractor (Centex) in part for delay costs caused by

Centex and/or the GSA (Count III).  *Id.* at 104.  Centex moved to stay the delay costs count of

the counterclaim "on the grounds that PCC is required to specific terms of its subcontract with

Centex to wait until the contractually prescribed dispute resolution procedures with GSA have been exhausted before seeking reimbursement for delay costs from Centex." *Id*.    The Court ruled on the Motion as follows (internal citations and quotation marks omitted):

> Thus, according to Centex, PCC must await resolution of Centex's claims, including that at issue here submitted by PCC, with GSA before PCC can assert a claim against Centex due to GSA's delay and subsequent non-payments to PCC.  On the other hand, PCC argues that staying the claim would only delay complete adjudication for the claims now pending before the Court.  This is hardly a basis for the Court to abrogate the binding agreement that the parties entered into voluntarily, and PCC provides no other basis for the Court to do so.  Moreover, PCC does not address the possibility that the same claim could be resolved two different ways, one by the GSA and the other by this Court.
>
> PCC's claim for damages caused by delay arises under the contract, and because GSA—the relevant administrative agency—has not yet ruled on Centex's claim, which includes PCC's claim, then PCC's prosecution of the very same claim should await the GSA's determination.  Centex's request to stay Count III of the counterclaim will therefore be granted.

*Id*. at 105.

Based on *Seal* and *Norment*, Lane's claim should be stayed pending the decision of the Contracting Officer on McKissack's certified claim and any subsequent appeal of the decision.

Case law also supports the dismissal of or the stay of the Miller Act suit pending completion of dispute procedures.  *United States v. Dick/Morganti*, 2007 WL 3231717, *2-*4 (N.D. Cal. 2007) (staying subcontractor's Miller Act claim against the surety pending completion of the general contractor's claim with the GSA); *United States v. David Boland, Inc*., 922 F. Supp. 597, 598-99 (S. D. Fla. 1996) (dismissing subcontractor's Miller Act claim against general contractor and surety without prejudice to pursue the remedies provided for in the contract between the parties); *United States v. Daniel, Urbahn, Seelye and Fuller*, 357 F. Supp. 853,  860-862 (N.D. Ill. 1973) (staying subcontractor's Miller Act claim against prime contractor pending outcome of disputes clause proceeding).

The Court in the *Dick/Morganti* case discussed the legislative history of the statute regarding waiver of Miller Act rights (40 U.S.C. §3133 (c)). In doing so, the Court found that Congress had explained in the legislative history for the Miller Act that it was not intended to:

> void subcontract provisions requiring arbitration or other alternative methods of resolving disputes. Such provisions would remain enforceable with a claimant's Miller Act rights preserved by a timely suit that can be stayed pending the outcome of the subcontract dispute resolution procedure. The bill respects the freedom of the parties to the subcontract to specify means to resolve their disputes and the exclusive jurisdiction of the district court to decide issues arising under the Miller Act.

*Dick/Morganti*, 2007 WL at *3.

In another recent decision, *United States v. Bencor-Petrifond*, 2007 WL 1725468, *1-*3 (N.D. Ill. 2007), the Court addressed whether a Miller Act suit should be stayed while the subcontractor's claim against the general contractor was arbitrated. In *Bencor*, the Court said:

> In this case, the [subcontractor's] claims against [the sureties] necessarily depend on whether [the general contractor] breached its subcontract with [the subcontractor]. The liability of the sureties … is limited to the liability of the principal. The extent of that liability will be determined by arbitration, and there is no reason to duplicate the determination here. To do so would risk inconsistent rulings. Also [the subcontractor] does not give any reason to think it would suffer hardship by a stay of its Miller Act claims. The court in *United Sates ex re. MPA Construction v. XL Specialty Insurance Co.*, 349 F. Supp.2d 934 (D. Md. 2004), addressed this issue. In that case, the court noted that delay from staying the Miller Act claims was speculative and unlikely. If a plaintiff wins arbitration, it still does not need to litigate its Miller Act claims unless the principal does not pay the arbitration award. *Id*. at 942.

*Bencor*, 2007 WL at *3.

Here, Walsh's liability (and St. Paul's liability) to Lane, if any, can only be determined through completion of the disputes resolution procedure with the Owner. There is no reason to think Lane will suffer any hardship by a stay of its Miller Act suit because it cannot collect anything until a determination is made as to whether the Owner is liable for Lane's delay claim. If McKissack prevails in its certified claim to the Owner, then Lane will not need to litigate its Miller Act claim.

Lane agreed to limit its recovery for owner caused delay costs to that amount Walsh collects through the disputes procedure in its contract with McKissack.   To allow Lane to proceed in this action may require the parties to litigate in a piecemeal fashion and could well result in multiple trials before different federal courts regarding the same issues which could have inconsistent results.   Considerations of judicial economy warrant dismissing Lane's Complaint, without prejudice, until a final decision is made with regard to the claims submitted to the Owner.  In the alternative, all proceedings in this action should be stayed until that time.

## CONCLUSION

Based on the foregoing, Walsh and St. Paul respectfully request this Court dismiss the Amended Complaint, or in the alternative, stay all proceedings in this case pending the exhaustion of contractually mandated disputes procedures.


Respectfully submitted,


BY:     /s/ Nicole L. Campbell
        Nicole Lefcourt Campbell, D.C. Bar #: 498490
        Huddles Jones Sorteberg & Dachille, P.C.
        10211 Wincopin Circle, Suite 200
        Columbia, Maryland 21044
        (301) 621-4120 (Telephone)
        (301) 621-4473 (Facsimile)
        campbell@hjpc.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 21st day of November, 2007, a copy of the foregoing

Defendants' Motion to Dismiss, or in the Alternative, to Stay Pending Exhaustion of Mandatory

Disputes Procedures, was sent via email and U.S. Mail to:

> Stephen J. Annino
> Kasimer & Annino, P.C.
> 7653 Leesburg Pike
> Falls Church, Virginia 22043
> (703) 893-3914 (phone)
> (703) 893-6944 (fax)

> /s/ Nicole L. Campbell
> Nicole L. Campbell

# AWARD/CONTRACT

| 1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) | RATING | PAGE 1 | OF PAGES 1 |
|---|---|---|---|

**2. CONTRACT** *(Proc. Inst. Ident.)* **NO.**
C3059020904

**3. EFFECTIVE DATE**
06/07/2002

**4. REQUISITION/PURCHASE REQUEST PROJECT NO.**

**5. ISSUED BY**  CODE 2081

DSC - CS - Contracting Services Group
National Park Service, P.O. Box 25297
12795 W. Alameda Parkway

Denver, CO 80225-

**6. ADMINISTERED BY** *(f other than item 5)*  CODE

**7. NAME AND ADDRESS OF CONTRACTOR** *(No., street, city, county, State and ZIP Code)*

McKissack & McKissack of WA
1401 New York Avenue, Suite 900
Washington, DC 20005-2162

| CODE | | FACILITY CODE | |
|---|---|---|---|

**8. DELIVERY**
☐ FOB Origin  ☑ Other *(See below)*

**9. DISCOUNT FOR PROMPT PAYMENT**
10 days    %
20 days    %
30 days    %
days    %

**10. SUBMIT INVOICES**  ITEM 12
*(4 copies unless other-wise specified)* To THE ADDRESS SHOWN IN

**11. SHIP TO/MARK FOR**  CODE

No Shipping Information

**12. PAYMENT WILL BE MADE BY**  CODE 2626

USDI/National Park Service/WASO-Accounting Operations Center
P. O. Box 100000
13461 Sunrise Valley Drive, 2nd Floor

Herndon, VA 20171-3288

**13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:**
☒ 10 U.S.C. 2304(c) ( 2 )    ☒ 41 U.S.C. 253(c) ( 2 )

**14. ACCOUNTING AND APPROPRIATION DATA**
No Funding Information

| 15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 16F. AMOUNT |
|---|---|---|---|---|---|
| | SEE LINE ITEM DETAIL | | | | |

**15G. TOTAL AMOUNT OF CONTRACT**  0.00

## 16. TABLE OF CONTENTS

| ( ) | SEC | DESCRIPTION | PAGE(S) | ( ) | SEC | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | **PART I - THE SCHEDULE** | | | | **PART II - CONTRACT CLAUSES** | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 26-63 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 4-5 | | | **PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH.** | |
| X | C | DESCRIPTION/SPECS/WORK STATEMENT | 6-7 | X | J | LIST OF ATTACHMENTS | 64 |
| X | D | PACKAGING AND MARKING | NA | | | **PART IV - REPRESENTATIONS AND INSTRUCTIONS** | |
| X | E | INSPECTION AND ACCEPTANCE | 8 | | | REPRESENTATIONS, CERTIFICATIONS, AND | |
| X | F | DELIVERIES AND PERFORMANCE | 9 | | K | OTHER STATEMENTS OF OFFERORS | |
| X | G | CONTRACT ADMINISTRATION DATA | 10-13 | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 14-25 | | M | EVALUATION FACTORS FOR AWARD | |

**CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE**

**17.** ☑ **CONTRACTOR'S NEGOTIATED AGREEMENT** *(Contractor is required to sign this document and return ____3____ copies to issuing office)* Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as attached or incorporated by reference herein. *(Attachments are listed herein.)*

**18.** ☐ **AWARD** *(Contractor is not required to sign this document.)* Your offer on Solicitation Number ____ including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

**19A. NAME AND TITLE OF SIGNER** *(Type or print)*
Deryl McKissack  President + CEO

**19B. NAME OF CONTRACTOR**
BY  *Deryl McKissack*
*(Signature of person authorized to sign)*

**19C. DATE SIGNED**
6/7/02

**20A. NAME OF CONTRACTING OFFICER**
John M. Fox

**20B. UNITED STATES OF AMERICA**
By  *(signature)*
*(Signature of Contracting Officer)*

**20C. DATE SIGNED**
6/7/02

NSN 7540-01-152-8069

STANDARD FORM 26 (REV 4-85)

EXHIBIT
1
tabbies

| Award/Contract | Document No.<br>C3059020904 | Document Title<br>NACC 79915/14980/16438 | Page 25 of 60 |
|---|---|---|---|

# SECTION I -- CONTRACT CLAUSES

### I.1    52.252-02    CLAUSES INCORPORATED BY REFERENCE

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es):

**http://www.arnet.gov/far**

**http://www.ios.doi.gov/pam/aindex.html**

| Clause | Title | Date |
|---|---|---|
| 1452.203-70 | Restrictions on Endorsements - Department of Interior | November 1995 |
| 52.202-01 Alt I | Definitions- Alternate I | December 2001 |
| 52.203-03 | Gratuities | April 1984 |
| 52.203-05 | Covenant Against Contingent Fees | April 1984 |
| 52.203-06 | Restrictions On Subcontractor Sales To The Government | July 1995 |
| 52.203-07 | Anti-Kickback Procedures | July 1995 |
| 52.203-08 | Cancellation, Rescission, and Recovery of Funds for Illegal or Improper Activity | January 1997 |
| 52.203-10 | Price Or Fee Adjustment For Illegal Or Improper Activity | January 1997 |
| 52.203-12 | Limitation On Payments To Influence Certain Federal Transactions | June 1997 |
| 52.204-04 | Printed or Copied Double-Sided on Recycled Paper. | August 2000 |
| 52.209-06 | Protecting the Government's Interest When Subcontracting With Contractors Debarred, Suspended, or Proposed for Debarment | July 1995 |
| 52.211-18 | Variation in Estimated Quantity | April 1984 |
| 52.215-02 | Audit and Records--Negotiation | June 1999 |
| 52.215-10 | Price Reduction for Defective Cost or Pricing Data | October 1997 |
| 52.215-11 | Price Reduction for Defective Cost or Pricing Data--Modifications | October 1997 |
| 52.215-12 | Subcontractor Cost or Pricing Data | October 1997 |
| 52.215-13 | Subcontractor Cost or Pricing Data--Modifications | October 1997 |
| 52.215-15 | Pension Adjustments and Asset Reversions | December 1998 |
| 52.215-18 | Reversion or Adjustment of Plans for Postretirement Benefits (PRB) Other than Pensions | October 1997 |
| 52.215-21 | Requirements for Cost or Pricing Data or Information Other Than Cost or Pricing Data--Modifications | October 1997 |
| 52.219-08 | Utilization of Small Business Concerns | October 2000 |
| 52.219-09 | Small Business Subcontracting Plan | January 2002 |
| 52.219-16 | Liquidated Damages-Subcontracting Plan | January 1999 |
| 52.222-03 | Convict Labor | August 1996 |
| 52.222-04 | Contract Work Hours and Safety Standards Act - Overtime Compensation | September 2000 |
| 52.222-06 | Davis Bacon Act | February 1995 |
| 52.222-07 | Withholding of Funds | February 1988 |
| 52.222-08 | Payrolls and Basic Records | February 1988 |
| 52.222-09 | Apprentices and Trainees | February 1988 |
| 52.222-10 | Compliance with Copeland Act Requirements | February 1988 |
| 52.222-11 | Subcontracts (Labor Standards) | February 1988 |
| 52.222-12 | Contract Termination-Debarment | February 1988 |

| Award/Contract | Document No.<br>C3059020904 | Document Title<br>NACC 79915/14980/16438 | Page 26 of 60 |
| --- | --- | --- | --- |

| | | |
| --- | --- | --- |
| 52.222-13 | Compliance with Davis-Bacon and Related Act Regulations. | February 1988 |
| 52.222-14 | Disputes Concerning Labor Standards | February 1988 |
| 52.222-15 | Certification of Eligibility | February 1988 |
| 52.222-21 | Prohibition of Segregated Facilities | February 1999 |
| 52.222-26 | Equal Opportunity | February 1999 |
| 52.222-27 | Affirmative Action Compliance Requirements for Construction | February 1999 |
| 52.222-35 | Affirmative Action For Disabled Veterans and Veterans of the Vietnam Era | December 2001 |
| 52.222-36 | Affirmative Action For Workers with Disabilities | June 1998 |
| 52.222-37 | Employment Reports On Disabled Veterans and Veterans of the Vietnam Era | December 2001 |
| 52.223-03 Alt I | Hazardous Material Identification and Material Safety Data Alternate I | July 1995 |
| 52.223-05 | Pollution Prevention and Right-to-Know Information | April 1998 |
| 52.223-06 | Drug Free Workplace | May 2001 |
| 52.223-14 | Toxic Chemical Release Reporting | October 2000 |
| 52.227-01 | Authorization and Consent | July 1995 |
| 52.227-02 | Notice And Assistance Regarding Patent And Copy Infringement | August 1996 |
| 52.227-04 | Patent Indemnity-Construction Contracts | April 1984 |
| 52.227-16 | Additional Data Requirements | June 1987 |
| 52.227-17 | Rights In Data-Special Works | June 1987 |
| 52.228-02 | Additional Bond Security | October 1997 |
| 52.228-11 | Pledges Of Assets | February 1992 |
| 52.228-12 | Prospective Subcontractor Requests for Bonds | October 1995 |
| 52.228-14 | Irrevocable Letter of Credit | December 1999 |
| 52.228-15 | Performance and Payment Bonds--Construction | July 2000 |
| 52.229-03 | Federal, State And Local Taxes | January 1991 |
| 52.232-05 | Payments under Fixed-Price Construction Contracts | May 1997 |
| 52.232-07 | Payments Under Time-And-Materials And Labor Hour Contracts | February 2002 |
| 52.232-10 | Payments under Fixed-Price Architect-Engineer Contracts | August 1987 |
| 52.232-17 | Interest | June 1996 |
| 52.232-23 | Assignment Of Claims | January 1986 |
| 52.232-26 | Prompt Payment for Fixed-Price Architect-Engineer Contracts | February 2002 |
| 52.233-01 | Disputes | December 1998 |
| 52.233-03 | Protest After Award | August 1996 |
| 52.236-02 | Differing Site Conditions | April 1984 |
| 52.236-03 | Site Investigation and Conditions Affecting the Work | April 1984 |
| 52.236-05 | Material and Workmanship | April 1984 |
| 52.236-06 | Superintendence by the Contractor | April 1984 |
| 52.236-07 | Permits and Responsibilities | November 1991 |
| 52.236-08 | Other Contracts | April 1984 |
| 52.236-09 | Protection of Existing Vegetation, Structures, Equipment, Utilities, and Improvements | April 1984 |
| 52.236-10 | Operations and Storage Areas | April 1984 |
| 52.236-11 | Use and Possession Prior to Completion | April 1984 |
| 52.236-12 | Cleaning Up | April 1984 |
| 52.236-13 Alt I | Accident Prevention Alternate I | November 1991 |
| 52.236-14 | Availability and Use of Utility Services | April 1984 |
| 52.236-15 | Schedules for Construction Contracts | April 1984 |
| 52.236-16 | Quantity Surveys | April 1984 |
| 52.236-17 | Layout of Work | April 1984 |
| 52.236-23 | Responsibility of the Architect-Engineer Contractor | April 1984 |
| 52.236-24 | Work Oversight in Architect-Engineer Contracts | April 1984 |



**D B I A**

**DESIGN-BUILD**
INSTITUTE OF AMERICA

# Standard Form of Agreement Between Design-Builder and General Contractor Lump Sum

*This document has important legal consequences. Consultation with an attorney is recommended with respect to its completion or modification.*

This **AGREEMENT** is made as of the _____Twentieth_____ day of ____October____ in the year of __Two Thousand Three__, by and between the following parties, for services in connection with the Project identified below:

**DESIGN-BUILDER:**
*(Name and address)*

   McKissack & McKissack
   1401 New York Avenue, NW
   Suite 900
   Washington, DC   20005-2102

**GENERAL CONTRACTOR:**
*(Name and address)*

   William V. Walsh Construction Company, Inc.
   14674 Rothgeb Drive
   Rockville, Maryland   20850

**PROJECT:**
*(Include Project name and location as it will appear in the Contract Documents)*

   Security and Preservation of the Jefferson & Lincoln Memorials
   Task Order #7:  Lincoln Circle Rehabilitation
   Washington, DC

**OWNER:**
*(Name and address)*

   DSC-CS Contracting Services Group
   National Park Service, P.O. Box 25287
   12795 W. Alameda Parkway
   Denver, CO   80225-0287



**EXHIBIT**
tabbies®
**2**

In consideration of the mutual covenants and obligations contained herein, Design-Builder and General Contractor agree as set forth herein.

**11.5    Design-Builder's General Indemnification**

**11.5.1**    Design-Builder, to the fullest extent permitted by law, shall indemnify, hold harmless and defend General Contractor and its officers, directors, employees and agents from and against claims, losses, damages, liabilities, including attorneys' fees and expenses, for bodily injury, sickness or death, and property damage or destruction (other than to the Work itself) to the extent resulting from the negligent acts or omissions of Design-Builder, Designer, Design-Builder's other contractors, anyone employed directly or indirectly by any of them or anyone for whose acts any of them may be liable.

**11.5.2**    If an employee of Design-Builder, Designer, Design-Builder's other contractors, anyone employed directly or indirectly by any of them or anyone for whose acts any of them may be liable has a claim against any party indemnified pursuant to Section 11.5.1 above, Design-Builder's indemnity obligation set forth in Section 11.5.1 above shall not be limited by any limitation on the amount of damages, compensation or benefits payable by or for Design-Builder, Designer, Design-Builder's other contractors, or other entity under any employee benefit acts, including workers' compensation or disability acts.

## Article 12

## Changes to the Contract Price and Time

**12.1    Owner-Generated Changes**

**12.1.1**    If Owner issues changes affecting the Work, General Contractor agrees, if directed by Design-Builder, to meet with Design-Builder and Owner to review and discuss the changes. General Contractor shall only be entitled to adjustments in its Contract Price and Contract Time(s) attributable to such Owner-generated changes to the extent Design-Builder actually receives such adjustments from Owner. If General Contractor disputes the adjustment, such dispute shall be resolved pursuant to Section 13.3 of this Agreement.

**12.2    Design-Builder Generated Changes**

**12.2.1**    Changes to the Work issued by Design-Builder shall be governed by the provisions set forth in the following sections of this Article 12.

**12.3    Change Orders**

**12.3.1**    A Change Order is a written instrument issued after execution of the Agreement signed by Design-Builder and General Contractor, stating their agreement upon all of the following:

    **.1**    The scope of the change in the Work;

    **.2**    The amount of the adjustment to the Contract Price; and

    **.3**    The extent of the adjustment to the Contract Time(s).

**12.3.2**    All changes in the Work authorized by applicable Change Order shall be performed under the applicable conditions of the Contract Documents. Design-Builder and General Contractor shall negotiate in good faith and as expeditiously as possible the appropriate adjustments for such changes.

**12.3.3**    If Design-Builder requests a proposal for a change in the Work from General Contractor and subsequently elects not to proceed with the change, a Change Order shall be issued to reimburse General Contractor for reasonable costs incurred for preparing the proposal.

**12.3.4**    General Contractor shall assert its right to an adjustment for Owner-requested changes within 20 days from the date of receipt of the written order of change.

**12.4    Work Change Directives**

**12.4.1**    A Work Change Directive is a written order prepared and signed by Design-Builder, directing a change in the Work prior to agreement on an adjustment in the Contract Price and/or the Contract Time(s).

**12.4.2**    Design-Builder and General Contractor shall negotiate in good faith and as expeditiously as possible the appropriate adjustments for the Work Change Directive. Upon reaching an agreement, the parties shall prepare and execute

DBIA Document No. 555  §  **Standard Form of Agreement Between Design-Builder and General Contractor c Lump Sum** 8 1999 Design-Build Institute of America

an appropriate Change Order reflecting the terms of the agreement.

## 12.5    Minor Changes in the Work

**12.5.1**    Minor changes in the Work do not involve an adjustment in the Contract Price and/or Contract Time(s) and do not materially and adversely affect the Work, including the design, quality, performance and workmanship required by the Contract Documents. Design-Builder may make minor changes in the Work consistent with the intent of the Contract Documents, provided, however that Design-Builder shall promptly inform General Contractor, in writing, of any such changes.

## 12.6    Contract Price Adjustment

**12.6.1**    The increase or decrease in Contract Price resulting from a change in the Work shall be determined by one or more of the following methods:

.1    unit prices set forth in the Agreement or as subsequently agreed between the parties;

.2    a mutually accepted, lump sum, properly itemized and supported by sufficient substantiating data to permit evaluation by Design-Builder;

.3    costs, fees and any other markups set forth in the Agreement; and

.4    if an increase or decrease cannot be agreed to as set forth in items .1 through .3 above and Design-Builder issues a Work Change Directive, the cost of the change of the Work shall be determined by the reasonable expense and savings in the performance of the Work resulting from the change, including a reasonable overhead and profit, as may be set forth in this Agreement. If the net result of both additions and deletions to the Work is an increase in the Contract Price, reasonable overhead and profit shall be calculated on the basis of the net increase to the Contract Price. If the net result of both additions and deletions to the Work is a decrease in the Contract Price, there shall be no overhead or profit adjustment to the Contract Price. General Contractor shall maintain a documented, itemized

accounting evidencing the expenses and savings associated with such changes.

**12.6.2**    If unit prices are set forth in the Contract Documents or are subsequently agreed to by the parties, but application of such unit prices will cause substantial inequity to Design-Builder or General Contractor because of differences in the character or quantity of such unit items as originally contemplated, such unit prices shall be equitably adjusted.

**12.6.3**    If Design-Builder and General Contractor disagree upon whether General Contractor is entitled to be paid for any services required by Design-Builder, or if there are any other disagreements over the scope of Work or proposed changes to the Work, Design-Builder and General Contractor shall resolve the disagreement pursuant to Article 13 hereof. As part of the negotiation process, General Contractor shall furnish Design-Builder with a good faith estimate of the costs to perform the disputed services in accordance with Design-Builder's interpretations. If the parties are unable to agree and Design-Builder expects General Contractor to perform the services in accordance with Design-Builder's interpretations, General Contractor shall proceed to perform the disputed services, conditioned upon Design-Builder issuing a written order to General Contractor (i) directing General Contractor to proceed and (ii) specifying Design-Builder's interpretation of the services that are to be performed.

## 12.7    Emergencies

**12.7.1**    In any emergency affecting the safety of persons and/or property, General Contractor shall act, at its discretion, to prevent threatened damage, injury or loss. Any change in the Contract Price and/or Contract Time(s) on account of emergency work shall be determined as provided in this Article 12.

# Article 13

# Contract Adjustments and Disputes

## 13.1    Requests for Contract Adjustments and Relief

DBIA Document No. 555 $ **Standard Form of Agreement Between Design-Builder and General Contractor c Lump Sum** 8 1999 Design-Build Institute of America

Page 21

**13.1.1** If either General Contractor or Design-Builder believes that it is entitled to relief against the other for any event arising out of or related to the Work or the Project, such party shall provide written notice to the other party of the basis for its claim for relief. Such notice shall be in accordance with specific notice requirements contained in applicable sections of the Contract Documents and, if possible, be made prior to incurring any cost or expense. General Contractor shall provide Design-Builder notice of claims for which Owner may be responsible in sufficient time for Design-Builder to meet its notice requirements to Owner set forth in the Contact Documents. In the absence of any specific notice requirement, written notice shall be given within a reasonable time, not to exceed ten (10) days, after the occurrence giving rise to the claim for relief or after the claiming party reasonably should have recognized the event or condition giving rise to the request, whichever is later. Such notice shall be in accordance with the Contract Documents and shall include sufficient information to advise the other party of the circumstances giving rise to the claim for relief, the specific contractual adjustment or relief requested and the basis of such request.

## 13.2    Dispute Avoidance and Resolution

**13.2.1** The parties are fully committed to working with each other throughout the Project and agree to communicate regularly with each other at all times so as to avoid or minimize disputes or disagreements. If disputes or disagreements do arise, General Contractor and Design-Builder each commit to resolving such disputes or disagreements in an amicable, professional and expeditious manner so as to avoid unnecessary losses, delays and disruptions to the Work.

## 13.3    Disputes Involving Owner

**13.3.1** To the extent a claim, dispute or controversy arises out of, or relates to, problems caused by Owner or for which Owner is responsible (Owner Disputes), such Owner Disputes shall be resolved pursuant to the dispute resolution clause set forth in the Design-Build Agreement. Both Design-Builder and General Contractor agree to cooperate in the presentation and prosecution or defense of Owner Disputes. If, after a request for an extension of time or additional compensation from General Contractor, Design-Builder believes that the event causing the delay or additional compensation is the responsibility of Owner, then Design-Builder will cooperate with and assist General Contractor in presenting a request for an extension of time or additional compensation to Owner.

**13.3.2** Notwithstanding any other provisions herein to the contrary, Design-Builder and General Contractor each agree to accept the relief as to a time extension or additional compensation obtained from Owner, if any, as well as all other aspects of the final decision following appeal or the expiration of the time for appeal, as full and final resolution of any Owner Dispute.

**13.3.3** If Design-Builder asserts a claim against Owner involving General Contractor, each party shall bear its own costs for outside counsel and third-party consultants retained to prosecute claims against Owner and for any other litigation costs. Each party shall present its portion of the claim to Owner.

**13.3.4** If Owner contends that the Contract Documents have been breached, or otherwise asserts a claim or set-off against Design-Builder, the party determined to be responsible for the breach either by settlement or by the trier of fact shall be responsible for all costs occasioned by the breach, including counsel and litigation costs. If the trier of fact fails to determine the relative degrees of fault of Design-Builder and General Contractor in connection with any claim by Owner, then Design-Builder and General Contractor agree that the allocation of fault shall be determined pursuant to Section 13.4.

## 13.4    Disputes Not Involving Owner

**13.4.1** For any claim, dispute or controversy not arising out of, or relating to, problems caused by Owner or for which Owner is responsible, General Contractor and Design-Builder will first attempt to resolve such claim, dispute or controversy at the field level through discussions between Design-Builder's Representative and General Contractor's Representative.

**13.4.2** If a claim, dispute or controversy cannot be resolved through Design-Builder's Representative and General Contractor's Representative, Design-Builder's Senior Representative and General Contractor's Senior Representative, upon the request of either party,

DBIA Document No. 555  §  Standard Form of Agreement Between Design-Builder and General Contractor c Lump Sum
8 1999 Design-Build Institute of America

# SUBCONTRACT AGREEMENT

SUBCONTRACT AGREEMENT MADE BETWEEN

THE CONTRACTOR: __WILLIAM V. WALSH CONSTRUCTION CO., INC.__ AND

THE SUBCONTRACTOR: _____ Senate Asphalt

_____ P.O. Box 71080 –Southwest Station, Washington, DC 20024

PHONE No.: __(202) 479-1009__     FAX No.: _____ (202) 479-1021

**1. THE PROJECT**

WWW JOB NO. J-128     DATE: March 19, 2004

COST CODE: 502-002020000

OWNER'S NAME: National Park Service

OWNER'S CONTRACT NO. C3059020904

JOB NAME: Lincoln Circle and Approach Way Rehabilitation – Task Order 7

LOCATION: Washington, DC

## SCOPE OF WORK

2. Subcontractor warrants that it is thoroughly familiar with the site conditions and the Prime Contract Documents (see ATTACHMENT A) and that the Subcontractor shall furnish anything necessary to complete in place the work as set forth in ATTACHMENT B, in strict accordance with the Prime Contract Documents (including plans and specifications, general provisions, general and special conditions). If subcontractor's proposal is made Attachment A, it is for scope purposes only. The terms and conditions as set forth in this agreement shall govern.

William V. Walsh reserves the exclusive and sole right to exercise all remaining contract options as described in the prime contract documents and as listed in ATTACHMENT B.

Also included are all security and safety requirements, compliance with federal, state and local regulations, OSHA and the owner's regulations, submittals, samples, surveys, transportation of your personnel, materials and equipment, coordination with William V. Walsh Construction and other trades, participation in scheduling, protection of existing elements and quality control.

## FLOW-DOWN RELATIONSHIP

3. The Subcontractor is bound to the Contractor in the same way the Contractor is bound to the Owner and shall assume toward the Contractor all the obligations and responsibilities which the Contractor assumes toward the Owner and shall have the benefit of all rights, remedies and redress against the Contractor, pursuant to the Prime Contract, has against the Owner, except that this Subcontract shall govern any inconsistent provision of the Prime Contract.

## THE SUBCONTRACT SUM

4. The Contractor shall pay the Subcontractor for the performance of this Subcontract in accordance with the schedule of values shown on ATTACHMENT B in partial payments as hereinafter described.

## PRICE AND PAYMENT

5. The Subcontract price shall be paid in partial payments, when received by the Contractor from the Owner, to Subcontractor for the payment for work in place and material on jobsite. Payment from the Owner is a specific condition precedent to the Contractor's obligation to pay the Subcontractor, the risks of nonpayment by the Owner being on the Subcontractor for its portion of the work in place or material on the job site. Ten percent (10%) retention shall be withheld until final payment is due except that retained funds will be reduced when and to the extent the Owner's retained funds withheld from the Contractor is reduced. Final payment shall be due after completion of all work, acceptance by the Owner, compliance with all Subcontract obligations, and receipt of final payment from the Owner, which items shall be conditions precedent to the making of final payment to Subcontractor. The Contractor is entitled to proof of payment for labor, material and services used before any payment is due. Material paid for shall belong to the Contractor, but shall remain in the care, custody and control of Subcontractor and be stored at Subcontractor's risk. The Subcontractor shall be responsible at all times for his labor and/or materials until same is accepted by the Owner. Subcontractor shall furnish guarantees and all other documents required by the Prime Contract for the Subcontractor's work, including releases of all claims and liens as a condition

**EXHIBIT**

tabbies

**3**

precedent for final payment. Partial releases may be required at the Contractor's option as a condition precedent to any partial payments for work completed and the Contractor may require the Subcontractor to certify and/or exhibit such other evidence that all entities furnishing labor, materials, and equipment under prior requisitions have been paid in full. Liquidated damages withheld by Owner will be assessed against Subcontractor for delay attributable to Subcontractor's fault. The Subcontract shall itemize the Subcontract price as a basis for establishing value of work completed, and partial payments. Subcontractor agrees that it will not be paid by the Contractor for work and materials in place until ten (10) days after the Contractor's receipt of payment from the Owner. If the Contractor withholds making payment to the Subcontractor until the Subcontractor has complied with the aforesaid terms and conditions, the Subcontractor shall still diligently proceed with the work as required.

## LIABILITY AND INDEMNITY INSURANCE

6. The Subcontractor shall procure, at its sole cost and expense, the insurance coverage's set forth below, and shall maintain such coverage's in full force and effect as specified in this Paragraph. The Subcontractor shall include the Contractor [William V. Walsh] as an additional insured to the insurance policies described below. The insurance coverage afforded under the policies described herein shall be primary and non-contributing with respect to any insurance carried independently by the Contractor. All such insurance policies shall indicate that as respects the insured (whether named or otherwise), cross liability and sever ability of interests shall exist for all coverage's provided there under. In addition, all such insurance policies shall include a waiver of subrogation endorsement in favor of the additional insured. The insurance specified below shall be placed with insurance companies reasonably acceptable to Contractor, shall be written on an occurrence basis, and shall incorporate a provision requiring the giving of notice to Contractor at least thirty (30) days prior to the cancellation, non-renewal or material modification of any such policies. The Contractor shall promptly furnish the Contractor with certificates of insurance evidencing the insurance required hereunder, and shall not commence any services under this Agreement until such insurance is obtained.

(i)    Commercial General Liability Insurance. A broad form Commercial General Liability Insurance Policy in form and substance reasonably acceptable to the Contractor and including, without limitation, appropriate endorsements adding the following coverage's: Premises and Operations Liability; Explosion, Collapse and Underground Damage Liability; Personal Injury Liability (with employee and contractual exclusions deleted); Broad Form Property Damage Liability; Contractual Liability supporting the Contractor's indemnification agreements in this Contract; Completed Operations and ~~Products Liability~~ for a period of not less than three (3) years following the Contractor's acceptance of the Project; and Independent Contractor's Protective Liability. The Commercial General Liability Insurance Policy must be written with a combined single limit of liability of not less than $1,000,000 for each occurrence of bodily injury and/or property damage and an annual aggregate of liability per project of not less than $2, 000,000 for bodily injury and/or property damage, and an annual aggregate of liability of not less than $2,000,000 for Completed Operations ~~and Products Liability~~.

(ii)    Comprehensive Automobile Liability Insurance. A Comprehensive Automobile Insurance Policy in form and substance reasonably acceptable to the Contractor [William V. Walsh]. The Comprehensive Automobile Liability Insurance Policy must provide coverage for all owned, hired, rented and non-owned automobiles, and must be written with a combined single limit of liability of not less than $1,000,000 for each occurrence of bodily injury and/or property damage.

(iii)    Worker's Compensation Insurance. A Worker's Compensation Insurance Policy in form and substance reasonably acceptable to the Contractor and in an amount not less than the statutory limits (as may be amended from time to time), including Employees Liability Insurance with limits of liability of not less than (i) $500,000 for bodily injury by accident, each accident, (ii) $500,000 for bodily injury by disease, each employee, and (iii) $500,000 aggregate liability for disease.

(iv)    Property Insurance. A Property Insurance Policy covering all materials, equipment and other portions of the Work stored off-site or in transit; it being expressly acknowledged and agreed by the Contractor that it shall assume responsibility for any loss or damage to such property.

(v)    Umbrella Liability Insurance. An Umbrella Liability Insurance Policy in form and substance reasonably acceptable to the Contractor [William V. Walsh] written in excess of the coverage's provided by the insurance policies described above in subsections (i),(ii) and the Employer's Liability in (iii). The Umbrella Liability Insurance Policy must be written with a combined single limit not less than $5,000,000 for each occurrence of bodily injury and/or property damage, and an annual aggregate of liability of not less than $5,000,000 for bodily injury and/or property damage.

The Contractor shall not insure nor be responsible for any loss or damage to tools, equipment or other property of any kind owned, rented or leased by the Subcontractors, sub-subcontractors, or their respective employees or agents. unless covered by the Contractor.

To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, Contractor, Architect, Architect's consultants and agents and employees of any of them from and against all injuries, claims, damages, losses and expenses, including but not limited to attorney's fees, arising directly or indirectly out of the obligations herein undertaken or resulting out of operations conducted by the Subcontractor, the Subcontractor's Sub-subcontractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such injury, claim, damage, loss or expenses is caused in part by a party indemnified hereunder, save and except claims or litigation caused by or resulting from the sole negligence of the party indemnified hereunder.

## BONDS

7.   The Subcontract shall furnish performance and payment bonds in a form satisfactory to the Contractor and in the Department of the Treasury's approved sureties list, in an amount equal to the Subcontract sum, which bonds shall carry the surety's consent to changes in price and time of performance necessary to conform to Prime Contract requirements. Furnishing of said bonds shall be a condition precedent to the Contractor's obligation to release partial payments. Contract price includes the amount shown in ATTACHMENT E to cover the Subcontractor's cost for the bond.

## SHOP DRAWINGS, SAMPLES AND DATA SUBMISSIONS

8.   All submittals such as shop drawings, catalogs, samples and material lists required by Prime Contract, which pertain to this work, shall be furnished in a complete and timely manner. Subcontractor shall be responsible for delays because of failure to do so and for any deviation from plans and specifications. All deviations from the Prime Contract documents must be noted clearly on the submittals, and by separate cover letter the Subcontractor shall state reasons for the deviation and refer to the applicable contract provision. The complete set of submissions for this Subcontract work shall be submitted by the Subcontractor to the Contractor within thirty (30) days from the date of this Subcontract, unless otherwise stated in the Contractor's Schedule of Progress. Approval by the Owner or the Contractor does not constitute a waiver or modification of the Prime Contract requirements.

## TIME IS OF THE ESSENCE

9.   Time is of the essence. The Contractor has the right to direct the manner in which the Subcontractor performs its work. Subcontractor shall proceed with the performance of the work at such time and in such sequence as the Contractor may direct and/or as required by the Schedule of Progress, which may be updated and revised from time to time by the Contractor as working conditions require, including overtime or shift work performance as necessary. If overtime or additional shifts are required solely to accelerate project completion through no fault of the subcontractor, it shall be authorized in writing prior to such acceleration effort and be paid for by the Contractor. Payments due may be withheld to insure timely progress and completion of work. The Subcontractor shall be liable for all losses and damages incurred by the Contractor (including consequential damages) due to inexcusable delays of the Subcontractor in the performance of the work, including delay costs not reimbursable from the Owner due to concurrent, inexcusable delays of the Subcontractor.

## EXTENSIONS OF TIME

10.   Subcontractor shall be entitled to an extension of time for performing and completing the work covered by this subcontract upon the same terms and conditions an extension of time is allowable under the Prime Contract, and only to the extent that an extension of time is actually granted to the Contractor by Owner, or its representative under the Prime Contract. The Subcontractor shall give notice of the excusable delay to the Contractor in writing within three (3) calendar days from the beginning of said delay in order that the Contractor may in turn notify the Owner. If notice is not given timely, said excusable delay may be considered waived. The Owner's decision, or its representative's, with regard to the delay, including the assessment of liquidated damages, shall be binding upon and chargeable to the Subcontractor, subject to the disputes procedure provided in the Prime Contract.

## DAMAGES FOR DELAY

11.   The Contractor shall not be independently liable to Subcontractor for any unforeseeable delay or interference occurring beyond the Contractor's control or for delay or interference caused by Owner or other subcontractors or suppliers. Subcontractor shall only be entitled to reimbursement for any damages for delays recovered on its behalf by the Contractor from the Owner or others. The Subcontractor shall have the right, at its expense, to exercise all provisions of the Prime Contract to recover said damages against the Owner. In the event that the Contractor seeks to recover damage for delay against the owner or others and the Subcontractor participates in such claim, the Subcontractor shall be responsible for its pro rata share of any legal expert or other expenses in presenting and/or prosecuting the overall claims. The Contractor shall have the right, at any time and for any reason, to delay or suspend the whole or any part of the work herein. A time extension shall be the sole and exclusive remedy of the Subcontractor for delays or suspensions caused by Contractor, even if the delays or suspensions were: (1) of a kind not contemplated by the parties, (2) amounted to an abandonment of the contract, or (3) were caused by active interference.

## SCHEDULE

12.   The Contractor may schedule this project using CPM Schedule techniques and/or simple bar charts. Subcontractor agrees to meet with the Contractor and to provide the necessary detailed information to properly depict activities, including their costs and duration, at no additional cost to the Contractor. All such data shall be provided within fifteen (15) days of the Contractor's written notice and request. The Contractor may at its option withhold making payments to the Subcontractor until the Subcontractor has provided said information. The Contractor may modify and change the schedule from time to time as it deems appropriate in accordance with actual performance conditions. Subcontractor shall perform the work as directed by such schedules as expeditiously as possible despite any pending disputes. See ATTACHMENT F for supplemental schedule information.

## DEFAULT TERMINATION

13.   The following events determined by the good faith judgment of the Contractor shall be deemed a breach of this Agreement by the Subcontractor: Failure to expeditiously prosecute and complete the whole or any part of the work in accordance with the current Schedule of Progress and/or directions from the Contractor; failure to pay for labor and material, payroll taxes, contributions or insurance premiums; interference with the performance of work by others for any reason; an act of bankruptcy or insolvency; or any other material failure to fulfill obligations of this Subcontract or of the Prime Contract concerning the Subcontractor's work or responsibilities. If the Subcontractor breaches the Subcontract, the Contractor may terminate Subcontractor's right to proceed upon three (3) days written notice. In the event that the Contractor believes in good faith that the work is being endangered by the Subcontractor's failure to prosecute the work or take action, such written notice may be omitted and the Subcontractor's performance in whole or in part may be

immediately terminated. The Contractor may then have the work completed and may use Subcontractor's material, supplies, tools and equipment to complete. Subcontractor and its surety shall continue to be liable for all costs to complete and any damages and expenses including reasonable counsel fees, liquidated damages assessed by owner and other liabilities which may result from the default and breach, without waiver of any other rights or remedies available to the Contractor, including right of setoff and collection of any funds which may be due Subcontractor under other subcontracts with the Contractor. If the Contractor wrongfully exercises its default option under this Article, the Subcontractor's remedy shall be solely and exclusively under Article 27, Termination for Convenience.

The Subcontractor agrees that in the event the Contractor is terminated for default by the Owner, all disputes relating to or arising out of the Subcontract shall be stayed pending the final resolution of the Contractor's termination for default in accordance with the administrative and/or judicial disputes procedures in the prime contract. The Subcontractor further agrees that all payment bond actions by the Subcontractor against the Contractor shall be stayed pending the final resolution of the Contractor's termination for default. In the event that the Owner's termination for default of the Contractor is upheld, the Subcontractor agrees that the amount of any recovery the Subcontractor is entitled to from the Contractor shall be limited to the recovery allowed pursuant to Article 27, Termination for Convenience.

## EXTRA WORK

14. The Contractor may at any time direct the Subcontractor to perform extra work or changes under this Subcontract. Only extra work authorized by the Contractor as an extra or change in writing shall be paid for by the Contractor. If the extra work direction does not originate from Owner's direction and there is no prior agreement on price, then Subcontractor shall be paid for the actual direct costs of said work plus fifteen percent (15%) for overhead, profit, supervision and small tools, which will constitute the entire amount due the Subcontractor for the extra work, including any impact or delay effect.

## OWNER CHANGES

15. Changes ordered by Owner shall be performed and paid for in accordance with the terms of the Prime Contract, including all rights of dispute and appeal, provided reservation and exercise of said rights to not interfere with the progress of the work. Payment for Owner changes shall be made in accordance with Paragraph 5, Price and Payment, and payment for Owner changes shall not be due the Subcontractor as a specific condition precedent until the Contractor from the Owner receives said payment.

## CONTRACT INTERPRETATION

16. The Contractor's interpretation of contract requirements shall be binding upon Subcontractor and complied with, except that Subcontractor shall have the right to claim adjustment of the contract because of said interpretation, if said claim is made in writing within forty-eight (48) hours after ruling and direction.

## DISPUTES

17. Disputes arising out of Owner acts, omissions or responsibilities shall be resolved in accordance with the disputes procedures in the Prime Contract. Subcontractor shall have the right to exercise the Contractor's rights at the Subcontractor's sole cost and shall be bound thereby. The Contractor shall have no direct liability to the Subcontractor except to give the Subcontractor the opportunity to exercise the rights in the Prime Contract. The Subcontractor shall be required as a condition precedent to submitting a claim against the Owner to certify its claim in accordance with all certification requirements in the Prime Contract. Subcontractor agrees to indemnify and hold harmless the Contractor for any defects or misrepresentations in its certifications, including any relating to cost or pricing data. In the event that arbitration is provided for in the Prime Contract for disputes between the Owner and the Contractor, Subcontractor specifically agrees to submit its disputes arising out of said Owner acts, omissions or responsibilities in any arbitration proceeding between the Owner and the Contractor. Subcontractor shall be given the opportunity to confer with the Contractor in the selection of arbitrators, unless the dispute is solely one between the Owner and Subcontractor, in which event the Subcontractor may make the selection of arbitrators in the Contractor's name. All disputes between the Contractor and Subcontractor, not involving the Owner's acts, omissions or responsibilities shall, at the contractor's sole option, be resolved by arbitration in accordance with the rules of the American Arbitration Association. Subcontractor specifically agrees that any such arbitration proceedings shall, at the Contractor's sole option, be consolidated with any arbitration proceedings between the Contractor and any other party.

Subcontractor specifically agrees that any dispute with the Owner or the contractor shall not interfere with Subcontractor's progress of its work in any manner, and that Subcontractor shall proceed with its work as ordered, subject to claim. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrators shall be final, and judgment may be entered upon it in any court having jurisdiction thereof. Any such award shall be binding and enforceable against any persons, surety and/or bonding company, which guarantee the performance by the Subcontractor of this Agreement in any manner.

## BACKCHARGES

18. All charges and back charges assessed by the Contractor against the Subcontractor shall be deemed accepted by Subcontractor unless rejected in writing within thirty (30) days. The Contractor is authorized to deduct and offset from any payments due Subcontractor an amount equal to any and all sums, obligations, liabilities, back charges, claims (liquidated or unliquidated) owed by Subcontractor to Contractor arising under this Subcontract or any other contract or agreement between the Subcontractor and the Contractor.

## PLANT AND CLEANUP

19. Subcontractor shall provide its own plant and facilities, including scaffolding and hoists, do its own cleanup, and repair or replace damaged, defective and defaced work caused by its own negligence. The Subcontractor shall cleanup and remove from the site all of its rubbish, debris, etc. on a daily basis, unless the Contractor directs otherwise. Upon completion of the subcontract work, all

Subcontractor's materials, equipment, etc. must be immediately removed from the jobsite by Subcontractor. Failure to comply will permit the Contractor to do so and backcharge Subcontractor for the cost. If Subcontractor uses the Contractor's hoist, scaffolding or facilities, it will be responsible for the operating expenses of such equipment when in use for Subcontractor's benefit.

## BANKRUPTCY AND DELINQUENT TAXES

20. In the event of any act of bankruptcy insolvency by the Subcontractor or notice of levy involving delinquent taxes owed by Subcontractor, the contractor shall have the right to withhold payments and apply the same to secure performance of the Subcontract without prejudice to all other rights against Subcontractor or its surety.

## RESPONSIBILITY FOR WORK IN PLACE

21. The Subcontractor shall check all work performed by others necessary to "receive" the Subcontractor's work. Failure to give notice of any discrepancy shall relieve the Contractor of any responsibility therefore. The Subcontractor shall be responsible for all field measurements and shall check elevations and grades to insure proper fitting of its work. It shall not be incumbent upon the Contractor to discover any mistakes, errors, omissions or deviations from the contract requirements in the subcontract drawings, and the Owner's final approval of drawings made by the Subcontractor shall not relieve the Subcontractor from responsibility for unauthorized changes, deviations or omissions or for error of any sort in its drawings.

## LICENSES AND FEES

22. Subcontractor shall be responsible for all taxes, permits, licenses and fees necessary to perform its work, including any increase therein, if any, during the life of the Subcontract.

## LABOR FORCE

23. Subcontractor shall be responsible for performance regardless of any interference of any trades council or other labor or union organization. Any work stoppage by employees which will in the opinion of the Contractor unreasonably delay the work will be a breach of the Subcontract subject to the rights set forth in Paragraph 13. The Subcontractor shall immediately remove from the work such of his employees as the Contractor shall deem incompetent, careless, insubordinate or otherwise undesirable. The Subcontractor shall employ at all times a sufficient number of workmen with sufficient equipment and proper materials which in the opinion of the Contractor shall be required to prosecute the work in a diligent and expeditious manner.

## NONDISCRIMINATION

24. Subcontractor shall not discriminate against any employee or applicant for employment, advancement, transfer, layoff or termination because of race, religion, color, sex or national origin. All Equal Opportunity or affirmative action requirements of the Prime Contract shall be obligations of the Subcontractor.

## SUPERINTENDENCE

25. Subcontractor shall employ full-time on the jobsite a competent Superintendent, satisfactory to the Contractor with full authority to act on Subcontractor's behalf. The Contractor shall have the right to require the Subcontractor to replace the Superintendent if, in the opinion of the Contractor, the Subcontractor's Superintendent is not satisfactorily performing the work.

## PATENT INFRINGEMENT

26. Subcontractor shall indemnify the Contractor from any use or infringement of patents.

## TERMINATION FOR CONVENIENCE

27. Contractor shall have the right to terminate this Agreement for its own convenience for any reason by giving notice of termination effective upon receipt thereof by Subcontractor. Termination for default under Paragraph 13, if wrongfully made, shall be treated as a termination for convenience. Settlement with the Subcontractor shall be accomplished in accordance with the provisions of the Termination for Convenience clause in the Prime Contract. If the Termination for Convenience clause in the Prime Contract is not applicable, the Subcontractor shall only be paid either the actual cost for work and labor in place, plus fifteen percent (15%), or a pro rata percentage of the Subcontract amount equal to the percentage of completion for the Subcontractor's work as approved by the Contractor, whichever is less. Subcontractor shall not be entitled to anticipated profits on unperformed portions of the work

## ASSIGNMENT

28. No assignment hereunder, including an assignment of proceeds due or to become due to the Subcontractor is allowed without prior written approval of the Contractor.

## NOTICES

29. All notices required under this Subcontract or the Prime Contract shall be addressed to Contractor's office located at 14674 Rothgeb Drive, Rockville, Md. 20850. Notices required by the various provisions of the Prime Contract (not otherwise dealt with herein) shall be due in the Contractor's office in one-half (½) the time specified in the Prime Contract so that Contractor will have sufficient time to forward its notice within the required period. Failure of Subcontractor to forward notices in a timely manner as required by the various equitable adjustment provisions of the Prime Contract shall operate to waive its rights to any such adjustments if the Owner rejects the claim.

## OWNER APPROVAL

30. This Agreement is contingent upon Subcontractor or its product being approved by the Owner. If a disqualification occurs because of failure to comply with and strictly fulfill the obligations herein, said failure shall be deemed a breach by the Subcontractor. Any other rights of disqualification by Owner shall render this Agreement null and void.

5

## RECITATION, SEVERABILITY AND WAIVER

31. Attachments are part of this Agreement. If this Agreement is retained by Subcontractor without executing and returning same within fifteen (15) days, it shall be deemed accepted; however, acceptance in writing is a condition precedent to payment due hereunder. The Subcontractor shall not deal directly with or work directly for Owner. This instrument is the entire Agreement between the parties. If any provision herein is held to be invalid by any competent court, the remaining Agreement shall survive. This Agreement shall control any inconsistency in any documents referred to or incorporated by reference. It is further agreed that no action or failure to act by the Contractor shall constitute a waiver of any breach of any term or condition in the Agreement or any subsequent breach thereof, nor shall such action or failure to act constitute a waiver of any right offered Contractor under this Agreement.

## OSHA

32. Subcontractor shall comply with OSHA and any other relevant and applicable federal, state and local safety regulations, standards and requirements. Subcontractor shall indemnify Contractor from any failure to comply with these requirements including fines and abatement costs and delays to project. Failure to comply shall be a breach of contract, subject to provisions of Paragraph 13.

## LIQUIDATED DAMAGES

33. In the event that liquidated damages are assessed against the Contractor and it is determined that Subcontractor is responsible to the Contractor for said liquidated damages, then Subcontractor shall pay to the Contractor liquidated damages in addition to any damages incurred by the Contractor as the result of Subcontractor's failure of performance.

## MECHANIC'S LIENS

34. Subcontractor hereby waives it right to any mechanic's liens on the property of the Owner to the extent allowed by law.

## EXECUTION

35. This subcontract must be executed by the Subcontractor and returned to the Contractor within fifteen (15) days of its receipt by the Subcontractor. Until the subcontract is executed and returned to the Contractor, along with any required bonds and certificates of insurance, the Contractor has the right to withhold any payment due the Subcontractor.

## GOVERNING LAW

36. This subcontract shall be governed by the laws of the State where Contractor has its principal office and any actions or lawsuits arising hereunder to the extent permitted by law shall be brought in the District where Contractor's principal office is located without regard to principles of conflict of laws or forum non-convenience.

## ATTACHMENTS

37. The following attachments are included as part of this contract:

**ATTACHMENT A:** Prime Contract Documents
**ATTACHMENT B:** Scope of Work and Schedule of Values. Includes Bond amount, if required.
**ATTACHMENT C:** Davis-Bacon Wage Rates applicable to this contract
**ATTACHMENT D:** Subcontract Information Package
**ATTACHMENT E:** Supplemental Schedule Information

SENATE ASPHALT
Subcontractor

Signature

Kirk D. Junco, Vice President
Name & Title

Date: March 29, 2004

WILLIAM V. WALSH CONSTRUCTION CO., INC
Contractor

Signature

James V. Walsh        CEO
Name & Title

Date:

*Subcontractor to sign and initial each sheet and return both copies of the Subcontract Agreement to the Contractor within fifteen days. The Contractor will then sign and return one copy for the Subcontractor's files.*

6

ATTACHMENT A

Prime Contract Documents

Subcontractor warrants that it is thoroughly familiar with the site conditions and the Prime Contract Documents (including plans and specifications, general provisions, general and special conditions). The following plans and specifications are made a part of this contract:

Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects (FP-96) Dated 1996

Federal Highway Administration Eastern Federal Lands Highway Division Special Contract Requirements: Project PLH-NACC 25(1)

Section 636 Supplemental Specifications: District of Columbia Department of Public Works Special Contract Requirements: Project PLH-NACC 25(1)

Drawings 99% Plans for Proposed PLH-NACC 25(1) (see cover sheet)

| Sheet Number | |
|---|---|
| A1 | Title Sheet |
| A2 | Conventional Symbols and Abbreviations |
| A3 | Location Map and Construction Signing Plan |
| A4 | Construction and Drainage and Utility Plan Sheet Layout |
| A5 | Signing and Striping, Traffic Control, and Erosion Control Plan Sheet Layout |
| B1-B7 | Typical Sections |
| C1-C6 | Tabulation of Quantities |
| D1-D31 | Schedules and Summaries |
| E1 | Staging Area Plan |
| F1-F4 | Survey Control Information |
| G1 | Alignment Plan and Horizontal Curve Data |
| H1-H28 | Construction Plans and Profiles |
| I0-I15 | Drainage and Utility Plans |
| J1-J15 | Drainage Profiles |
| K1-K17 | Lighting Plans |
| L1-L8 | Barrier Wall Architectural Profiles |
| M1-M8 | Barrier Wall Structural Profiles |
| N1 | Erosion Control Narrative |
| N2-N6 | Erosion and Sediment Control Plans |
| O1-O4 | Signing and Striping Plans |
| P1-P6 | Traffic Signal Plans |
| R1 | Bridge Approach Repairs |
| S1-S7 | Pedestrian Plaza Plan, Bollard and Barrier Wall Details |
| T1-T52 | Standards and Details |
| U1-U22 | Cross Sections |

Initial & Date: _____

7

ATTACHMENT B

Scope of Work
Lincoln Circle and Approach Way Rehabilitation – Task Order 7

| PAY ITEM/ SPEC. | WORK DESCRIPTION | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 41301x | Asphalt Pavement Milling | 11,696 | m² | $3.25 | 38,012 |
| 41301x | Daniel French Drive 40mm Milling | 0 | m² | $3.25 | 0 |
| 41301x | Bridge Approach Milling | 120 | m² | $3.25 | 390 |
| 41801AD | Superpave Asphalt Concrete, 9.5 mm agg, Type 4 | 2,582 | t | $67.70 | 174,801 |
| 41801AD | Bridge Approach Superpave Asphalt Concrete, 9.5 mm agg, Type 4 | 73 | t | $67.70 | 4,942 |
| 41801AD | Daniel French Drive Superpave Asphalt Concrete, 9.5 mm agg, Type 4 | 168 | t | $67.70 | 11,374 |
| 41801CD | Superpave Asphalt Concrete, 19 mm agg | 524 | t | $65.25 | 34,191 |
| 41801CD | Bridge Approach Superpave Asphalt Concrete, 19 mm agg | 80 | t | $65.25 | 5,220 |
| 41801CD | Daniel French Drive Superpave Asphalt Concrete, 19 mm agg | 333 | t | $65.25 | 21,728 |
| 41802CD | Superpave Asphalt Concrete, 19 mm agg, Wedge and Leveling | 2,814 | t | $65.25 | 183,614 |
| | | | | | 474,272 |

Total Contract          $ 476,772*

Scope Notes:
- Price is for all work to be completed in the year 2005
- Senate Asphalt will conduct a winter shutdown for approx. 30 days beginning around February 1, 2004
- This is a unit price proposal based on bid quantities from drawings titled "Rehabilitation of Lincoln Memorial Circle," (including: typical sections, tabulations of quantities, construction plan, profile and traffic control plan) see Attachment A "Prime Contract Documents".
- Proposal includes 9 mobilizations for asphalt laydown & 3 mobilizations for milling. Additional mobilizations are $1,500.00 each.
- Truck and equipment access to be provided by others.
- Prices are not based upon scale wages.
- Specifically excluded: maintenance of traffic operations
- Additional exclusions: winter pavement maintenance, survey/layout, excavation, earthwork, undercut, proofrolling, stonework, patching/utility patching, utility adjustments, sawcut, prime, stone under curb/gutter and concrete flatwork, curb/gutter & concrete flatwork, herbicide, offsite work, fine grading, pavement markings (either temporary or permanent), bond, trails, signs and testing.

*Includes Bond

Initial & Date: [handwritten] 13 Dec 04
[handwritten] 12/16/04

8

ATTACHMENT C

Davis-Bacon Wage Rates

This project requires submission of certified payroll information and is subject to periodic wage rate interviews by Government personnel. The following wage rate decision(s) are applicable to the work under this contract.

General Decision Number DC 020003 Dated May 24, 2002

ATTACHMENT D

## Subcontract Information Package

I     Requisition Requirements

Ia    Requisition Form

Ib    Subcontract Affidavit, Partial Release and Waiver of Liens

II    Certified Payrolls and Labor Compliance Requirements

IIIa  Affirmative Action and Minority Utilization

IIIb  Non-Discrimination in Employment

IV    IRS Business Regulations

V     Insurance Requirements

VI    Special Project General Conditions, Project Phasing, Safety, Security, Etc.

VII   Sales Tax Requirements

ATTACHMENT E

## Supplemental Schedule Information

The Contractor may schedule this project using CPM Schedule techniques and/or simple bar charts. Subcontractor agrees to meet with the Contractor and to provide the necessary detailed information to properly depict activities, including their costs and duration, at no additional cost to the Contractor. All such data shall be provided within fifteen (15) days of the Contractor's written notice and request. The Contractor may at its option withhold making payments to the Subcontractor until the Subcontractor has provided said information. The Contractor may modify and change the schedule from time to time as it deems appropriate in accordance with actual performance conditions. Subcontractor shall perform the work as directed by such schedules as expeditiously as possible despite any pending disputes.

Contract completion is Sept 5, 2005. Onsite work for subcontractors will start approximately March 1, 2004. CPM to be issued for coordination

# THE AMERICAN INSTITUTE OF ARCHITECTS



Bond No. 400SU0997

*AIA Document A312*

# Payment Bond

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

**CONTRACTOR (Name and Address):**

William V. Walsh Construction Co., Inc.
14674 Rothgeb Drive
Rockville, MD 20850

**SURETY (Name and Principal Place of Business):**

St. Paul Fire and Marine Insurance Company
14120 Newbrook Drive, Suite 160
Chantilly, VA 20151

**OWNER (Name and Address):**

McKissack & McKissack
1401 New York Avenue, NW, Suite 900
Washington, 20005-2102

**CONSTRUCTION CONTRACT**
Date:    October 20, 2003
Amount: ($11,458,000.00   )  Eleven Million Four Hundred Fifty Eight Thousand Dollars and 00/100
Description (Name and Location): Security and Preservation of the Jefferson & Lincoln Memorials, Task Order #7, Lincoln Circle Rehabilitation, Washington, DC

**BOND**
Date (Not earlier than Construction Contract Date):    November 4, 2003
Amount: ($ 11,458,000.00   )  Eleven Million Four Hundred Fifty Eight Thousand Dollars and 00/100
Modifications to this Bond:                □ None                ☒ See Page 6

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | (Corporate Seal) | Company: | (Corporate Seal) |
| William V. Walsh Construction Co., Inc. | | St. Paul Fire and Marine Insurance Company | |
| Signature: _____ | | Signature: _____ | |
| Name and Title: | | Name and Title:  Stephen A. Spencer | |
| | | Attorney-in-Fact | |

(Any additional signatures appear on page 6)

*(FOR INFORMATION ONLY—Name, Address and Telephone)*

**AGENT or BROKER:**

Insurance Associates, Inc.
22 Baltimore Road
Rockville, MD 20850
(301) 838-9400

**OWNER'S REPRESENTATIVE (Architect, Engineer or other party):**

AIA DOCUMENT A312 • PERFORMANCE BOND AND PAYMENT BOND • DECEMBER 1984 ED. • AIA ®
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON, D.C. 20006
THIRD PRINTING • MARCH 1987

A312-1984   4

**EXHIBIT**

**4**

1 The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference.

2 With respect to the Owner, this obligation shall be null and void if the Contractor:

   2.1 Promptly makes payment, directly or indirectly, for all sums due Claimants, and

   2.2 Defends, indemnifies and holds harmless the Owner from claims, demands, liens or suits by any person or entity whose claim, demand, lien or suit is for the payment for labor, materials or equipment furnished for use in the performance of the Construction Contract, provided the Owner has promptly notified the Contractor and the Surety (at the address described in Paragraph 12) of any claims, demands, liens or suits and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety, and provided there is no Owner Default.

3 With respect to Claimants, this obligation shall be null and void if the Contractor promptly makes payment, directly or indirectly, for all sums due.

4 The Surety shall have no obligation to Claimants under this Bond until:

   4.1 Claimants who are employed by or have a direct contract with the Contractor have given notice to the Surety (at the address described in Paragraph 12) and sent a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and, with substantial accuracy, the amount of the claim.

   4.2 Claimants who do not have a direct contract with the Contractor:

      .1 Have furnished written notice to the Contractor and sent a copy, or notice thereof, to the Owner, within 90 days after having last performed labor or last furnished materials or equipment included in the claim stating, with substantial accuracy, the amount of the claim and the name of the party to whom the materials were furnished or supplied or for whom the labor was done or performed; and

      .2 Have either received a rejection in whole or in part from the Contractor, or not received within 30 days of furnishing the above notice any communication from the Contractor by which the Contractor has indicated the claim will be paid directly or indirectly; and

      .3 Not having been paid within the above 30 days, have sent a written notice to the Surety (at the address described in Paragraph 12) and sent a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and enclosing a copy of the previous written notice furnished to the Contractor.

5 If a notice required by Paragraph 4 is given by the Owner to the Contractor or to the Surety, that is sufficient compliance.

6 When the Claimant has satisfied the conditions of Paragraph 4, the Surety shall promptly and at the Surety's expense take the following actions:

   6.1 Send an answer to the Claimant, with a copy to the Owner, within 45 days after receipt of the claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed.

   6.2 Pay or arrange for payment of any undisputed amounts.

7 The Surety's total obligation shall not exceed the amount of this Bond, and the amount of this Bond shall be credited for any payments made in good faith by the Surety.

8 Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for the performance of the Construction Contract and to satisfy claims, if any, under any Construction Performance Bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and the Surety under this Bond, subject to the Owner's priority to use the funds for the completion of the work.

9 The Surety shall not be liable to the Owner, Claimants or others for obligations of the Contractor that are unrelated to the Construction Contract. The Owner shall not be liable for payment of any costs or expenses of any Claimant under this Bond, and shall have under this Bond no obligations to make payments to, give notices on behalf of, or otherwise have obligations to Claimants under this Bond.

10 The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

11 No suit or action shall be commenced by a Claimant under this Bond other than in a court of competent jurisdiction in the location in which the work or part of the work is located or after the expiration of one year from the date (1) on which the Claimant gave the notice required by Subparagraph 4.1 or Clause 4.2.3, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone under the Construction Contract, whichever of (1) or (2) first occurs. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

12 Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page. Actual receipt of notice by Surety, the Owner or the Contractor, however accomplished, shall be sufficient compliance as of the date received at the address shown on the signature page.

13 When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this

AIA DOCUMENT A312 • PERFORMANCE BOND AND PAYMENT BOND • DECEMBER 1984 ED. • AIA®
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON, D.C. 20006
THIRD PRINTING • MARCH 1987

A312-1984    5

Bond shall be construed as a statutory bond and not as a common law bond.

14   Upon request by any person or entity appearing to be a potential beneficiary of this Bond, the Contractor shall promptly furnish a copy of this Bond or shall permit a copy to be made.

15   DEFINITIONS

15.1   Claimant: An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials or equipment for use in the performance of the Contract. The intent of this Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the

Construction Contract, architectural and engineering services required for performance of the work of the Contractor and the Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

15.2   Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

15.3   Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

MODIFICATIONS TO THIS BOND ARE AS FOLLOWS:
This bond is hereby modified by changing the term "owner", referenced throughout this bond, to "obligee". It is therefore understood that McKissack & McKissack, as referenced in this bond, is the obligee and not owner.

(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | (Corporate Seal) | Company: | (Corporate Seal) |
| | | | |
| Signature: _____ | | Signature: _____ | |
| Name and Title: | | Name and Title: | |
| Address: | | Address: | |

AIA DOCUMENT A312 • PERFORMANCE BOND AND PAYMENT BOND • DECEMBER 1984 ED. • AIA ®
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON, D.C. 20006
THIRD PRINTING • MARCH 1987

A312-1984   6

**The St Paul**

*Surety*

St. Paul Fire and Marine Insurance Company
St. Paul Guardian Insurance Company
St. Paul Mercury Insurance Company
United States Fidelity and Guaranty Company
Fidelity and Guaranty Insurance Underwriters, Inc.
Fidelity and Guaranty Insurance Company
Principal Office:    385 Washington Street
                     St. Paul, Minnesota 55102

Seaboard Surety Company
Principal Office:    5801 Smith Avenue
                     Baltimore, Maryland 21209

**DUAL OBLIGEE RIDER**
To be attached to bond at time of issuance

Bond Number    400SU0997

TO BE ATTACHED TO AND FORM PART OF PERFORMANCE AND PAYMENT BONDS

NO.    400SU0997

dated concurrently with the execution of this Rider, issued by ST. PAUL FIRE AND MARINE INSURANCE COMPANY

a Corporation, as Surety, on Behalf of    WILLIAM V. WALSH CONSTRUCTION CO., INC.

as Principal, and in favor of   MCKISSACK & MCKISSACK

and    NATIONAL PARK SERVICE                                        , as Obligees.

IT IS HEREBY UNDERSTOOD AND AGREED that the above-described bond(s) are hereby amended to include the following:

Notwithstanding anything contained herein to the contrary, there shall be no liability on the part of the Principal or Surety under this bond to the Obligees, or either of them, unless the Obligees, or either of them, shall make payments to the Principal, or to the Surety in case it arranges for completion of the Contract upon default of the Principal, strictly in accordance with the terms of said Contract as to payments, and shall perform all the other obligations required to be performed under said Contract at the time and in the manner therein set forth.

In no event shall the liability of the Principal and the Surety to the Obligees, or either of them, in the aggregate, exceed the penal sum stated in the attached bond(s).

IT IS FURTHER UNDERSTOOD AND AGREED that nothing herein contained shall be held to change, alter or vary the terms of the above-described bond(s) except as hereinbefore set forth.

Signed, sealed and dated this   4th   day of   November   , A.D., 2003

WILLIAM V. WALSH CONSTRUCTION CO., INC.
                        Principal

By:_____

MCKISSACK & MCKISSACK
By:_____
                        Obligee
NATIONAL PARK SERVICE
By:_____
                        Obligee

Surety:ST. PAUL FIRE AND MARINE INSURANCE COMPANY

By:_____
                        Attorney-In-Fact

Stephen A. Spencer

86383 Rev. 5-2000 Printed in U.S.A.



# SENATE ASPHALT

Proposal To:
William V. Walsh Construction Company, Inc.
14674 Rothgeb Drive
Rockville, Maryland 20850
Attn: Mr. James Walsh

Date:    17-Apr-06
Bid #:   06-0001
Project Description:
Lincoln Circle Rehabilitation-Task Order 7
Washington, D.C.
**Revised Pricing**

We are pleased to quote the following prices in accordance with your request on the above referenced project. We would like to point out that this quotation is subject to the Terms and Conditions stated on page 2

| Description | Estimated Quantity | Unit Price | Estimated Amount |
|---|---|---|---|
| 41301 - Asphalt Pavement Milling | 11,622 sq M | $4.75 | $55,203.50 |
| 41801AD - Superpave AC 9.5mm agg, Type 4 | 2,722 Mtons | $106.50 | $289,850.40 |
| 41801CD - Superpave AC 19mm agg | 525 MTons | $90.75 | $47,643.75 |
| 41802CD - Superpave AC 19mm agg, wedge/Level | 3,149 MTons | $90.75 | $285,771.75 |

| | |
|---|---|
| Total Amount ===========================>>> | $678,469.40 |

- Price is for all work to be completed by October 31, 2006.
- This is a unit price proposal based on bid quantities from drawings titled "Rehabilitation of Lincoln Memorial Circle," including typical sections, tabulations of quantities, construction plan, profile and traffic control plan.
- Proposal includes 8 mobilizations for asphalt laydown and 7 mobilizations for milling. Additional mobilizations are $ 2,500.00 each.
- Truck and equipment access to be provided by others.
- Maintenance od traffic operations are specifically excluded.
- Additional exclusions: winter pavement maintenance, survey/layout, excavation, earthwork, undercutting, proofrilling stone work, patching/utility patching, utility adjustments, sawcutting, prime coat, offsite work, pavement markings (either temporary or parmanent), bonds, public space permits, trails, driveways, sings and testing.

We thank you for this opportunity to quote on this work. This proposal is valid for 30 days but may be accepted at any later date at the sole option of Senate Asphalt. Your signing and returning one copy of this proposal will constitute acceptance of our proposal by you and will be our authorization to proceed with the work when we are notified to proceed. This proposal includes all Terms and Conditions on page 2 of this document and your signature hereon acknowledges your receipt and agreement to those terms. This pricing is good for work performed thru October 31, 2006.

ACCEPTED:
William V. Walsh Construction Company, Inc.
By:_____

Name:_____

Title:_____ Date:_____

Senate Asphalt

By: _____
Name:  Robert L. McKeever Jr.

Title:  Plant Manager

6218 Oxon Hill Road; Oxon Hill, MD 20745;  PHONE (301) 686-9090;  FAX (301) 686-9093

**EXHIBIT**

**5**

## Terms and Conditions

### RESPONSIBILITIES OF THE OWNER AND/OR CONTRACTORS

1. Location and adjustments of underground facilities and/or utility structures including manholes, water and gas valves.
2. Owner shall not subject our work to traffic or other loads in excess of the design capacity.
3. Senate Asphalt will accept no back charges unless agreed to in writing by both parties in advance.
4. Obtaining all permits and payment of fees prior to beginning of work by Senate Asphalt.
5. Damage to above and underground utilities, facilities and other items caused by equipment to carry out work.

### CREDIT AND PAYMENT

1. Prices quoted are net work invoiced monthly without retainage unless agreed to in writing prior to the start of Senate Asphalt's work.
2. Payments are due 30 days from invoice date.
3. If any payment is not made when due, then Senate Asphalt may suspend operations until payment is received. Interest at the rate of one and one-half percent (11/2 %) per month shall be charged and paid on all unpaid balances from the due date to the date payment is received.
4. In the event that Senate Asphalt retains an attorney to recover any monies due under this contract, the owner/contractor agrees to pay attorney fees are hereby established and agreed to as twenty-five percent (25%) of the amount found to be due and owing, which percentage is hereby stipulated as reasonable. Buyer consents to jurisdiction of the Courts of the Commonwealth of Virginia over any dispute arising under this proposal.

### SUBGRADE, SUBBASE, AND/OR BASE COURSES

1. Drainage not guaranteed on areas having less than 2% grade. No guarantee against rupture and/or displacement.
2. Pavement designs are not guaranteed.
3. Depths indicated are to be constructed as an average depth within specified tolerance.
4. All existing subbase and subgrade to be proof rolled, compacted, dry, in stable condition and plus or minus 0.2 feet of proposed elevation.
5. Senate Asphalt shall not be responsible for subgrade and/or subbase conditions, compaction thereof, or unmarked utilities.
6. It is understood that if after being made aware of undesirable subbase and/or subgrade or base course conditions, the owner or contractor insists on the installation of any part of the pavement without authorizing corrective action, Senate Asphalt will not be responsible in any way for any subsequent pavement failures, and will be paid as stated in the contract.
7. Senate Asphalt shall not be liable for any failure and completion of the work for causes beyond our control, including but not limited to delays or failures caused by Acts of God, weather, suppliers, fuel, raw materials shortages, plant failures, other contractors and/or subcontractors, acts of the owner(s), accidents, or other mishaps affecting this work or other operations in which we are involved, directly or indirectly.

### ADDITIONAL WORK

1. Additional work beyond our stated scope of work in the original proposal will be negotiated and agreed in writing by an authorized agent prior to the performance of any extra work regardless of the state of completion at the time the work is performed. No deduction to the contract amount may be made on account of defective work unless Seller has been given three (3) business days written notice and has not commenced corrective action.

### SCHEDULING

1. Senate Asphalt will endeavor to fully cooperate with the progress of the work, and Senate Asphalt shall not be bound to any construction schedule unless agreed to in writing by both parties.
2. Two weeks notice of availability is required.
3. It is understood that Senate Asphalt has a winter shutdown for approximately 90 days beginning around December 20. Senate Asphalt shall not be held liable for non-performance during this shutdown period. Any work which may be scheduled or requested by the owner/contractor during this shutdown period without prior consent of Senate Asphalt shall be done at the owner's/contractor's risk and expense.

### ACCEPTANCE

1. This proposal is valid for 30 days, but may be accepted at any later date at the sole option of Senate Asphalt.
2. This proposal is not a contract and shall become binding only upon the contractor's acceptance below or upon the contractor commencing performance. This proposal shall be attached and become part of the contract between the parties and may not be modified except by a writing signed by both parties.

Signed and accepted:_____     Date:_____
Proposal void unless second page is signed and accepted.

(Page 2 of 2)

| PAY ITEM/ SPEC. | WORK DESCRIPTION | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 41301x | Asphalt Pavement Milling | 11,696 | m² | $3.25 | 38,012 |
| 41301x | Daniel French Drive 40mm Milling | 0 | m² | $3.25 | 0 |
| 41301x | Bridge Approach Milling | 120 | m² | $3.25 | 390 |
| 41801AD | Superpave Asphalt Concrete, 9.5 mm agg, Type 4 | 2,582 | t | $67.70 | 174,801 |
| 41801AD | Bridge Approach Superpave Asphalt Concrete, 9.5 mm agg, Type 4 | 73 | t | $67.70 | 4,942 |
| 41801AD | Daniel French Drive Superpave Asphalt Concrete, 9.5 mm agg, Type 4 | 168 | t | $67.70 | 11,374 |
| 41801CD | Superpave Asphalt Concrete, 19 mm agg | 524 | t | $65.25 | 34,191 |
| 41801CD | Bridge Approach Superpave Asphalt Concrete, 19 mm agg | 80 | t | $65.25 | 5,220 |
| 41801CD | Daniel French Drive Superpave Asphalt Concrete, 19 mm agg | 333 | t | $65.25 | 21,728 |
| 41802CD | Superpave Asphalt Concrete, 19 mm agg, Wedge and Leveling | 2,814 | t | $65.25 | 183,614 |

474,272



# SENATE ASPHALT

William V Walsh Construction
14674 Rothgeb Drive
Rockville, MD 20850

08/09/07

Account Summary #101243
#631 (263)  Lincoln Circle & Approach Way Rehab-Task Order 7

| Invoice# | Date | Billed | Paid | Over/Short | Check Number | Total Due |
|---|---|---|---|---|---|---|
| 9277/262358 | 04/13/04 | $2,479.48 | | | | |
| | 08/26/04 | | $1,563.00 | | 31097 | $916.48 |
| 262385 | 05/03/04 | $6,681.00 | | | | |
| | 08/26/04 | | $6,681.00 | | 31097 | $0.00 |
| 714205/264063 | 11/19/05 | $11,861.01 | | | | |
| | 02/27/06 | | $10,675.00 | -$0.09 | 34374 | $1,186.10 |
| 742602/264140 | 06/16/06 | $32,512.40 | | | | |
| | 08/04/06 | | $29,261.00 | $0.15 | 35402 | $3,251.25 |
| 766650/264174 | 08/31/06 | $90,889.88 | | | | |
| | 11/20/06 | | $81,801.00 | | 36092 | $9,088.88 |
| 778954/264189 | 10/24/06 | $256,551.28 | | | | |
| | 01/15/07 | | $230,896.00 | $0.15 | 36458 | $25,655.13 |
| 788751/264212 | 11/30/06 | $96,501.19 | | | | |
| | 04/16/07 | | $86,851.07 | | 37005 | $9,650.12 |
| 792730/264220 | 12/31/06 | $131,409.75 | | | | |
| | 04/16/07 | | $118,268.93 | $0.16 | 37005 | $13,140.98 |
| 798681/264234 | 03/31/07 | $275,323.82 | | | | $275,323.82 |
| #20 | 03/31/07 | $5,104.00 | | | | $5,104.00 |
| #21 | 07/31/07 | $216,734.00 | | | | $216,734.00 |
| Total Due | | $1,126,047.81 | $565,997.00 | $0.37 | | $560,050.44 |

6216 Oxon Hill Road; Oxon Hill, MD 20475
Phone: 301-686-9090    Fax: 301-686-9093

Equal Opportunity Employer M/F

EXHIBIT
6

# APPLICATION AND CERTIFICATION FOR PAYMENT

AIA DOCUMENT G702    PAGE ONE OF TWO PAGE(S)

TO OWNER: William V. Walsh Constructor
14674 Rothgeb Drive
Rockville, Maryland 20850

PROJECT: Lincoln Circle Rehabilitation
Project No: J-128

APPLICATION NO: 10

PERIOD TO: 31-Jul-07

AGGREMENT NOS:

CONTRACT DATE: 23-Jul-04

Distribution to:

[ ] OWNER
[ ] ARCHITECT
[X] CONTRACTOR

FROM CONTRACTOR:
Senate Asphalt, a Division of The Lane Construction Corporation
6216 Oxon Hill Road
Oxon Hill, Maryland 20745

Contact: Rob McKeever

CONTRACT FOR: Asphalt Paving

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation Sheet, AIA Document G703, is attached.

SEE ATTACHED SWORN STATEMENT FROM CONTRACTOR TO OWNER

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM | $ | 476,772.00 |
| 2. Net change by Change Orders | $ | 549,275.82 |
| 3. CONTRACT SUM TO DATE (Line 1 ±2) | $ | 1,026,047.82 |
| 4. TOTAL COMPLETED & STORED TO DATE (Column G on G703) | $ | 1,026,047.82 |
| 5. RETAINAGE: (Original Contract Only) | | |
| a. 0 % of Completed Work (Column D + E on G703) | $ | |
| b. 0 % of Stored Material (Column F on G703) | $ | |
| Total Retainage (Lines 5a + 5b or Total in Column I of G703) | $ | 0.00 |
| 6. TOTAL EARNED LESS RETAINAGE (Line 4 Less Line 5 Total) | $ | 1,026,047.82 |
| 7. LESS PREVIOUS CERTIFICATES FOR PAYMENT (Line 6 from prior Certificate) | $ | 565,997.40 |
| 8. CURRENT PAYMENT DUE | $ | 460,050.42 |
| 9. BALANCE TO FINISH, INCLUDING RETAINAGE (Line 3 less Line 6) | $ | 0.00 |

431,513 $
708,285 $

3,000,000

0.00

$ 78,285 $

312288 $

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $432,541.82 | $0.00 |
| Total Pending this Month | $216,734.00 | $0.00 |
| TOTALS | $649,275.82 | $0.00 |
| NET CHANGES by Change Order | $649,275.82 | $0.00 |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR: Senate Asphalt, a Division of The Lane Construction Corporation

By: _____    Date: August 9, 2007

State of Virginia    City / County of Alexandria
Subscribed and sworn to before me this 9th day of August, 2007
Notary Public: Lisa D. Whisenant
My Commission expires: 10/31/08    Registry # 343626

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising the application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED ........... $    560,050.42

(Attach explanation if amount certified differs from the amount applied. Initial all figures on this Application and on the Continuation Sheet that are changed to conform with the amount certified.)

ARCHITECT:

By: _____    Date: _____

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

AIA DOCUMENT G702 · APPLICATION AND CERTIFICATION FOR PAYMENT · 1992 EDITION · AIA · ©1992
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON, DC 20006-5292

# CONTINUATION SHEET

AIA Document G702, APPLICATION AND CERTIFICATION FOR PAYMENT, containing
Contractor's signed certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column 1 on Contracts where variable retainage for line items may apply.

*AIA DOCUMENT G703*

Lincoln Circle Rehabilit

| APPLICATION NO: | 10 |
|---|---|
| APPLICATION DATE: | 1-Jul-07 |
| PERIOD TO: | 31-Jul-07 |
| WALSH'S PROJECT NO: | J-128 |

| A ITEM NO. | B DESCRIPTION OF WORK | C CONTRACT VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION | E COMPLETED THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G÷C) | H BALANCE TO FINISH (C-G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
|  | ORIGINAL CONTRACT |  |  |  |  |  |  |  |  |
| 1 | Lincoln Circle East | $171,643.00 | $171,643.00 | $0.00 | $0.00 | $171,643.00 | 100.00% | $0.00 | $17,164.30 |
| 2 | Lincoln Circle West | $91,439.00 | $91,439.00 | $0.00 | $0.00 | $91,439.00 | 100.00% | $0.00 | $9,143.90 |
| 3 | 23rd Street North | $36,829.00 | $36,829.00 | $0.00 | $0.00 | $36,829.00 | 100.00% | $0.00 | $3,682.90 |
| 4 | Henry Bacon Drive | $50,061.00 | $50,061.00 | $0.00 | $0.00 | $50,061.00 | 100.00% | $0.00 | $5,006.10 |
| 5 | Ramp A | $35,758.00 | $35,758.00 | $0.00 | $0.00 | $35,758.00 | 100.00% | $0.00 | $3,575.80 |
| 6 | 23rd Street South | $23,374.00 | $23,374.00 | $0.00 | $0.00 | $23,374.00 | 100.00% | $0.00 | $2,337.40 |
| 7 | Daniel French Drive | $33,102.00 | $33,102.00 | $0.00 | $0.00 | $33,102.00 | 100.00% | $0.00 | $3,310.20 |
| 8 | Ramp B | $19,071.00 | $19,071.00 | $0.00 | $0.00 | $19,071.00 | 100.00% | $0.00 | $1,907.10 |
| 9 | Ramp C | $15,495.00 | $15,495.00 | $0.00 | $0.00 | $15,495.00 | 100.00% | $0.00 | $1,549.50 |
|  | Contract Changes |  |  |  |  |  |  |  |  |
| 10 | CO #1 Temp Asphalt 23rd St. Duct | $9,160.00 | $9,160.00 | $0.00 | $0.00 | $9,160.00 | 100.00% | $0.00 | $916.00 |
| 11 | CO #2 Reconstruction of Ramp A | $229,767.00 | $229,767.00 | $0.00 | $0.00 | $229,767.00 | 100.00% | $0.00 | $22,976.70 |
| 12 | Grade Changes, Areas 7, 8 & 9 | $31,668.94 | $31,668.94 | $0.00 | $0.00 | $31,668.94 | 100.00% | $0.00 | $3,166.89 |
| 13 | Henry Bacon Drive Grade Change | $7,454.88 | $7,454.88 | $0.00 | $0.00 | $7,454.88 | 100.00% | $0.00 | $745.49 |
| 14 | Tear Drop Demo (8/8/2006) | $14,625.00 | $14,625.00 | $0.00 | $0.00 | $14,625.00 | 100.00% | $0.00 | $1,462.50 |
| 15 | Tear Drop Demo (11/3/2006) | $9,750.00 | $9,750.00 | $0.00 | $0.00 | $9,750.00 | 100.00% | $0.00 | $975.00 |
| 16 | Reconstruction Daniel French Drive | $78,577.00 | $78,577.00 | $0.00 | $0.00 | $78,577.00 | 100.00% | $0.00 | $7,857.70 |
| 17 | Undercutting Daniel French Drive | $10,663.00 | $10,663.00 | $0.00 | $0.00 | $10,663.00 | 100.00% | $0.00 | $1,066.30 |
| 18 | 23rd Street South Bus Pad Asphalt | $6,396.00 | $6,396.00 | $0.00 | $0.00 | $6,396.00 | 100.00% | $0.00 | $639.60 |
| 19 | CO #3 21-A Stone Daniel French | $29,376.00 | $29,376.00 | $0.00 | $0.00 | $29,376.00 | 100.00% | $0.00 | $2,937.60 |
| 20 | Repair of Motorcade Lincoln Circle | $5,104.00 | $5,104.00 | $0.00 | $0.00 | $5,104.00 | 100.00% | $0.00 | $510.40 |
|  | Pending Changes |  |  |  |  |  |  |  |  |
| 21 | Time Extension / Material Escalation | $216,734.00 | $0.00 | $216,734.00 | $0.00 | $216,734.00 | 100.00% | $0.00 | $21,673.40 |
|  | APPROVED GRAND TOTALS Pending Changes | $1,126,047.82 0.00 | $909,313.82 | $216,734.00 | $0.00 | $1,126,047.82 | 100.00% | $0.00 | $112,604.78 |

JAMES V. WALSH, President/CEO



**WALSH**
CONSTRUCTION
COMPANY, INC.

*General Contractor*
14674 Rothgeb Drive,
Rockville, MD 20850

Phone: 301-738-1199, Fax: 301-738-1177, Bid Fax: 301-738-1311

June 28, 2006

McKissack & McKissack
1401 New York Avenue, N.W.
Suite 900
Washington, D.C. 20005-2102
**ATTN: Ms. Christine Merdon; and
        Mr. Walter Huber**

          **RE:**   **Task Order No. 7, Lincoln Circle Rehabilitation
        William V. Walsh Project No. J-128**

        **Subj:**   **Amended and Certified Claim / Request For Equitable Adjustment to
        Contract Amount and Contract Time Stemming from Design Defects**

                **Delays/Extended Contract Performance Costs and Added Labor
        Costs $3,232,534**

                **Request for Contracting Officer's Final Decision**

         **Ref:**   **2/7/2006 WVW REA**

Dear Ms. Merdon and Mr. Huber:

     Reference is made to our contract (i.e. Task Order No. 7) for the above project as well as
the numerous letters and meetings which have addressed delay issues and problems occurring on
the project. In accordance with our prior notifications, we are herewith submitting this Revised /
Amended Claim / Request for an Equitable Adjustment to our contract amount in the amount of
$3,232,534. We have previously a contract time extension for 392 calendar days, from the
current adjusted contract completion date of March 11, 2006 to the new current projected
contract completion date of April 7, 2007. Alternatively, we herein are requesting a time
extension of 295 calendar days, to the extent we are required to accelerate work in order to
substantially complete our work by December 31, 2006.

**EXHIBIT
7**

McKissack & McKissack
June 28, 2006
Page 2

As you are aware, our February 6, 2006 REA was premised on the additional costs and time we expected through our projected completion date of April 7, 2007. Since this submission, we have been asked to recover excusable delay, by way of project acceleration, in order to effect substantial completion of our work activities by December 31, 2006. As such, this Amended Claim / Request for Equitable Adjustment is based on both actual costs incurred to date as well as projected costs we expect to incur, including the cost of acceleration. To the extent the forward pricing aspects of this Request for Equitable Adjustment change, William V. Walsh Construction Company, Inc. ("WVW") reserves all rights to further supplement and/or amend this Request.

At the present time, we are submitting this Amended Claim / Request for Equitable Adjustment as a Certified Claim and we are requesting a Final Decision of the Contracting Officer on this matter. To the extent the Contracting Officer's Final Decision determines entitlement to exist then we expect a prompt resolution on quantum. Alternatively, to the extent the Contracting Officer's Final Decision denies this Amended Claim / Request for Equitable Adjustment then WVW is prepared to appeal the Final Decision of the Contracting Officer in accordance with the Contract Disputes Act. In this regard, since our contract is with McKissack & McKissack, any appeal will have to be prosecuted through McKissack. If McKissack & McKissack is unwilling to sponsor such an appeal, then be assured the WVW will pursue appropriate recourse against McKissack & McKissack.

Given the fact that McKissack & McKissack is in privity of contract with the Government, WVW expects McKissack & McKissack to promptly pass this claim through to the Government along with the Certification required by the Contract Disputes Act and a Request for a Final Decision of the Contracting Officer on this matter in order to start the necessary time deadlines and the accrual of CDA interest. Again, to the extent McKissack & McKissack refuses to do so, our only recourse will be against McKissack & McKissack.

### Entitlement Overview

WVW's entitlement to the costs and time claimed herein remains predominately the same as written in our February 7, 2006 initial Request for Equitable Adjustment. As such, we have recast the entitlement and quantum information herein and updated the information to reflect recent events since our initial REA.

### Factual Background

In September 2003, WVW was issued the contract for Task Order No. 7. WVW is under contract to McKissack & McKissack who is serving as the Owner's Construction Manager. We understand that on Task Order No. 7, McKissack & McKissack did not serve in the role of a design builder.

McKissack & McKissack
June 28, 2006
Page 3

As the Construction Manager, we understand McKissack & McKissack is responsible for interacting with the various government agencies having oversight over this project (i.e. the Nation Park Service, the Department of Interior and the District of Columbia Department of Transportation). As the Construction Manager, we also understand McKissack & McKissack is responsible for interaction with the Owner's designer, CH2MHill.

The original contract completion date for the completion of our work pursuant to Task Order No. 7 was May 5, 2005. To date, Contract Modification Nos. 1 and 2 have adjusted this contract completion date to March 11, 2006. Through Contract Modification No. 3, the current adjusted contract amount totals $13,307,795.[1]

As McKissack & McKissack is aware, WVW commenced work on this project pursuant to our approved baseline project schedule. This approved schedule has been adjusted for the time extensions already received pursuant to Contract Modification Nos. 1 and 2. Each month, WVW submits with its Payment Application a progressed construction scheduled based on the approved changes to the contract. However, due to the numerous delays, design problems and changes that have been experienced on the project, the approved adjusted project schedule is no longer a realistic construction management tool. It does not include as-built information for delays and the work on the project has not proceeded in accordance with the construction phasing contemplated in the approved project schedule.

For these reasons, on October 26, 2005, WVW developed an alternate "control" schedule which more realistically planned and projected the completion of remaining work activities on the project as of November 2005. Since then, WVW has been submitting both the approved contract schedule and our alternate control schedule on a monthly basis; updating the progress of the work in both schedules. Our alternate "control" schedule currently continues to project a completion date of April 7, 2007 or later.

We also note that we have since established an accelerated control schedule to address the NPS demands that the project finish by 12-31-06, as well as deletion of the East Plaza and resequencing issues. All of this information has been timely and detailed to address the ever changing needs of the project.

The story behind the project delays and numerous problems and changes we have encountered on this project can all be traced to the original project design, which we have now come to conclude was seriously defective and flawed. As you are aware, when WVW was awarded this contract we were informed the contract drawings were 99% complete. Any remaining design issues (to the extent there were any) WVW understood would be minor and insignificant. As such, WVW relied on the contract drawings to provide our lump sum bid proposal for performing the contract work in the specific contract time period. Based on the

---

[1] Currently there are literally dozens of pending change proposals that have been submitted, but which have not yet been resolved. The approximate value of the pending changes totals more than $300,000. This Request does not include and is separate from our pending change proposals.

McKissack & McKissack
June 28, 2006
Page 4

Government's implied warranty and adequacy of the plans and specifications, we reasonably expected the contract drawings would be suitable for their intended purpose.

As work on the project progressed, however, WVW learned otherwise. The major design deficiency related to the contract drawings stemmed from erroneous elevations depicted on the contract drawings. This was discovered as WVW began performing work and realized that work performed to the contract drawings was being installed at elevations that did not appear to be consistent with the existing conditions. In turn, this often caused WVW to reperform work consistent with the existing conditions.

The design elevation issues were addressed on a regular basis at each of the weekly progress meetings (which were attended by McKissack & McKissack, the National Park Service and CH2MHill). They were also addressed in literally hundreds of RFIs requesting clarification as to how work should be installed. Of course, there were also dozens of letters submitted concerning these issues. Further, the design problems stemming from the erroneous elevations depicted on the contract drawings was the central focus of our partnering meeting with McKissack & McKissack as well as the Owner and CH2MHill on May 13, 2005.

It was nearly one year into the project when WVW finally understood why the elevations on the contract drawings were deficient and incorrect. At a meeting in late October 2004, Mark Osborne of CH2MHill finally acknowledged the elevations depicted on the contract drawings were established from an aerial survey and then was spot checked by a surveyor.

It is a well known fact in the construction industry that aerial surveys are not appropriate for detailed design construction documents. Aerial surveys can establish elevations that are plus or minus one foot from the actual elevations. As such, CH2MHill was negligent in using aerial surveys for purposes of developing and issuing the construction contract drawings. As an experienced design consulting firm, CH2MHill should have known that aerial surveys do not provide the accuracy required for actual construction work, particularly when a project involves extensive civil work including roadways, sidewalks, curbs, gutters and underground utilities.

When this fact finally came to light, WVW immediately sent a letter requesting a detailed survey be performed in order to obtain accurate elevation information for purposes of revising the contract drawings in order for WVW to construct the project. This request was simply ignored.

For this reason, WVW stopped all work on the project and performed our own survey as a change to the contract in order to help expedite the collection of elevation information so contract drawings could be reissued with correct design information. WVW completed this survey in mid-December 2004. At the time, WVW provided the survey information, we understood McKissick & McKissick was to transmit the information to CH2MHill in order to incorporate the information into a complete revised set of drawings reflecting accurate design information for construction purposes.

McKissack & McKissack
June 28, 2006
Page 5

To our dismay, in January 2005 CH2MHill issued revised drawings which did not incorporate the survey information that had been provided. Rather, the revised drawings only included the centerline elevation for roadways and top of curbs. Nothing in the revised drawings provided us any information concerning elevations for sidewalks, handicap ramps and storm drainage inlets, manholes, sub-grades, etc. Further, the revised drawings did not cloud or depict changes on the original drawings and design details for manholes, underground foundations, roadway subgrades and any adjustments to existing subgrades in the construction areas.

After receiving the revised drawings issued by CH2MHill, WVW immediately advised McKissack and McKissack the drawings were not complete; they did not provide all of the information gathered in the survey performed by WVW and they were not adequate or suitable for the intended construction purpose. Simply stated, the revised drawings were also deficient. CH2MHill was fully aware of what information WVW needed on the revised design drawings. Why the revised drawings did not provide the necessary design information is a question only CH2MHill can answer. However, the result of having deficient revised drawings continued to impact and delay the performance of our work. Essentially, any work that could be performed had to be performed on an RFI basis with every detail and aspect of the work being clarified by onsite designers. This approach required the work to be performed in a piecemeal, ad hoc, catch-as-catch can and unproductive basis. It also forced WVW to perform work in any phase of the project where work could be performed as opposed to the original phasing plan contemplated in our contract schedule. This required WVW to coordinate and provide manpower and supervision for performing work in as many as 19 work areas at any given time as opposed to only 7 work areas at a time, as contemplated in our original schedule and construction phasing plan.

In response to our complaints, beginning in February 2005 the National Park Service promised revised drawings would be issued containing accurate and detailed information in order for WVW to perform the work. This promise was made again in March, April and each week for every month thereafter.

Eventually, in July 2005, WVW received a revised set of drawings issued by CH2MHill which purportedly represented updated, complete and accurate design drawings for construction of the work. If this had been the case, work on the project would now be a great deal further along then it currently is. The fact is the revised drawings issued in July 2005 were just as worthless and deficient as the drawings issued in January 2005. This was extremely disappointing to WVW. For months we had been strung along (performing contract work on an RFI basis) on the premise that revised, accurate and detailed drawings would be issued on a prompt basis. While hindsight is perfect, had we known in January 2005 that the drawings we would received in July 2005 would be just as deficient, we would have simply suspended all work on the project until an accurate set of design construction documents were issued. The fact that we did not, has resulted in the significant amount of additional costs requested herein.

McKissack & McKissack
June 28, 2006
Page 6

The problems with the July 2005 drawings were immediately brought to the attention of McKissack & McKissack. The issues were discussed at numerous project meetings and, once again, the National Park Service promised that reissued revised drawings would be provided with the correct design information. This never happened. Instead, in October 2005 Walsh was directed to use the July 2005 drawings with the incorrect, incomplete and erroneous design information.

This prompted our letter of October 23, 2005 in which we advised that performance of the work in accordance with the July 2005 drawings would result in serious project safety and control concerns. By letter dated October 25, 2005, McKissack & McKissack forwarded our letter to the Contracting Officer, Michael Fox. The McKissack & McKissack letter included a chronology of the problems with the contract design drawings and attached a six-page log which provided a sampling of discrepancies, problems and defects discovered in the July 2005 revised drawings. The McKissack & McKissack letter also attached a 14-page log of revisions made to the original contract documents by way of RFI clarifications and answers.

In mid-November 2005, McKissack once again promised to reissue the revised drawings with correct design information. To date no such drawings have been reissued. The promise to issue revised drawings has been reiterated to WVW in numerous conversations and at weekly Progress Meetings since November 2005. Recently (at the Progress Meeting of 1-31-06) it was stated by McKissack for the first time that they are unsure if the NPS is actually revising the drawings. In the meantime WVW continues to be strung along, performing work by way of RFIs and field discussions/adjustments provided by McKissack & National Park Service representatives. This request for equitable adjustment is based upon our best estimate of the situation and is subject to revision upon the actual disposition of revised drawings.

It is for this reason WVW developed its alternate "control" project schedule. In order to perform the work in a controlled and safe fashion, work needs to occur in limited areas at any given time and in the restricted sequence contemplated in our alternate "control" schedule. Further, the alternate control schedule attempts to mirror (albeit on a delayed basis) the construction phasing sequence contemplated in our original project schedule.

Subsequently, WVW developed its accelerated control schedule, to address a myriad of issues including deletion of the East Plaza, the NPS demand to complete by 12/31/06, certain work resequencing, WVW's need to maintain its orderly progression of areas, and the numerous delays such as the Constitution Ave. night work, modifications to stone curb, changes to exposed aggregate sidewalk, etc. Notably, we proceeded on many changes without having a final change in order to minimize impact and give the NPS a realistic chance at 12/31/06 completion. This attitude should be reciprocated in timely review of this proposal.

It is particularly important to note the continued lack of timeliness in any administrative capacity by the NPS and M&M. In a meeting on 3/15/06 the subject of liquidated damages was discussed at length and the primary issue was a lack of approved schedule by M&M. Further,

McKissack & McKissack
June 28, 2006
Page 7

the issue of changes was discussed at length and WVW was the only part with adequate understanding and documentation. Notably, the many changes promised to be received by WVW by April 30th are still only partially received. Further there has been no review/comment of any import to our previous request for an equitable adjustment dated 2/6/06.

We have expressed our concern regarding the administrative disconnect between M&M and the NPS and have received assurances that these issues will not hold up resolution. We will be holding all parties accountable for that position.

Since we are past the March 11, 2006 adjusted contract period we are now financing the time extension as well as other changes. We will pursue these finance costs separately when they are known.

As a safety matter, under no circumstances should the National Park Service expect our work to be performed in any other sequence other than the sequence contemplated in our accelerated control schedule. To do so would result in serious safety and project control issues, which will endanger not only WVW's workforce, but also the public in general (including vehicular traffic and pedestrian traffic).[2]

### Quantum Overview

Our Request for Equitable Adjustment essentially includes three components: (1) our costs for delays/extended performance stemming from the design defects; (2) our costs for added labor stemming from the design defects; and (3) the cost of certain subcontractors stemming from the design defects.

### A.    Delays/Extended Performance Costs Stemming From Design Defects

The period from Mar. 11, 2006 to Dec. 31, 2006 is 295 calendar days. Attached is our computation of additional costs in the amount of $1,671,067 for this delay/extended performance. In calculating these costs, WVW used built up pricing based on actual costs incurred to date and projected costs to be incurred. We have computed these costs for both our on-site overhead and management as well as for our continuing labor expense due to the delay/extended performance.

---

[2] WVW has participated in discussions with McKissack & McKissack and the National Park Service concerning our construction sequence. To date, all parties have agreed regarding the current construction sequence reflected in the accelerated control schedule. We are willing to listen to additional input but to the extent the ideas are not safe, they will not be implemented.

McKissack & McKissack
June 28, 2006
Page 8


**B.    Added Labor Costs Stemming From Design Defects**

Our added labor costs have been computed based on an analysis of the number of work areas we should have worked in at any given time (i.e. 7 work areas), versus the number of work areas we actually had to work in at any given time (i.e. as many of 19 work areas), simply to keep moving with available work. This required a significant amount of additional labor as opposed to using a smaller labor crew to work more efficiently in the areas we had planned to work in.

The attached chart depicts the planned versus actual work areas from the start of the job through March 11, 2006. It also depicts actual number of work areas we actually work in, based on historical data.

But for the design deficiencies and the piecemeal manner in which they have caused our work to be performed, none of these added labor costs would have been incurred. The cost for this additional labor totals $251,887.


**C.    Additional Subcontractor Costs Stemming From the Design Defects**

The primary subcontractors we are utilizing on this project include: Kalos Inc., Lorton Contracting, Freestate Electric, Senate Paving, Traffic Group, Mactec, Burgess & Niple, and Davey Tree. Just as the defective and incomplete design has impacted our performance, it has also impacted and delayed the performance of these subcontractors. The requested additional costs for several of these subcontractors are attached. The other prices are based on estimates derived from discussions and current known conditions. The projected additional costs for our subcontractors total $1,309,580.

**Conclusion and Certification**

WVW prides its self on the work we do for the Nation's Monuments. We have successfully completed numerous Memorial projects. On none of these projects have we ever encountered the design problems we have been confronted with on this project. We have endured numerous personnel turnovers within the Owner's organization as well as within McKissack & McKissack. We have attempted in every instance to be patient and to educate the new players. Unfortunately, the combination of deficient contract documents and many complete changeovers in personnel has created the worst possible conditions for constructing a project whose essence for safe and timely performance relies upon coordination of the many parties. Notably it is our recent understanding that once again several key positions for McKissack are in the process of being replaced right now, and revised documents are apparently not planned.

Despite the challenges with which WVW has been confronted, we have made every attempt to keep the project moving. We undertook the performance of a survey when we

McKissack & McKissack
June 28, 2006
Page 9

recognized it was the only thing that might help get the project back on track. We have attempted to perform work on an extremely piecemeal basis and we have had to re-perform work on numerous occasions due to design problems. We have re-adjusted, when, where and how work will be performed for safety and control reasons. This aspect of the project that has always been at the forefront of WVW's priorities, but from the start any planning efforts are rendered moot almost immediately. What started as a 1 ½ year project has now turned into a 3 year project, but we intend to finish it with or without the design information we so sorely need. And, we intend to finish the project in a safe and controlled fashion notwithstanding any plans suggested otherwise for the sake of a premature project opening.

The cost to this Company and to our sub-contractors is significant. But for the inadequate design, which was unsuitable for its intended purpose, and administrative delays this project likely would have been completed on time and without the additional costs for which we are now requesting compensation. Therefore, we would hope these additional costs can be promptly resolved by way of a change order and an amicable resolution.

In accordance with the Contract Disputes Act: I certify this claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amounts requested accurately reflect the contract adjustment for which the contractor believes the Government is liable, and that I am duly authorized to certify this claim on behalf of the Contractor.

Sincerely,

WILLIAM V. WALSH CONSTRUCTION COMPANY

James V. Walsh
President/CEO

Cc:    Roger Jones, Esq.
       Christina Cavey
       C. Jackson

Enclosures

**Notes and comments regarding request for equitable adjustment (revised for 6-28-
06 submission)**

1. The time extension is calculated using the time periods as follows (note this is based
upon our submitted schedules):

      TO #4 extended time is for the time period 11/15/05 to 7/22/06 per our schedule
revised since the original proposal submission.

      TO #7 extended time is for the time period 3/11/06 to 12/31/06. This totals 295
days, or 9.8 months for extension.

For calculation of allocation, we note the following:

      We are estimating an allocation to the task orders. However, the total requested
represents the entire amount estimated to complete Task Orders #4 and #7. Changing the
allocation on one task order will not change the overall amount requested on the
combined projects.

      The allocation of effort to Task Order # 4 is revised to 21%, and Task Order # 7 is
78%. We note that apparently this has been accepted as the basis for a breakdown by
both the NPS and M&M.

2. The schedule used for calculation of work areas is our control schedule of 11/30/05.
The calculation of the number of areas 7.3 worked in per the original contract is arrived
at by projecting the areas from our control schedule onto the original schedule so that our
analysis is consistent with both schedules.

3. The basis for analysis for time extension and acceleration is the enclosed original
schedule adding delays and modifications. Owner caused delays have pushed both the
original schedule and the control schedule well past the 4/7/07 completion date used in
our previous calculation. This proposal is for the time extension costs and acceleration
costs required to complete by 12/31/06.

The completion date of 12/31/06 is also the basis for our accelerated control schedule of
4/18/06.

We have enclosed a copy of both the modified original schedule and the accelerated
control schedule of 4/18/06. We also reference but have not attached our control
schedule along with any updates. These are incorporated by reference and have been
supplied numerous times already.

We note that our control schedule had specific notes and comments that defined sequences and set terms and conditions to the schedule. These are specifically included in this resubmission. We emphasize the importance of beneficial occupancy and acceptance of areas as they are completed. We specifically exclude costs to repair damage, do maintenance, etc. by the failure to accept areas in a reasonable fashion. We also specifically reiterate that this is also a safety issue and we will hold others responsible for their failure to adequately address the project control issues in our correspondence.

4. Please note that there have been subsequent delays to our schedule of 4/18/06, and time extension, impact, and acceleration for these subsequent delays is specifically excluded. We will submit for that separately.

5. We exclude any work to the final as-built requirement other than to keep current penciled notes and attach sketch and drawing revisions for turnover and incorporation by others into final as-built documents. We also have already submitted all procedures and information for approval. Compilation of anything into a comprehensive as-built document is by others. We have made no provisions in our staffing plan for an effort additional to this.

6. Specific inspection schedules, procedures, and quality control parameters must be agreed upon in order to meet the schedule. Our request is predicated upon this agreement.

7. East Plaza Bollard notes and comments

Subsequent to our previous time extension submission, the East Plaza work has been deleted from our contract. The notes below are modified per this:

   Ornamental bollards:  Deleted from contract

   Retractable bollards:  Deleted from contract

11. Senate Asphalt

Milling Remaining 11,622 m$^2$ $\Delta$ = \$1.50/ m$^2$ - total change: \$ 17,433

Type 4 Superpave 9.5mm Asphalt Remaining 2722 metric tons $\Delta$ = \$38.80/metric ton - total change: \$105,614

Superpave AC 19mm Wedge/Leveling Remaining 3674 metric tons $\Delta$ = \$25.50/metric ton – total change: \$93, 93,687.

Total escalation in asphalt and milling costs: \$216,734

12. It is anticipated that as a part of the acceleration, WVW's staff will have to work overtime and off hours. This is included with the Field Supervision and Administrative labor as well as the Time Extension Activity Labor.

13. It is also anticipated that WVW's staff will have closeout activities beyond the 12/31/06 completion and this is also included in the proposal.

William V. Walsh Construction Co., Inc.                                                      6/28/2006

SUBCONTRACTOR PRICING SUMMARY

PROJECT NAME: ▓▓▓▓▓▓▓▓▓▓▓

DESCRIPTION: Lincoln Circle

SUBCONTRACTOR PRICING

| DIV/ SPEC. | SUBCONTRACTOR NAME | WORK DESCRIPTION | PROPOSAL DATE | PROPOSAL AMOUNT | NOTES/REMARKS |
|---|---|---|---|---|---|
| | Lorton Contracting | Stone work | 26-Jun-06 | $ | |
| | Freestate | Electrical | 22-Jun-06 | $ | |
| | Kalos | Utilites/walks | | $ | |
| | Retractable bollards | | | $    - | See notes and comments in cover letter |
| | Retractable bollard test | | | $    - | See notes and comments in cover letter |
| | K-12 ornamental  bollard test | | | $    - | See notes and comments in cover letter |
| | Traffic Group | | | $ | Estimated increase of 30% of original $50,000 contract for continuing review |
| | Mactec | | | $ | See notes and comments in cover letter |
| | Burgess & Niple | | | $ | |
| | Senate Asphalt | | | $   216,734.00 | See notes and comments in cover letter - From 4/24/06 proposal |
| | Davey Tree | | | $ | Unit price contract, estimated 5% increase |
| | Wood Steel | Rebar installation | | $ | Labor Escalation 25 Tons @ 3.20/ estimated amount (barrier wall) |

SUBCONTRACTOR SUBTOTAL          $ 1,117,079.00



# SENATE ASPHALT

Proposal To:                                      Date:    17-Apr-06
William V. Walsh Construction Company, Inc.       Bid #:   06-0001
14674 Rothgeb Drive                               Project Description:
Rockville, Maryland 20850                         Lincoln Circle Rehabilitation-Task Order 7
Attn: Mr. James Walsh                             Washington, D.C.
                                                  **Revised Pricing**

We are pleased to quote the following prices in accordance with your request on the above referenced project. We would like to point out that this quotation is subject to the Terms and Conditions stated on page 2

| Description | Estimated Quantity | Unit Price | Estimated Amount |
|---|---|---|---|
| 41301 - Asphalt Pavement Milling | 11,622 sq M | $4.75 | $55,203.50 |
| 41801AD - Superpave AC 9.5mm agg, Type 4 | 2,722 Mtons | $106.50 | $289,850.40 |
| 41801CD - Superpave AC 19mm agg | 525 MTons | $90.75 | $47,643.75 |
| 41802CD - Superpave AC 19mm agg, wedge/Level | 3,149 MTons | $90.75 | $285,771.75 |

| | |
|---|---|
| Total Amount ============================>>> | $678,469.40 |

- Price is for all work to be completed by October 31, 2006.
- This is a unit price proposal based on bid quantities from drawings titled "Rehabilitation of Lincoln Memorial
   Circle," including typical sections, tabulations of quantities, construction plan, profile and traffic control plan.
- Proposal includes 8 mobilizations for asphalt laydown and 7 mobilizations for milling. Additional mobilizations
   are $ 2,500.00 each.
- Truck and equipment access to be provided by others.
- Maintenance od traffic operations are specifically excluded.
- Additional exclusions: winter pavement maintenance, survey/layout, excavation, earthwork, undercutting, proofrilling
   stone work, patching/utility patching, utility adjustments, sawcutting, prime coat, offsite work, pavement markings
   (either temporary or parmanent), bonds, public space permits, trails, driveways, sings and testing.

We thank you for this opportunity to quote on this work. This proposal is valid for 30 days but may be accepted at any later date at
the sole option of Senate Asphalt. Your signing and returning one copy of this proposal will constitute acceptance of our proposal
by you and will be our authorization to proceed with the work when we are notified to proceed. This proposal includes all Terms
and Conditions on page 2 of this document and your signature hereon acknowledges your receipt and agreement to those terms.
This pricing is good for work performed thru October 31, 2006.

ACCEPTED:                                          Senate Asphalt
William V. Walsh Construction Company, Inc.
By:_____                By: _____
Name:_____                 Name:  Robert L. McKeever Jr.
Title:_____ Date:_____                 Title:  Plant Manager
          6216 Oxon Hill Road;  Oxon Hill, MD 20745;  PHONE (301) 686-9090;  FAX (301) 686-9093

# Terms and Conditions

## RESPONSIBILITIES OF THE OWNER AND/OR CONTRACTORS

1. Location and adjustments of underground facilities and/or utility structures including manholes, water and gas valves.
2. Owner shall not subject our work to traffic or other loads in excess of the design capacity.
3. Senate Asphalt will accept no back charges unless agreed to in writing by both parties in advance.
4. Obtaining all permits and payment of fees prior to beginning of work by Senate Asphalt.
5. Damage to above and underground utilities, facilities and other items caused by equipment to carry out work.

## CREDIT AND PAYMENT

1. Prices quoted are net work invoiced monthly without retainage unless agreed to in writing prior to the start of Senate Asphalt's work.
2. Payments are due 30 days from invoice date.
3. If any payment is not made when due, then Senate Asphalt may suspend operations until payment is received. Interest at the rate of one and one-half percent (11/2 %) per month shall be charged and paid on all unpaid balances from the due date to the date payment is received.
4. In the event that Senate Asphalt retains an attorney to recover any monies due under this contract, the owner/contractor agrees to pay attorney fees are hereby established and agreed to as twenty-five percent (25%) of the amount found to be due and owing, which percentage is hereby stipulated as reasonable. Buyer consents to jurisdiction of the Courts of the Commonwealth of Virginia over any dispute arising under this proposal.

## SUBGRADE, SUBBASE, AND/OR BASE COURSES

1. Drainage not guaranteed on areas having less than 2% grade. No guarantee against rupture and/or displacement.
2. Pavement designs are not guaranteed.
3. Depths indicated are to be constructed as an average depth within specified tolerance.
4. All existing subbase and subgrade to be proof rolled, compacted, dry, in stable condition and plus or minus 0.2 feet of proposed elevation.
5. Senate Asphalt shall not be responsible for subgrade and/or subbase conditions, compaction thereof, or unmarked utilities.
6. It is understood that if after being made aware of undesirable subbase and/or subgrade or base course conditions, the owner or contractor insists on the installation of any part of the pavement without authorizing corrective action, Senate Asphalt will not be responsible in any way for any subsequent pavement failures, and will be paid as stated in the contract.
7. Senate Asphalt shall not be liable for any failure and completion of the work for causes beyond our control, including but not limited to delays or failures caused by Acts of God, weather, suppliers, fuel, raw materials shortages, plant failures, other contractors and/or subcontractors, acts of the owner(s), accidents, or other mishaps affecting this work or other operations in which we are involved, directly or indirectly.

## ADDITIONAL WORK

1. Additional work beyond our stated scope of work in the original proposal will be negotiated and agreed in writing by an authorized agent prior to the performance of any extra work regardless of the state of completion at the time the work is performed. No deduction to the contract amount may be made on account of defective work unless Seller has been given three (3) business days written notice and has not commenced corrective action.

## SCHEDULING

1. Senate Asphalt will endeavor to fully cooperate with the progress of the work, and Senate Asphalt shall not be bound to any construction schedule unless agreed to in writing by both parties.
2. Two weeks notice of availability is required.
3. It is understood that Senate Asphalt has a winter shutdown for approximately 90 days beginning around December 20. Senate Asphalt shall not be held liable for non-performance during this shutdown period. Any work which may be scheduled or requested by the owner/contractor during this shutdown period without prior consent of Senate Asphalt shall be done at the owner's/contractor's risk and expense.

## ACCEPTANCE

1. This proposal is valid for 30 days, but may be accepted at any later date at the sole option of Senate Asphalt.
2. This proposal is not a contract and shall become binding only upon the contractor's acceptance below or upon the contractor commencing performance. This proposal shall be attached and become part of the contract between the parties and may not be modified except by a writing signed by both parties.

Signed and accepted:_____      Date:_____
Proposal void unless second page is signed and accepted.

(Page 2 of 2)

| PAY ITEM/ SPEC. | WORK DESCRIPTION | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 41301x | Asphalt Pavement Milling | 11,696 | $m^2$ | $3.25 | 38,012 |
| 41301x | Daniel French Drive 40mm Milling | 0 | $m^2$ | $3.25 | 0 |
| 41301x | Bridge Approach Milling | 120 | $m^2$ | $3.25 | 390 |
| 41801AD | Superpave Asphalt Concrete, 9.5 mm agg, Type 4 | 2,582 | t | $67.70 | 174,801 |
| 41801AD | Bridge Approach Superpave Asphalt Concrete, 9.5 mm agg, Type 4 | 73 | t | $67.70 | 4,942 |
| 41801AD | Daniel French Drive Superpave Asphalt Concrete, 9.5 mm agg, Type 4 | 168 | t | $67.70 | 11,374 |
| 41801CD | Superpave Asphalt Concrete, 19 mm agg | 524 | t | $65.25 | 34,191 |
| 41801CD | Bridge Approach Superpave Asphalt Concrete, 19 mm agg | 80 | t | $65.25 | 5,220 |
| 41801CD | Daniel French Drive Superpave Asphalt Concrete, 19 mm agg | 333 | t | $65.25 | 21,728 |
| 41802CD | Superpave Asphalt Concrete, 19 mm agg, Wedge and Leveling | 2,814 | t | $65.25 | 183,614 |
|  |  |  |  |  | 474,272 |

JAMES V. WALSH, President / CEO



**WALSH**
CONSTRUCTION
COMPANY, INC.

*General Contractor*
14674 Rothgeb Drive,
Rockville, MD 20850

Phone: 301-738-1199, Fax: 301-738-1177, Bid Fax: 301-738-1311

June 25, 2007

McKissack & McKissack
1401 New York Avenue, N.W.
Suite 900
Washington, D.C. 20005-2102

ATTN:   Mr. Walter Huber
        Ms. Christine Merdon

RE:   Task Order No. 7, Lincoln Circle Rehabilitation
      Contract No. Park-PKC-NACC-79914/44463/88922, 1443 CO59020904
      William V. Walsh Project No. J-128

Subj:   Revised and Consolidated Certified Claim / Request For Equitable
        Adjustment No. 3R To Contract Amount and Contract Time Stemming
        From Design Defects, Owner Changes and MPS Delays

        Delays / Extended Contract Performance Costs and Additional Labor
        Costs - $ 4,545,436.00

        Request For Contracting Officer's Final Decision

Ref:   3/15/07 WVW Revised Claim / Request For Equitable Adjustment No. 3
       2/28/07 MPS (Undated) Letter re: Assessment of LDs Commencing 3/2/07
       1/26/07 Unilateral Contract Modification No. 12 / Time Extension to 3/2/07
       1/9/07 Contract Modification No. 11 / Time, Delay and Impact Costs
            Reserved
       12/20/06 WVW Revised Change Proposal / Time Extension Request to
            4/30/07
       12/19/06 Contracting Officer Change Directive No. 3
       12/8/06 WVW Change Proposal / Time Extension Request to 4/30/07
       6/28/06 WVW REA No. 2 / Alternative Time Extension Request to 12/21/06
       2/7/06 WVW REA No. 1 / Time Extension Request to 4/7/07



EXHIBIT
8

McKissack & McKissack
June 25, 2007
Page 2

Dear Mr. Huber and Ms. Merdon:

Reference is made to our contract (i.e. Task Order No. 7) for the above project. Reference is also made to the numerous letters and meetings at which we have addressed the impact and delay issues and problems occurring on the project. As you are aware, by letter dated March 15, 2007, we submitted a Revised Claim / Request For Equitable Adjustment No. 3 in the amount of $3,719,481. At that time, the costs submitted and the contract time extension requested were based on estimates and projections of what Walsh reasonably believed would be the costs and delays through April 26, 2007.

Except for minor remaining punchlist work, all contract work and change work for this project has been performed and completed. Given this fact, we are now able to accurately ascertain the total delay to our work and the actual labor impact experienced. As such, we are submitting this REA No. 3R, in the form of a Consolidated and Revised Certified Claim, for impact and delay costs experienced on the project totaling **$4,545,436.00**.[1] We are also requesting a contract time extension of 77 calendar days from March 2, 2007 through May 18, 2007 (the date of beneficial occupancy).

This REA No. 3R includes labor impact costs as well as compensable delay costs for 433 calendar days, from March 11, 2006 through May 18, 2007. A complete summary of the claimed additional costs sought herein is attached as **EXHIBIT 1**. The factual information discussed in our REA No. 3, submitted on March 15, 2007, remains as stated and is incorporated by reference herein. Since the submission of our REA No. 3 (as well as the prior submissions of our REAs No. 1 and 2) there has been no formal response by the Park Service to any of our claim submissions. Rather, as indicated previously, there has been little, if any, substantive response that would indicate any desire on the part of the Park Service to resolve these issues.

Since McKissack & McKissack is in privity of contract with the Government, Walsh expects McKissack & McKissack to promptly pass this claim through to the Government. In doing so, Walsh expects McKissack & McKissack to provide the appropriate claim certification required by the Contract Disputes Act and to request a Final Decision of the Contracting Officer on this matter within 60 days.

To the extent McKissack & McKissack certifies this claim and requests a final decision and, to the extent the Contracting Officer's Final Decision determines entitlement to exist, then we expect a prompt resolution of the quantum issues. Alternatively, to the extent the Contracting Officer's Final Decision denies this Revised Claim / Request For Equitable Adjustment then Walsh is prepared to appeal the Final Decision of the Contracting Officer in accordance with the Contract Disputes Act. In this regard, since our contract is with McKissack & McKissack, any appeal will have to be prosecuted through McKissack. We trust McKissack & McKissack is

---

[1] These claimed costs supplement and supersede the previous claimed costs we have submitted.

McKissack & McKissack
June 25, 2007
Page 3

willing to sponsor this appeal and will advise immediately if this is not the case so that we can take appropriate action.

Entitlement Overview

Walsh's entitlement to the costs and time claimed herein remains predominately the same as written in our February 7, 2006 Request For Equitable Adjustment No. 1, our June 28, 2006 Request For Equitable Adjustment No. 2 and our March 15, 2007 Request For Equitable Adjustment No. 3, all of which are incorporated by reference herein. Since the submission of these REAs, however, there have been additional changes and delay issues, which are briefly recapped as follows:

1.    **Delayed Demobilization:**    Initial instructions from the Park Service and McKissack, required Walsh to be off the project site by April 16, 2007. However, we were also directed by the Park Service to leave our construction offices and compound in place for use by another contractor to perform the East Plaza work, which had been deleted from our Contract. Notwithstanding this prior direction, on April 9, 2007 Walsh was directed to demobilize our construction offices and compound and restore the site to its original condition. This work was completed by the May 18, 2007 final inspection by the Government.

2.    **Additional Undercutting Work Required At Daniel French Drive:**    As the Park Service is aware, when the pavement on Daniel French Drive was removed, the subgrade conditions were determined to be unsuitable for paved roadway purposes. As a result, the Park Service issued RFP No. 34.01 for additional undercutting and stabilization work required on the Daniel French Drive subgrade. This work involved an area that was approximately 22 feet wide, 101 feet long and 16 inches deep. By letter dated March 12, 2007, the Park Service directed McKissack / Walsh to proceed with this change work. Thereafter, the change work itself took approximately three days to perform.

2.    **Elevation Adjustments At Area R:**    Pursuant to COR No. 138 Walsh was required to provide additional backfill in Area R in order to raise the final elevation 6 to 12 inches to accommodate sidewalk and planter bed construction. Due to winter weather conditions experienced at the project site, this work was not able to proceed until early March 2007 and was not complete until the end of March 2007. The work itself involved importing and distributing over 20 truck loads of backfill material.

Shortly after the completion of the Area R final grading work, a beneficial occupancy inspection was performed on April 3, 2007. After this inspection, Walsh expected the prompt issuance of a punchlist from the Park Service. To our dismay, the Park Service failed to even perform a punchlist inspection until May 18, 2007.

McKissack & McKissack
June 25, 2007
Page 4

        Between April 3, 2007 and May 18, 2007, Walsh diligently performed the punchlist work
that was identified by the Park Service, McKissack and Walsh during the April 3, 2007
inspection. This punchlist work was complete by May 18, 2007. We were then dismayed by the
Park Service's May 18, 2007 punchlist inspection for the entire project, including areas that had
been occupied and utilized for several years. On June 20, 2007 Walsh received the final
punchlist generated from this inspection (prior to this date we had only received "drafts"). Many
items on this final list are disputed, as being maintenance work generated by the Park Service's
use and occupancy of previously completed areas – some of which were turned over 3 years ago.
Be assured Walsh will not be the Park Service's maintenance contractor for items of work now
necessitated by the Park Service using the areas for events (e.g. Rolling Thunder) and for driving
vehicles across sidewalks and planted areas.

McKissack & McKissack
June 25, 2007
Page 5

## Quantum Overview

The costs claimed herein include revised delay costs as itemized in Exhibit 1.  They also include revised labor impact costs, which reflect actual hours expended on the project based on Walsh labor records.  They too are itemized in Exhibit 1.

## CERTIFICATION

In accordance with the Contract Disputes Act:

I certify that this claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amounts requested accurately reflect the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

Sincerely,
WILLIAM V. WALSH CONSTRUCTION COMPANY

James V. Walsh
President/CEO

Enclosures
cc:    Roger C. Jones, Esquire (w/encs.)
       J-128 Job File

6/25/2007

William V. Walsh Construction Co., Inc.

SUBCONTRACTOR PRICING SUMMARY

PROJECT NAME: Task Order #7

DESCRIPTION: Lincoln Circle

SUBCONTRACTOR PRICING

| DIV/ SPEC. SUBCONTRACTOR NAME | WORK DESCRIPTION | PROPOSAL DATE | PROPOSAL AMOUNT | NOTES/REMARKS |
|---|---|---|---|---|
| Lorton Contracting | Stone work | 26-Jun-06 | | |
| Freestate | Electrical | 22-Jun-06 | | |
| Kalos | Utilites/walks | | | |
| Retractable bollards | | | $ - | See notes and comments in cover letter |
| Retractable bollard test | | | $ - | See notes and comments in cover letter |
| K-12 ornamental bollard test | | | $ - | See notes and comments in cover letter |
| Traffic Group | | | | Estimated increase of 30% of original $50,000 contract for continuing review |
| Mactec | | | | See notes and comments in cover letter |
| Burgess & Niple | | | | See notes and comments in cover letter - From 4/24/06 proposal |
| Senate Asphalt | | | $ 216,734.00 | Unit price contract, estimated 5% increase |
| Davey Tree | | | | Labor Escalation 25 Tons @ 3.20/ estimated amount (barrier wall) |
| Wood Steel | Rebar installation | | | |

SUBCONTRACTOR SUBTOTAL       $ 1,117,079.00

Page 1 of 1





September 25, 2007

**Certified Mail**
**Return Receipt Requested**

Ms. Lori Irish
Contracting Officer
National Park Service
Denver Service Center
12795 W. Alameda Parkway
PO Box 25287
Denver, Colorado 80225-0287

ARCHITECTURE

ENVIRONMENTAL
ENGINEERING

PLANNING & FACILITIES
MANAGEMENT

PROGRAM & CONSTRUCTION
MANAGEMENT

Reference: Preservation of the Lincoln and Jefferson Memorials, Contract
No. 1443C3059020904, Task Order No. 7, Rehabilitation of the
Lincoln Memorial Circle and Approach Roadways, Package No
NACC-79914/44463/88922

Subject:    1) Response to Charles Borders letter dated June 20, 2007
regarding Walsh Construction Co.'s Request for Equitable
Adjustment
2) Submission of Certified Claim and Request for a Final
Decision of Contracting Officer

Dear Ms. Irish:

McKissack & McKissack believes that the National Park Service (NPS) has <u>not</u>
provided timely and substantive responses to the Request for Equitable
Adjustment (REA) for the referenced contract. The issue of this REA has been
the subject of much discussion and the few responses that have been received
have:

* Not been submitted in a timely manner
* Been based on misinterpretation of the facts and
* Failed to recognize the significance of change order actions of the NPS
  regarding timely directives, resolution and issuance.
* Failed to acknowledge and respond to McKissack & McKissack's letter
  dated December 5, 2006, which contained very detailed information and
  justification for the requested compensable time delay and associated
  impact costs. This letter was a response to Charles Borders' Lack of
  Progress letter dated November 29, 2006.
* Additionally, the submission of Walsh's REA 3 dated March 15, 2007,
  submitted by McKissack to NPS on March 30, 2007, has not been
  acknowledged or responded to by NPS, nor was it referenced in Charles
  Borders' REA response dated June 20, 2007.

1401 NEW YORK AVENUE, NW

SUITE 900

WASHINGTON, DC 20005

T 202.347.1446

F 202.347.3814

www.mckissackdc.com

It is common knowledge and a subject that has been recognized by NPS
Officials that the design of the work under Task Order #7 had major errors and
conflicts. McKissack & McKissack notified the NPS by letter dated October
20, 2005, of the incompleteness of the drawings and the potential impact to the

EXHIBIT
9

schedule of those design deficiencies. Walsh could not proceed in an organized manner as originally planned and scheduled without running into a changed condition, which needed to be investigated and revised. Each time this occurred, it became necessary for Walsh to stop his work and move on to another area, where he would run into the same problem all over again. Needless to say, this is not a cost or time effective situation and it is not or should not be a surprise that the work sequence was greatly affected. It can be stated that, " almost nothing under the scope of Task Order #7 could be or was built as originally designed". NPS representatives in the field and those in Denver were well aware of the design issues and the impact that those issues were having on progress of the work.

The interference to Walsh's work was further compounded by NPS's failure to administer this Contract properly. Rather than issue directives and change orders in a timely manner, NPS simply chose to ignore throughout the duration of the Project the significant impact these changes and NPS responsible delays were having on Walsh. By way of example, Modification Nos. 13 and 14 were issued in May and June of 2007 respectively for scope changes dating back to December 29, 2004.

A contract overview was prepared that showed the summary history by date of the change order activity for the Project. This was presented to NPS representatives on June 20, 2007 for information to better understand the timing of the change order events that occurred. Mr. Borders' comment in regard to this presentation was simply that the change orders that did occur would have occurred at an earlier point in time if the Walsh had prosecuted the work in a more diligent fashion, thus stating that the delays were Walsh's fault, and not those of the NPS. This statement demonstrates an apparent lack of understanding of the events that led to the delays and fails to recognize the affect of all of the impact of the improperly designed and poorly coordinated drawings.

The following is a point-by-point response to the comments contained in the latest NPS response regarding Walsh's REA submission, which was contained in a letter dated June 20, 2007 from Mr. Charles Borders (copy attached):

## Schedule
Mr. Borders states, in part, as follows:
> *The Basis for this additional delay is an arbitrary schedule created by WVW for the purpose of presenting these REAs. These schedules were never submitted officially to the National Park Service and furthermore, no revised schedule was ever accepted.* He further states that,
> *"Specification Section 01323-1 requires that a progress schedule update shall be submitted if it appears that the project schedule no longer represents the actual prosecution of work.*

Response:

> The submitted schedules were not arbitrary. These schedules were used for the basis of planning the job, payments and justifying all time extensions. Schedule updates were submitted with every monthly invoice. The record will show that schedules were discussed in weekly progress meetings. They were most certainly accepted in every way, shape and form. It is convenient to say that no revised schedules were approved, but the facts will show that they were tacitly approved as the project progressed.

## Time Impact Analysis

Mr. Borders states, in part, as follows:

> *In accordance with specification Section 1323-1.7, if a contract modification or change occurs the contractor shall submit a Time Impact Analysis illustrating the impact of the change to the contract time period. You have failed to comply with these requirements."*

Response:

> This statement is not understood. The impact of each change affecting the schedule was discussed at each weekly progress meeting. The two-week schedule distributed to the NPS was reviewed and commented on in both meeting minutes and correspondence from the NPS. Detailed analysis has been submitted every step along the way including with the REAs. The time analysis statement makes the NPS's review extremely suspect.

> The schedules, as submitted, accurately and definitively portray the activities and dependencies. Further, they have always been updated to reflect the contemporary situation. The NPS, by failure to issue timely responses, timely change order actions, maintain control of their other parties, such as PEPCO, and failure to keep us informed of their intentions (such as providing a date that the compound would actually be removed) were responsible for any inaccuracies of any contemporary schedules.

The following is in response to the lettered items contained in Mr. Borders' response

## Item A.

Mr. Borders states in part as follows:

> *"Daniel French Drive and 23rd Street South was closed in August 06. Drawing revision #54 was transmitted to M&M on July 26,*

*2006. Drawing revision #55 regarding adjusted sidewalk elevations on area R was transmitted to M&M on August 10, 2006. A notification of additional cost was received by the Park after the installation of the additional base material on January 10, 2007. The contractor finished the curb installation on both sides of Daniel French on October 25, 2006.*

*Conclusion: The bus pad on Daniel French COULD have been installed immediately following the completion of the curb. If the contractor had installed the bus pad at this time, the contractor could have claimed that the government caused a delay by issuing the RFP for additional excavation on Daniel French November 2, 2006."*

Response:

The above statements are basically not correct and are not supported by the record. These statements and the resulting conclusion are based on misinterpretation, misinformation or simply inaccurate analysis and are indicative of the reasons that this claim has not received a fair and accurate resolution. The facts show the following:

1. In August 2006, Daniel French and 23rd St. were closed to automobile traffic and pedestrian traffic.

2. Rev. #54 was issued on July 24, 2006. It changed sidewalk dimensions and limits of work on Daniel French. RFP #24 dated August 10, 2006, Additional Undercut Roadway Area U, was issued requiring over-excavation of the Northern part of 23rd St. South. This work required completely closing Daniel French Drive. The Tourmoblie permanent route was in Area U and required over three weeks of construction work to over-excavate and replace the area.

3. Rev. #55 issued revised elevations for the area and then the NPS sent CLA 024 on November 1, 2006 and CLA 024.01 on November 3, 2006 revising the elevations again. Walsh requested an RFP for these clarifications on November 20, 2006. RFP #28 dated September 20, 2006 was issued titled "Raise sidewalks Area R and RFP #29 extend bus pad on Daniel French Drive by 7.62(25 feet). All documentation can be found in WVW COR-138. A cost proposal was submitted on December 20, 2007 from Walsh.

4. The curbs at Daniel French were completed by November 1, 2006, however the bus pad could not be poured pending inspection and approval of the subbase by the NPS, the

issuance of final documents revising the road profile for
Daniel French for the second time and the cold weather
concrete plan would not allow placing of colored concrete in
cold weather. Walsh received a bus pad reinforcement
detail with RFP # 35 on January 16, 2007. This issue
required clarification and a reanalysis by both Walsh and the
NPS to understand the impact of the cold weather concrete
placement to the colored concrete. See daily reports
detailing temperature readings of the sub base that were
taken three (3) times daily. These facts were also
documented in meeting minutes.

5. The NPS issued RFP #34 the Daniel French Reconstruction
documents on November 2, 2006, which were received by
Walsh on November 7, 2006. These reconstruction
documents were immediately sent to Walsh's
subcontractors for pricing. An NPS Contracting Officer
Directive dated December 19, 2006 was received on
December 20, 2006. The details for the reconstruction were
again changed by the NPS on December 26, 2006.

6. The NPS issued a reinforcement detail for the bus pad that
was received on January 16, 2007, RFP #35. This
information was revised via two NPS clarifications CLA
000016 and 000025 and then further clarified via a Walsh
RFI and NPS response on January 23, 2007 and January 31,
2007, respectively.

7. A review of these facts clearly demonstrate that the bus pad
on Daniel French COULD NOT have been installed
immediately following completion of the curbs in October,
2006, because the Daniel French Drive road profile was
being revised along with the bus pad being extended and the
reinforcement being changed. These were all NPS directed
changes by RFP's.

## Item B

Mr. Borders' states in part as follows:

*"Daniel French Reconstruction (RFP 0034 Additional*
*Excavation). This RFP along with Drawing rev #57 was issued on*
*November 2, 2006. The scope of work was clear; there was a need*
*for additional excavation and change in the asphalt thickness. It*
*was repeatedly noted in the progress meeting minutes that it was*
*very important for the contractor to submit this proposal in a*
*timely manner to avoid further delays. The proposal was received*
*on December 19, 2006. A Contracting Officers' Directive was*

*immediately issued at the request of the contractor. The contractor
initially claimed 60 additional days to perform this work. When the
third tier subcontractor submitted their proposal, they estimated
four days of additional time.*

*Although Daniel French was completed on March 20, 2007, it took
only 3 days of additional time to complete this work, and another
day to perform additional sub base substitution (RFP 0034.001).*

*Conclusion: Daniel French additional work could have been
completed before December 31, 2006, with a potential delay of 3
or 4 days."*

Response:

The Daniel French Drive road profile was being revised and
adjusted during the period the bus pad could have been poured.
When the weather changed from mild to winter temperatures the
bus pad had been excavated but not constructed, because the road
profile was changing and removal of 10" of colored concrete was
not a risk the contractor wanted to carry. Due to the delays in
answering the question regarding the suitability of the sub base for
the bus pad and the subsequent issuance of the reinforcement detail
for the bus pad that was received on January 16, 2007, it was not
possible to pour the bus pad in the Daniel French area until a break
in the cold weather. See design mix comments noted above in item
A.4. The bus pad is a predecessor to the reconstruction work to
prevent asphalt patching around the bus pad creating an inferior
product. This was agreed to by all parties in progress meetings.

How could a determination be made that the bus pad could have
been poured immediately following completion of the curbs on
both sides of Daniel French in October 2006, when sub base and
reinforcement changes were still being issued in December 2006
and January 2007 forcing the work into cold weather thus
impacting the Walsh's ability to properly pour the design mix?

The physical work may have taken 4 days but the delay to other
work affected the schedule by 60 days. At this point of the project
Daniel French Drive was a critical item on the schedule to
complete the project.

## Item C

Mr. Borders' states in part as follows:

*"An RFI for sidewalk modifications in area Q was resolved prior
to the August 14, 2006 closure date. The contractor's schedule was
never revised to reflect the new start date for Area Q and the*

*sidewalks were not installed until March 2007, therefore the RFI
resolved in August 2006 did not affect the work progress or
closure time. In addition the increased presence of the NPS
through Alpha Corporation has expedited the contractor's work
eliminating RFI's for small onsite problems.*

*Conclusion: the sidewalks in area Q could have been installed in
October 2006 as there was nothing else affecting the completion of
this work."*

Response:

Walsh RFI 251 was submitted on 3/31/06 and was answered
incompletely by NPS resulting in follow-up RFI 215.01 for Area Q
sidewalk elevations.  Once the necessary elevations were provided
in August of 2006 after a delay of several months, the area was
then occupied by PEPCO and not accessible to Walsh crews.  This
is well documented in the meeting minutes.  Not only did PEPCO
block accessibility to the area, they damaged work in place and
created areas that required repair prior to final paving operations.

PEPCO completed its work in Area Q approximately October 17,
2006; however there was still damage and cleanup to be completed
by PEPCO, which didn't get resolved until January 2007.

The sidewalks were placed in this area in March 2007. As with
other areas of the project, Area Q was found to have no subbase
under the existing sidewalks and Walsh had to place new subbase
prior to pouring the concrete for the sidewalks.

**Item D**

Mr. Borders' states in part as follows:

*"Elevation Changes in Areas D, E & F. Again, the contractor is
using his own schedule to show delays that are not substantiated.
These changes occurred during May of 2006."*

Response:

Elevation changes in areas D, E & F did not occur during May of
2006 as stated. They occurred during 2005. Conflicting contract
documents and delays in RFI responses resulted in delays of
approximately 2 months. See RFI 215 and 215.01 along with RFI
Correspondence Letter 215.001. The response to the original RFI
requesting clarification of the conflicting contract documents was
received on October 3, 2005 and would have put a portion of the
sidewalk below the existing soil level.  A second RFI was created
on October 10, 2005 with a final answer received on December 19,
2005 from Charles Borders requesting Walsh to "stakeout sidewalk

for Government Approval."

<u>Item E</u>
Mr. Borders' states in part as follows:
> "*PEPCO Manholes Construction & Induction Loops. These issues could have caused a delay if the balance of the work on Daniel French Dr. was performed with no deliberate delays by the contractor. In other words, the completion of the contract did not directly depend on the completion of these activities (these activities ceased to be critical).*

<u>Response:</u>
PEPCO had to raise and lower manholes on 23rd Street North and South prior to final paving operations. M&M, WVW and the NPS all agreed that final paving operations could not occur until Daniel French was complete to provide a complete project. Responses to items A and B above clearly demonstrate that the delays to final paving on Daniel French were due to actions of the NPS.

As for the induction loops, this was an add to the contract. The sealant material used to install the loops is extremely cold sensitive and cannot be applied in cold weather. However, this was still added work to be done after the final paving operations.

<u>Additional Comments</u>
Mr. Borders' included additional comments in his REA response that require discussion and rebuttal. Mr. Borders stated, in part as follows :
> " *there were several milestone events that occurred in the period of October, 2006 to March, 2007, which substantially impacted progress and which have not been accounted for in the REAs. These events are the responsibility of McKissack & McKissack.*"

Mr. Borders included five (5) specific statements that are not factual and that place all blame on Walsh and do not acknowledge actions by the NPS, as follows:
> <u>Item 1.</u>
> "*Lack of proper updated schedules submitted for NPS review and acceptance in accordance with Section 1323.*"

> <u>Rebuttal</u>
> As previously stated in this response, schedule updates were submitted with every monthly invoice. The record will show that schedules were discussed in weekly progress meetings. They were most certainly accepted in every way, shape and form. It is convenient to say that no revised schedules were approved, but the facts will show that they were tacitly approved as the project

progressed and that payments were approved as the schedules were
submitted. The contract had been modified for time based on
approved schedules (Unilateral Directive dated January 26, 2007).
We have no knowledge or evidence that the NPS performed any
meaningful review of submitted schedule information. Instead, the
NPS has simply taken the position that updated schedules were not
submitted and approved. The NPS position in regard to schedule
submissions is unfounded based on the facts and on the submitted
record.

Item 2.
*"REA schedule review completed on July 14, 2006, claiming full
compensation for delays to Dec 31, 2006. At this point actual
events override those claims."*

Rebuttal
The schedule analysis that was submitted with the original REA
was based on the best information at the time. Subsequent
submissions of schedule information based on later events were
submitted with REA #2, REA #3 and REA #3R. The NPS has
ignored the totality of schedule information submitted and
therefore has reached an unfounded conclusion. It should be noted
that Mr. Borders issued a "Lack of Progress" letter on November
27, 2006. This letter was responded to in great detail with
information as to project status, outstanding change orders and
directives and schedule issues. To this date, that detailed response
has never been addressed by the NPS and there is no official
response in the record. A review of the contract files will reveal the
accuracy of this statement.

Item 3.
*"Intentional delay and demobilization November 7, 2006, by the
contractors. Directive issued by McKissack & McKissack to Walsh
Construction and Kalos addressed in a November 30, 2006 letter
and a January 16, 2007 letter."*

Rebuttal
Our December 5, 2006 response, (which was directed to the Contracting
Officer, Mr. Mike Fox) to Mr. Borders' Lack of Progress letter dated
November 29, 2006, stated, in part,

> "We assume that this statement regarding a deliberate intent to
> slow progress is the result of an e-mail dated November 13, 2006
> that was sent to you by Mr. Avon Wilson, our on-site Project
> Manager. This e-mail is hereby withdrawn and rescinded. It was
> based on a misunderstanding of a statement made regarding

actual circumstances and Walsh's contractual inability to proceed with work in all significant areas of the contract.

The lack of resolution of the Request for Equitable Adjustment (REA) Time Extension certainly has a significant impact on project funding. However, the correct and documented reasons for a reduction in crew sizes is the direct result of the lack of issuance and execution of appropriate change order actions to authorize work to proceed. There are practically no areas of the project that were not affected by outstanding and pending change order actions."

Item 4
*"Intentional demobilization by Senate paving at the direction of WVW on Dec 18, 2006 and did not return for paving operation until early March, 2007."*

Rebuttal
Senate Paving had finished the work, which they were scheduled for on December 19, 2006 and were present on site for cleanup activities the following days. They returned later in March 2007 to complete the Daniel French and the majority of the "final paving" at one time per the direction of the NPS to maintain a clean looks to the new paving and provide an overall better paving product. This has been the agreed approach based on a meeting regarding the sequencing for the final paving plan. The weather also played a factor as winter temperatures prevented paving operations. Asphalt plants, in the DC Metro Region, typically shut down for maintenance during the winter months.

Item #5
*"Concurrent contractor delays are not incorporated into the fragnets analysis."*

Rebuttal
There were a number of critical activities on the schedule, some more critical than others to complete the project. Since the official completion date of the project at that time was March 11, 2006, all activities became critical on the schedule. If one critical activity was removed from the critical path then another would take its place. NPS has not identified the alleged concurrent contractor delays. What are the concurrent contractor delays that need to be incorporated? Walsh was always waiting on answers, change orders, approvals or directions from the NPS or its representatives in every case.

### Mr. Borders's Concluding Statements

A number of concluding statements were made that require response. Statements made by Mr. Borders are in italics. Responses follow:

#### Borders' Statement

*"In our analysis of information submitted in the August, 2006, REA there is no justification for a 294 calendar day fully compensated time extension. The Government has performed an analysis of the submittal and has determined that small portion of the delay was caused by actions of the Government."*

#### Response

In addition to the REA that was submitted in August, 2006, considerable detailed information and justification for the requested compensable time delay and associated impact costs was submitted in our December 5, 2006 response to Charles Borders' Lack of Progress letter dated November 29, 2006. Additionally, McKissack's letter dated March 30, 2007 submitted Walsh's REA 3 dated March 15, 2007. It is interesting to note that no reference is made to those submissions by the NPS when discussing an analysis of the REA. The conclusion that the NPS only caused a small portion of the delay is not valid if one properly considers all of the improper design and lack of coordination issues, as well as the actions and inactions on the part of the NPS. The response from the NPS regarding the REA submitted in August 2006 delineated no analysis of their position on any delays or the valve of the time extension or compensation to Walsh. We submit that the response could not be understood by anyone or explained as to when or how the NPS arrived at such a statement that the NPS involvement in delaying the project was small.

#### Borders' Statement

Mr. Borders states, in part," *The National Park Service has made several attempts to present a reasonable offer and requested additional back-up with little response*"

#### Response

No valid offer to settle this REA has ever been made in writing from the NPS Contracting Officer. There is nothing in the written record of an offer of any kind. In some verbal conversation, an indication of a compensable period of approximately 90 working days was discussed. This period would have extended the contract from March 11, 2006 through some time in July 2006, making everything after July 2006 the responsibility of Walsh. The continuing change order actions, as well as Contracting Officer Directives, well after July 2006 by the NPS with all of the events that preceded these change orders defy the reasonableness of any consideration of such a notion.

Borders' Statement
*"On January 12, 2007 the National Park Service and representatives from McKissack & McKissack agreed to a project completion date of March 2, 2007. This date was not arbitrarily chosen by the Government as claimed but rather discussed, planned and negotiated with McKissack & McKissack."*

Response
McKissack & McKissack agrees that the March 2, 2007 date was discussed with the NPS and that given the balance of work to complete to that date, excluding weather delays and other unforeseen events, that date appeared reasonable at the time. The ice storms and severe cold that delayed concrete and asphalt placement that occurred were not anticipated, resolution of additional changes order actions were not anticipated and the required removal of the construction compound that was going to remain for completion of the East Plaza and then required to be removed, all affected Walsh's performance.

Border's Statement
*Because of the deliberate actions of the contractor to slow progress during the period from November to mid January nearly two and a half months of good weather was lost because WVW would not work. James Walsh claims in this writings referring to the Park Service that they worked "fairly and in good faith". These delay actions were deliberate, calculated and detrimental the project schedule"*

Response
Contract work was being completed and the balance of the work was waiting for issuing of RFP's, Modifications or Directives to the outstanding issues for the contract. McKissack has already gone on record for Walsh Construction Co. by our letter dated December 5, 2006, responding to Charles Borders' Lack of Progress letter dated November 29, 2006. It is grossly unfair to categorize any reduction of the workforce, which was actually a result of the contract problems in terms of scope clarification, change order issuance and overall general coordination associated with the multitude of design discrepancies, as deliberate and calculated. Walsh Construction Co. categorically disputes the government's position in this matter. In addition, it is errant to assume that there will be "good weather from November to mid January" as stated. If there is good weather during the winter months it is unusual, and very difficult for a contractor to anticipate and plan accordingly. During this time period, all asphalt plants close for maintenance and scheduling asphalt placement is difficult, if not impossible. We verified the closure of the area plants, with all the pavement contractors.

As we have previously stated, a negotiation and settlement would be the desired action for all parties in regard to the delay issue. However, after having received and reviewed Mr. Borders' response to the REA, we find the Government's position to be unrealistic, overly subjective and unyielding. Accordingly, we have no choice but that you issue a Final Decision as expeditiously as possible consistent with your duties as Contracting Officer.

To this end, McKissack & McKissack is enclosing Walsh's certified claim, which establishes that McKissack & McKissack is entitled to have its Contract Price adjusted by $4,545,436 and the construction time extended from March 11, 2006 through May 18, 2007. In providing the following certification, McKissack & McKissack is relying on the attached Certification from the Walsh Construction Company.

I hereby certify that the Claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which McKissack & McKissack believes the Government is liable; and that I am duly authorized to certify the Claim on behalf of McKissack & McKissack.

Should you wish to discuss this response, or should the Government be sincerely interested in negotiating an amicable, realistic resolution of the Claim, you may reach me at 202 572-2523.

Sincerely,

Christine A. Merdon PE, CCM
Vice President of Program Management

Attachments

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA f/u/b** | * | |
| **THE LANE CONSTRUCTION** | | |
| **CORPORATION, d/b/a** | * | **Case No.: 1:07-cv-01576** |
| **SENATE ASPHALT, et al.** | | **Judge: Reggie B. Walton** |
| | * | **Contract** |
| **Plaintiffs,** | | |
| | * | |
| **v.** | | |
| | * | |
| **WILLAIM V. WALSH** | | |
| **CONSTRUCTION** | * | |
| **CO., INC., et al.** | | |
| | * | |
| **Defendants.** | | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>ORDER</u>

UPON REVIEW of Defendants' Motion to Dismiss, or in the Alternative, to Stay

Pending Exhaustion of Mandatory Disputes Procedures, and any Opposition filed thereto, it is

this ___ day of _____, 2007, by the United States District Court for the District of

Columbia, **ORDERED** that

(1) The Motion be and is hereby **GRANTED**; and

(2) The Amended Complaint is hereby **DISMISSED WITHOUT PREJUDICE.**

_____
The Honorable Reggie B. Walton
United States District Court for the
 District of Columbia

cc:

Nicole L. Campbell, Esquire
Huddles Jones Sorteberg & Dachille, P.C.
10211 Wincopin Circle, Suite 200
Columbia, Maryland 21044

Stephen J. Annino, Esquire
Kasimer & Annino, P.C.
7653 Leesburg Pike
Falls Church, Virginia 22043

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **f/u/b THE LANE CONSTRUCTION** | | |
| **CORPORATION d/b/a SENATE ASPHALT** | * | |
| | | |
| **Plaintiff** | * | |
| | | |
| **v.** | * | **Case No. 1:07-cv-01576** |
| | | **Judge: Reggie B. Walton** |
| **WILLIAM V. WALSH** | * | **Contract** |
| **CONSTRUCTION CO., INC., et al.** | | |
| | * | |
| **Defendants** | | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## DECLARATION OF JAMES V. WALSH

I, James V. Walsh, am over eighteen years of age and am competent to testify with respect to all matters stated herein:

1.    I am the President of William V. Walsh Construction Co., Inc. ("Walsh").

2.    The construction project that is the subject of the above captioned action is the Lincoln Circle and Approach Way Rehabilitation, Task Order 7 (the "Project"). The owner of the Project is the National Park Service (the "Owner"). The Owner entered into a contract (the "McKissack/Owner Contract") with McKissack & McKissack of Washington, Inc. ("McKissack"), an architectural and design firm, for construction management services related to the Project. A true and correct copy of relevant pages from the McKissack/Owner Contract are attached to Walsh's Motion to Dismiss, or in the Alternative, Motion to Stay Pending Exhaustion of Mandatory Disputes Procedures (the "Motion to Dismiss/Stay") as **EXHIBIT 1**. McKissack entered into a contract with William V. Walsh Construction Co., Inc. (the "Walsh/McKissack Contract") for Walsh to perform the construction work at the Project. A true and correct copy of relevant pages from the Walsh/McKissack Contract are attached to the Motion to Dismiss/Stay

as **EXHIBIT 2**. Walsh entered into a subcontract with The Lane Construction Co., Inc. d/b/a Senate Asphalt ("Lane"), for Lane to perform asphalt work on the Project (the "Subcontract"). A true and correct copy of the Subcontract is attached to the Motion to Dismiss/Stay as **EXHIBIT 3**.

3.    Pursuant to 40 U.S.C. § 3131 (the "Miller Act"), Walsh, as the contractor performing the construction work on the Project, was required to provide a payment bond for the protection of all persons supplying labor and materials to the Project, in accordance with the terms of the Miller Act. Accordingly, Walsh, together with St. Paul Fire and Marine Insurance Company ("St. Paul"), as surety, furnished a payment bond for the project, Bond No.400U0997 (the "Bond"). A true and correct copy of the Bond is attached to the Motion to Dismiss/Stay as **EXHIBIT 4**.

4.    In the Spring of 2006, I requested Lane to submit updated pricing for the remaining work Lane had to perform on the Project. The updated pricing was needed due to Owner caused delays on the Project which had specifically extended the contract performance period. On April 17, 2006, Lane submitted the requested pricing (the "April 17, 2006 Price Proposal"). A true and correct copy of Lane's April 17, 2006 Price Proposal is attached to the Motion to Dismiss/Stay as **EXHIBIT 5**.[1] During the Spring of 2006, Christy Cavey, Walsh's project manager, and I had several discussions with Mark Shiller and Robert McKeever of Lane regarding the April 17, 2006 Price Proposal. During these discussions, it was agreed that, in order to determine the delay claim, the unit prices in the April 17, 2006 Price Proposal had to be reduced by the unit prices in the Subcontract in order to derive the price escalation caused by the Owner delays. Once that was done, Lane's alleged delay costs totaled $216,734. Mark Shiller and Robert McKeever agreed that Lane's increased costs were caused by delays to the project

---

[1] The amount on the April 17, 2006 Price Proposal is $678,469.40. It appears the math on the proposal is incorrect and should total $678,513.

caused by the Owner. They, on behalf of Lane, authorized Walsh to include Lane's claim for

$216,734 in Walsh's claim to McKissack on the basis that Walsh would request McKissack to

pass the claim on to the Owner because the Owner was responsible for the alleged damages Lane

alleged it incurred.[2] True and correct copies of Lane's Account Summary and Application and

Certification for Payment No. 10 with a Continuation Sheet are attached to the Motion to

Dismiss/Stay as **EXHIBIT 6**.

5.       Walsh has submitted a series of Requests for Equitable Adjustment ("REA") to

McKissack seeking an equitable adjustment for design defects, owner changes, and the delays on

the project caused by design errors, conflicts and changes. A copy of REA No. 2 and REA No.

3R, with Subcontractor Pricing information attached thereto,[3] are attached to the Motion to

Dismiss/Stay as **EXHIBITS 7 and 8** respectively. Each of the REAs supplemented and

superseded the previous submissions and each REA included a request for Lane's escalation

costs based on the information then known about Lane's costs. REA No. 2 and REA No. 3R

were certified by Walsh and included a request in the amount of $216,734 for Lane's alleged

increased costs.

6.       On September 25, 2007, McKissack submitted a certified claim to the Contracting

Officer requesting a Contracting Officer's final decision. A true and correct copy of the

September 25, 2007 certified claim is attached to the Motion to Dismiss/Stay as **EXHIBIT 9**.

McKissack's certified claim included Walsh's certified REA 3R which incorporated Lane's

claim. In accordance with the Contract Disputes Act, McKissack's certified claim requested a

---

[2] It is unclear to me why the amount claimed to be due in the Amended Complaint is approximately $1,028 higher than the $216,734 amount of Lane's delay claim. Walsh is unable to reconcile Lane's accounting with its accounting. Walsh's accounting of Lane's Subcontract indicates all amounts Lane has invoiced have been paid with the exception of the $216,734 delay claim amount.
[3] The Subcontractor Pricing information for both REA 2 and REA 3R is redacted so that only the amount included for Lane is showing. In addition, other attachments were attached to REA No. 2 and REA No. 3R. These attachments and the information that is redacted on the Subcontractor Pricing information are not relevant to this motion or this case and they contain proprietary pricing information that Walsh seeks to protect from release in the public domain for use by its competitors.

3

Contracting Officer's final decision within 60 days. The Contracting Officer has not yet provided a final decision on the claim.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. Executed on: November 20th, 2007

_____
James V. Walsh, President of
William V. Walsh Construction Co., Inc.

4