IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| f/u/b THE LANE CONSTRUCTION | ) | |
| CORPORATION d/b/a SENATE | ) | |
| ASPHALT, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 1:07-CV-01576 |
| | ) | Judge: Reggie B. Walton |
| WILLIAM V. WALSH | ) | |
| CONSTRUCTION CO., INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF THE LANE CONSTRUCTION COROPORATION'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE TO STAY PENDING EXHAUSTION OF MANDATORY DISPUTES PROCEDURES**

COMES NOW Plaintiff the Lane Construction Corporation ("Lane"), by and through counsel, and for its Opposition to Defendants' Motion To Dismiss, or in the Alternative To Stay Pending Exhaustion of Mandatory Disputes Procedures (hereinafter "Motion to Dismiss") states that Defendants' Motion should be denied for the reason that Defendant's Motion to Dismiss is procedurally inappropriate and not supported by the facts of this case or the provisions of the Subcontract between Lane and Defendant.

**SUMMARY OF ARGUMENT**

Defendants motion is procedurally inappropriate in that Defendants have not filed a responsive pleading to Lane's Amended Complaint, and Defendants' Motion to Dismiss does not present a defense enumerated in FRCP 12(b)(6) and is not a responsive pleading allowed under the Federal Rules of Civil Procedure. Instead of responding to Lane's Amended Complaint, Defendants seek to dismiss it essentially seeking summary judgment asking this Court to conclude that Lane's claim is based upon delays to the project cause by the Owner, and therefore

finding that Lane's claims are barred by failure to exhaust the procedures provided for disputes with the Owner provided in the contract between Defendant William V. Walsh Construction Co., Inc. ("Walsh") and McKissack & McKissack of Washington, Inc. ("McKissack"). Even if the Court were to overlook these procedural irregularities, Defendants' Motion to Dismiss must fail for the reason that Walsh agreed to the price increase for which Lane seeks payment in this case, and thus this claim is not subject to the disputes clause of the Prime Contract. Defendant Walsh's agreement to the increased prices was not contingent upon Defendant Walsh's ability to recover the price increase from the Owner. Defendant Walsh agreed to the price increase and its failure to pay for the work performed at the increased price is a breach of contract which Lane has the right to prosecute in this case.

Defendant Walsh has been paid for the work for which it has failed to pay Lane. Consequently, Walsh has no contractual basis for refusing to pay Lane for such work at the increased prices to which Walsh agreed. The pay when paid clause in Lane's Subcontract does not support Defendant Walsh's refusal to pay for work at the increased prices, and Defendant Walsh's surety cannot escape or defer its liability under the Miller Act bond in this case.

## STATEMENT OF FACTS

On or about April 1, 2004, Lane and Defendant Walsh entered a subcontract concerning a Project identified as the Lincoln Circle and Approach Way Rehabilitation ) Task-Order 7 (hereinafter the "Subcontract"). (McKeever Declaration, Ex. "A" [hereinafter "McKeever"] at ¶2; Declaration of Mark Schiller, Ex. "B" [hereinafter "Schiller"] at ¶ 2). Pursuant to the Subcontract, Lane agreed to furnish anything necessary to complete in place the work as set forth in Attachment B. (McKeever at ¶ 3). Attachment B specifically provides that the "[p]rice is for all work to be completed in the year 2005." *Id.* In 2006, Defendant Walsh contacted Lane to

direct work on the Project. *Id.*. Lane advised that its Subcontract provided that the prices were only for work to be completed in 2005, and that work performed in 2006 would be subject to a price increase. (McKeever at ¶ 4; Schiller at ¶ 2). Lane submitted its proposed price increase to Defendant Walsh on or about April 17, 2006. *Id.*. Walsh accepted Lane's revised pricing and directed Lane to perform work in 2006. (McKeever at ¶ 5; Schiller at ¶ 3). Lane performed the work under the revised prices, but Walsh has failed and/or refused to make payment to Lane for the work performed in 2006 under the revised price schedule. (McKeever at ¶¶ 6 & 8).

Lane invoiced Defendant Walsh for the work performed in 2006 at the revised prices, but Defendant Walsh asked Lane to break down the work performed at the 2006 rates to facilitate Defendant Walsh's efforts to recover the price increase, to which it agreed, from McKissack and/or the Owner. (McKeever at ¶¶ 6-8; Schiller at ¶ 4). A true and correct copy of one of Lane's pay applications for work performed in 2006 at the 2006 prices is attached to Mr. McKeever's Declaration.

 Although Lane agreed to provide the price breakdown requested by Defendant Walsh, Lane did not agree that the price increase that it negotiated with Defendant Walsh was a result of Owner caused delay. (McKeever at ¶ 7; Schiller ¶ 3). Lane had performed limited work on the Project in 2005, and had no basis to determine whether any Owner caused delay had occurred. (McKeever at ¶¶ 9-10; Schiller at ¶ 5). The pricing in Lane's Subcontract expired in 2005, so Lane negotiated new prices for work to be performed in 2006. From Lane's perspective, it made no difference why work was directed in 2006 because contractually Lane was entitled to the price increase to which Defendant Walsh agreed. *Id.*. Lane did not agree to forego payment for work performed at the 2006 prices unless Walsh recovered the increase from McKissack or the Owner. (McKeever at ¶¶ 9-10; Schiller at ¶ 4).

3

Defendant Walsh has made payment to Lane for the work that Lane performed in 2006 but at the 2005 prices. (McKeever at ¶ 8). Contrary to its acceptance of Lane's 2006 prices and the modification of the Subcontract, Defendant Walsh now contends that it has no liability to Lane for the increased prices unless the Owner is ultimately determined to be liable for delay because Walsh contends that the work was not performed in 2005 under the original prices due to Owner delay. (Motion at p. 8). This position is clearly contrary to Walsh's acceptance of Lane's price revisions as part of the Subcontract between Lane and Walsh.

## ARGUMENT

**I.    LANE HAS PROPERLY PLED ALL THE ELEMENTS FOR RECOVERY UNDER ITS SUBCONTRACT AND THE PAYMENT BOND UNDER THE MILLER ACT AND DEFENDANTS' MOTION TO DISMISS MUST BE DENIED.**

Under FRCP 12(b)(6), a court should not dismiss a complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conlev v. Gibson*, 355 U.S. 41, 45-46 (1957). The function of a motion to dismiss is to test the legal sufficiency of the Complaint, and not the facts to support it. *Nietzke v. Williams*, 490 U.S. 319 (1989). In the instant case, Lane seeks payment due for work it performed pursuant to its Subcontract with Defendant Walsh and payment from Defendant Walsh's surety under the Miller Act. The fact that Defendant Walsh contends that it incurred a price increase due to an Owner delay is not a sufficient basis to dismiss Lane's claims because Lane has properly pled a basis for recovery against both Defendants. Lane's claim is based upon the revised prices accepted and agreed to by Defendant Walsh. Consequently, Defendant Walsh's unsubstantiated contentions to the contrary cannot defeat Lane's claims.

**II.    LANE'S CLAIM IS BASED UPON A MODIFICATION TO THE SUBCONTRACT IN WHICH DEFENDANT WALSH AGREED TO PAY LANE AT THE INCREASED PRICES CONTAINED IN THE APRIL 16,**

**2007 REVISED PRICE PROPOSAL AND NOT OWNER CAUSED DELAY; THEREFORE THE DISPUTES ARISING OUT OF OWNER ACTS PROVISION OF THE SUBCONTRACT IS NOT APPLICABLE.**

Regardless of how Defendant Walsh seeks to characterize Lane's price increase in order to recover the increase from the Owner, Lane's price increase was agreed to, and accepted by Defendant Walsh and became part of the Subcontract between Lane and Defendant Walsh. Lane is not seeking recovery of delay damages in this case, and the provision in the Subcontract regarding disputes arising out of owner acts is not applicable. Lane is seeking enforcement of the Subcontract modification providing for increased prices for work performed in 2006. Walsh agreed to the price increase and directed Lane to work. Whether Walsh is able to recover the price increase from the Owner is irrelevant to Defendant Walsh's obligation to pay Lane under the revised Subcontract.

The fact that Walsh asked Lane to break down the price increase to accommodate Walsh's submission of a claim to the Owner is also irrelevant. Walsh agreed to pay the increased price. Once Walsh agreed to the increased prices, the increased price became part of the Subcontract, and Walsh's failure to pay Lane for work performed at the increased price is a breach of the Subcontract which has nothing to do with whether Walsh can recoup the increase from McKissack or from the Owner.

The cases cited by Defendants in support of their contention that Lane's price increase was a result of an Owner caused delay are not on point because in the cases cited a change to the existing subcontract was not negotiated, unlike the situation in the instant case. None of the cases cited by Defendants concern a claimant seeking to enforce an accepted price increase that modified the contract between the parties. The cases cited by Defendants concern claimants seeking previously unaccepted additional charges associated with alleged delays. In those cases,

the general contractor did not negotiate and accept the price charged by the subcontractor for work and the price increase was not quantified.

In the instant case, Defendant Walsh's liability to Lane is not contingent upon Walsh's recovery from McKissack or the Owner. Defendant Walsh agreed to the price increase which became part of the Subcontract between Lane and Defendant Walsh. Whether Defendant Walsh can recover the price increase from McKissack or the Owner has no bearing on Defendant's obligation, or that of its surety, to Lane.

Defendants rely heavily on *Norment Security Group, Inc. v. Travelers Casualty and Insurance Company,* 505 F. Supp.2d 97 (D.D.C. 2007); however, *Norment* is factually distinct from the instant case. In *Norment*, the owner granted the general contractor a time extension to accommodate redesign work by the owner. The general contractor then invited its subcontractors to submit cost proposals for their additional costs as a result of the delay to be included in the general contractor's submission to the owner. In the *Norment* case, the general contractor had been awarded a time extension and a delay had been acknowledged. In the instant case, Defendant Walsh did not provide any evidence that the Owner had acknowledged a delay or had granted Defendant Walsh a time extension. When Lane was asked to perform work in 2006, Lane did not seek a time extension. Lane simply pointed out the expiration of the pricing contained in the Subcontract and negotiated a price increase directly with Defendant Walsh. The *Norment* case is factually inconsistent with Lane's claim to enforce the price increase agreed to and accepted by Defendant Walsh.

Defendants also cite *United States v. Dick/Morganti*, 2007 WL 3231717 (N.D. Cal. 2007), *United States v. David Boland, Inc.*, 922 F. Supp. 597 (S.D. Fla. 1996), and *United States v. Daniel, Urbahn, Seelye and Fuller*, 357 F. Supp. 853 (N.D. Ill. 1973) as support for the

dismissal, or stay of, Miller Act suits pending completion of dispute procedures (Motion at p. 11), but again these cases are factually distinct from the instant case in that they do not address the situation where the subcontractor is seeking to enforce a price increase expressly agreed to by the general contractor.  Moreover, the disputes provisions in the cases cited by Defendants are in no way similar to the disputes provision in Lane's Subcontract.

The Subcontract between Lane and Defendant Walsh states that "[d]isputes arising out of Owner acts, omissions or responsibilities shall be resolved in accordance with the disputes procedures in the Prime Contract."  (McKeever at ¶ 2, attached Exhibit 1).

In *Dick/Morganti* the disputes provision at issue stated:

> If the Owner and the Contractor, pursuant to the General Contract or by agreement, submit any dispute, controversy, or claim between them to arbitration or some other dispute resolution procedure specified in the General Contact and such a matter involves or relates to a dispute, controversy, or claim between the Contractor and the Subcontractor, Subcontractor agrees . . . *to stay any action filed by the Subcontractor until the dispute resolution and appeals process between the Contractor and the Owner is exhausted.*

*Dick/Morganti*, 2007 WL 3231717 at *1.  The subcontract at issue in the *Dick/Morganti* case contains an express stay provision.  Similarly, the disputes provision in the *David Bolan, Inc.* case also contained an express stay provision stating that the subcontractor agreed to stay an action or claim against the prime contractor's Miller Act bond pending the complete and final resolution of the Prime Contract's contractual remedial procedure.  922 F. Supp. at 598.  The disputes provision at issue in the *Daniel, Urbahn, Seelye and Fuller* case is nothing like the disputes provision contained in the Lane Subcontract.  357 F. Supp. at 860-861.  The disputes provision under consideration in the *Daniel Urbahn* case provided:

> Except as otherwise provide in this Subcontract, any dispute concerning a question of fact arising under this Subcontract which is not disposed of by agreement shall be decided by the manager, Chicago Operations Office, Atomic Energy Commission, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Subcontractor. The decision of the Manager, Chicago Operations Office shall be final and conclusive unless within thirty (30) days from the date of receipt of such copy, the Subcontractor mails or otherwise furnishes to the Manager, Chicago Operations Office a written appeal addressed to the Commission, providing a copy to the Contractor. The decision of Commission or its duly authorized representative for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence.

*Id.*

Moreover, the agreed upon price increase in Lane's contract is not the typical delay damages. Typically, delay damages are items like unabsorbed home office overhead. Lane seeks nothing like delay damages in this case. Lane simply seeks to enforce the price increase that Lane negotiated with Defendant Walsh.

### III. THE PAY WHEN PAID PROVISION IN LANE'S SUBCONTRACT DOES NOT EXCUSE WALSH FROM PAYMENT AT THE INCREASED RATE BECAUSE WALSH HAS ACKNOWLEDGED PAYMENT FOR THE WORK BY PAYING LANE FOR THE WORK AT THE 2005 PRICES.

Defendants have also argued that the Subcontract provision providing that payment from the Owner is a specific condition precedent to Defendant Walsh's obligation to pay Lane precludes Defendant Walsh's obligation to Lane for the price increase unless Defendant Walsh recovers the increased price amount from the Owner. (Motion at pp. 5-6). However, Defendants ignore the fact that Defendant Walsh has acknowledged payment from the Owner by paying Lane for the work it performed after 2005; even though Defendant Walsh paid Lane at the 2005

8

prices.  Defendant Walsh has been paid for the work in place for which Lane seeks payment in this case.  The fact that Defendant Walsh agreed to pay Lane a higher price for work performed in 2006 does not excuse Defendant Walsh's obligation to pay Lane for work for which Defendant Walsh has received payment.  The pay when pay provision in the Subcontract does not excuse Walsh's obligation to pay Lane for the work perform at the increased price to which Defendant Walsh agreed.  The fact that Walsh may have agreed to pay its subcontractor Lane a higher price than Walsh originally may have negotiated with McKissack does not eliminate Walsh's obligation to honor the prices that Walsh accepted in 2006.

Even if Defendant Walsh could assert a valid "pay when paid" defense, a point Lane does not concede and vehemently contests, Defendant Walsh's surety cannot assert such a defense because Lane's Subcontract is not incorporated into the surety's bond, and the bond is a separate and distinct agreement from the Subcontract.  A subcontractor's inability to proceed against the general contractor because of a pay when paid clause does not prevent the subcontractor from recovering from the surety.  *Moore Bros. Const. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 723 (4th Cir. 2000), *citing OBS Co. v. Pace Constr. Corp.*, 558 So.2d 404 (Fla. 1990); *Brown & Kerr, Inc. v. St. Paul Fire and Marine Ins. Co.*, 940 F. Supp. 1245 (N.D. Ill 1996); *Shearman & Assoc., Inc. v. Continental Cas. Co.*, 901 F. Supp. 199 (D. Virgin Islands 1995).  Such an argument runs counter to the underlying purpose of the payment bond.  *Id.*

IV.    **LANE HAS A STATUTORY CAUSE OF ACTION AGAINST ST. PAUL FIRE & MARINE INSURANCE COMPANY PURSUANT TO THE MILLER ACT INDEPENDENT OF ITS CONTRACT ACTION AGAINST DEFENDANT WALSH.**

Lane has an independent statutory cause of action against Defendant St. Paul Fire & Marine under the Miller Act.  The Miller Act provides:

> Every person that has furnished labor or material in carrying out
> work provided for in a contract for which a payment bond is
> furnished under section 3131 of this title and that has not been
> paid in full within 90 days after the day on which the person did
> or performed the last of the labor for furnished or supplied the
> material for which the claim is made may bring a civil action on
> the payment bond for the amount unpaid at the time the civil
> action is brought and may prosecute the action to final execution
> and judgment for the amount due.

40 U.S.C. § 3133.  An action brought under this subsection must be brought no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action.  40 U.S.C. § 3133(b)(4).  Lane is entitled to prosecute its action under the bond, and in fact, due to the statute of limitation, Lane is required to prosecute its action within on year of its last work on the Project.  Thus Lane cannot be required to sit idly by while Defendant Walsh seeks to recover from the Owner.

It is well settled that federal law governs the rights and obligation of the Miller Act Surety.  *F. D. Rich Co. v. Industrial Lumber Co. Inc.*, 417 U.S. 116 (1974); *U.S. ex rel. William F. Klingensmith, Inc.*, 670 F.2d 1227 (D.C. App. 1982).  The Miller Act is highly remedial in nature and is construed liberally in order to properly effectuate the congressional intent of protecting those whose labor and material go into public projects.  *Clifford v. MacEvoy Co. v. U.S. ex rel. Calvin-Tompkin's Co.,* 322 U.S. 102 (1944).

There is no clear language in Lane's Subcontract which contemplates a waiver of Lane's Miller Act rights.  Circumvention of the Miller Act cannot rest on mere implication.  *U.S. ex rel. DDC Interiors, Inc. v. Dawson Construction Company, Inc.*, 895 F. Supp. 270, 274 (D.C. Co. 1995), *see also Fanderlik-Locke,* 285 F.2d 939, 941 (10th Cir. 1960).[1]  Rather, any waiver of Miller Act rights must be clear and express.  *Dawson Const. Co.,* 895 F. Supp. at 274.  The plain

meaning of those terms contemplates a waiver which is definite, clear, explicit and unmistakable. *Id.* At a minimum, an effective waive of Miller Act rights must include mention of the Miller Act and unambiguously express intention to waive the rights provided by it. *Id.* A Miller Act claim should not be stayed pending the dispute process between the government and prime contractor, unless the subcontractor has waived its rights under the Miller Act by a clear and express provision in the subcontract. *United States v. Phoenix Gen. Constr. Co.,* 462 F.2d 1098, 1099 (4th Cir. 1972); *H. W. Caldwell and Son, Inc. v. United States ex rel. John H. Moon and Sons, Inc.,* 407 F.2d 21, 23 (5th Cir. 1969); *United States v. Fryd Constr. Corp.*, 423 F.2d 980, 983 (5th Cir. 1970). No such language is contained in the Lane Subcontract.

## CONCLUSION

Lane's suit against Defendant Walsh and its surety should not be dismissed or stayed pending any resolution of a dispute between Walsh and McKissack and/or the Owner because Lane's claims in the instant case are based upon enforcement of a revised price schedule expressly agreed to by Defendant Walsh, and not any alleged delay damages as Defendant Walsh contends. Moreover, Lane's Miller Act claim against Defendant Walsh's surety is a separate and independent statutory right that Lane has not waived. There is no language in the Lane Subcontract that expressly waives Lane's Miller Act rights. Defendant Walsh has been paid for the work for which Lane seeks full and complete payment, and Defendant Walsh has acknowledged such payment by making payment to Lane at the 2005 prices. Lane does not seek delay damages in this case, but seeks enforcement of the price revision to which Defendant Walsh expressly agreed. As such, Defendant Walsh's surety is obligated to Lane under the bond, if Defendant Walsh fails to make payment.

---

[1] The *Dawson Const. Co.* court also distinguished *Seal & Co., Inc. v. A.S. McGaughan Co., Inc.*, 907 F.2d 450 (4th Cir. 1990), a case relied upon by Defendants, as inapposite because the *Seal* case was not brought under the Miller

For all these reasons, Defendants' Motion to Dismiss, or in the Alternative To Stay Pending Exhaustion of Mandatory Disputes Procedures must be denied, and Defendants should be order to Answer the Amended Complaint.

Respectfully submitted,

/s/ Stephen J. Annino, Esquire
Stephen J. Annino, Esq. (D.C. Bar No. 390252)
KASIMER & ANNINO, P.C.
7653 Leesburg Pike
Falls Church, Virginia 22043
(703) 893-3914 – Telephone
(703) 893-6944 – Facsimile
sannino@kasannlaw.com
Counsel for Plaintiff The Lane Construction
Corporation

Act.  895 F. Supp. at 274.

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that a true and correct copy of Plaintiff The Lane Construction

Corporation's Opposition to Defendants' Motion To Dismiss, or in the Alternative To Stay

Pending Exhaustion Of Mandatory Disputes Procedures and attached exhibits was served on

Defendants this 30th day of November, 2007 by the Court's electronic filling system addressed

to:

<div align="center">

Nicole L. Campbell, Esq.
Huddles Jones Sorteberg & Dachille, P.C.
10211 Wincopin Circle, Suite 200
Columbia, Maryland 21044
(310) 621-4120 - Phone
(301) 621-4473 – Facsimile
Campbell@hjpc.com
Counsel for Defendants

</div>

/s/ Stephen J. Annino, Esquire

C:\Documents and Settings\Gina\My Documents\K & A Temporary Work in Progress\Final Lane Opposition to Motion to Dismiss 11-30-07.doc

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| f/u/b THE LANE CONSTRUCTION | ) | |
| CORPORATION d/b/a SENATE | ) | |
| ASPHALT, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 1:07-CV-01576 |
| | ) | Judge: Reggie B. Walton |
| WILLIAM V. WALSH | ) | |
| CONSTRUCTION CO., INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF ROBERT MCKEEVER**

I, Robert McKeever, state that I am more than twenty-one (21) years of age, and have personal knowledge of, and am competent to testify with respect to all matters stated herein:

1.     I am Plant Manager for The Lane Construction Corporation ("Lane"). I have worked for Lane for over twenty (20) years and have served as Plant Manager since 2000. In my capacity as Plant Manager, I have personal knowledge of the facts and circumstances surrounding Lane's subcontract for, and performance and applications for payment on, a project known as Lincoln Circle and Approach Way Rehabilitation  (hereinafter the "Project").

2.     On or about April 1, 2004, Lane entered a contract with William V. Walsh Construction Co., Inc. ("Walsh") concerning the Project (hereinafter the "Subcontract"). A true and correct copy of the original Subcontract that Lane signed, without change orders, modifications or revisions is attached hereto and incorporated herein by reference as Exhibit 1.

3.     Pursuant to the Subcontract, the prices contained on Attachment B were for all work to be completed in the year 2005. See Attachment "B" to Exhibit 1.

4. In 2006, Walsh requested that Lane perform work under the Subcontract, and Lane advised that the prices in the Subcontract expired in 2005, and Lane submitted a revised price proposal to Walsh for the work to be performed in 2006. A true and correct copy of Lane's revised price proposal is attached hereto and incorporated herein by reference as Exhibit 2.

5. Walsh accepted the revised price proposal, and directed Lane to perform work. A true and correct copy of an email from James Walsh, CEO of William V. Walsh Construction Co., Inc. in which Mr. Walsh memorialized Walsh's acceptance of Lane's revised price proposal is attached hereto and incorporated herein by reference as Exhibit 3.

6. Lane performed the work directed by Walsh and billed Walsh for Lane's work at the revised price as agreed by Walsh. True and correct copies of Lane's pay applications for work performed in 2006 at the revised price rate is attached hereto and incorporated herein by reference as Exhibit 4.

7. Walsh requested that Lane provided a break down of the work performed in 2006 to reflect the difference between Lane's 2005 and 2006 prices to assist Walsh's efforts to recover the price increase from McKissack and/or the Owner. Lane complied with Walsh's request and provided the requested break down in its pay application, but Lane did not agree to forego payment for the price increase unless Walsh collected the price increase amount from McKissack and/or the Owner.

8. Lane has demanded payment from Walsh for the work that Lane performed in 2006 at the agreed upon 2006 prices. Walsh has made incomplete payment to Lane for this work by paying Lane for this work at the 2005 prices, instead of the prices to which Walsh agreed in 2006. Contrary to Mr. Walsh's representation, Walsh has failed or refused to make payment to Lane for the price increase for work performed in 2006.

2

9.    Lane did not condition its price increase on Walsh's ability to recover the increased price from the Owner. Lane's original Subcontract provided that the pricing contained on Attachment B was for work to be completed in the year 2005. When Walsh asked Lane to perform work in 2006, Lane required a price increase. Lane submitted its increased prices and Walsh accepted the increased prices and directed Lane to commence work. Although Walsh requested that Lane prepare documentation to assist Walsh in its efforts to recover the price increase from McKissack or the Owner, Lane did not agree to forego payment for the price increase if Walsh could not collect the increased price from the Owner. Lane provided a breakdown for Walsh so that Walsh to quantify the work performed at the increased price for its claim, but Lane did not agree only to receive payment for the increased prices if Walsh recovered the price increase from the Owner.

10.    Neither I nor Mark Schiller agreed that Lane's increased costs were caused by delays to the Project caused by the Owner. Lane had no basis upon which to make such a determination, and Lane performed virtually no work on the Project during 2005. For these reasons, Lane required the price increase as an amendment to its Subcontract prior to performing the work in 2006. Lane was aware that Walsh intended to seek reimbursement from the Owner to recover the cost increase, but Lane did not agree to forego payment for the price increase unless Walsh recovered the increase from the Owner.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Execute on: ___11/29/07___

_____
Robert McKeever

# EXHIBIT 1

# SUBCONTRACT AGREEMENT

SUBCONTRACT AGREEMENT MADE BETWEEN

THE CONTRACTOR: __WILLIAM V. WALSH CONSTRUCTION CO., INC.__ AND

THE SUBCONTRACTOR: __Senate Asphalt__

__P.O. Box 71080 –Southwest Station, Washington, DC 20024__

PHONE No.: __(202) 479-1009__    FAX No.: __(202) 479-1021__

## 1. THE PROJECT

WVW JOB NO.: __J-128__    DATE: __March 19, 2004__

COST CODE: __S02-002020000__

OWNER'S NAME: __National Park Service__

OWNER'S CONTRACT NO.: __C3059020904__

JOB NAME: __Lincoln Circle and Approach Way Rehabilitation – Task Order 7__

LOCATION: __Washington, DC__

## SCOPE OF WORK

2. Subcontractor warrants that it is thoroughly familiar with the site conditions and the Prime Contract Documents (see ATTACHMENT A) and that the Subcontractor shall furnish anything necessary to complete in place the work as set forth in ATTACHMENT B, in strict accordance with the Prime Contract Documents (including plans and specifications, general provisions, general and special conditions). If subcontractor's proposal is made Attachment A, it is for scope purposes only. The terms and conditions as set forth in this agreement shall govern.

William V. Walsh reserves the exclusive and sole right to exercise all remaining contract options as described in the prime contract documents and as listed in ATTACHMENT B.

Also included are all security and safety requirements, compliance with federal, state and local regulations, OSHA and the owner's regulations, submittals, samples, surveys, transportation of your personnel, materials and equipment, coordination with William V. Walsh Construction and other trades, participation in scheduling, protection of existing elements and quality control.

## FLOW-DOWN RELATIONSHIP

3. The Subcontractor is bound to the Contractor in the same way the Contractor is bound to the Owner and shall assume toward the Contractor all the obligations and responsibilities which the Contractor assumes toward the Owner and shall have the benefit of all rights, remedies and redress against the Contractor, pursuant to the Prime Contract, has against the Owner, except that this Subcontract shall govern any inconsistent provision of the Prime Contract.

## THE SUBCONTRACT SUM

4. The Contractor shall pay the Subcontractor for the performance of this Subcontract in accordance with the schedule of values shown on ATTACHMENT B in partial payments as hereinafter described.

## PRICE AND PAYMENT

5. The Subcontract price shall be paid in partial payments, when received by the Contractor from the Owner, to Subcontractor for the payment for work in place and material on jobsite. Payment from the Owner is a specific condition precedent to the Contractor's obligation to pay the Subcontractor, the risks of nonpayment by the Owner being on the Subcontractor for its portion of the work in place or material on the job site. Ten percent (10%) retention shall be withheld until final payment is due except that retained funds will be reduced when and to the extent the Owner's retained funds withheld from the Contractor is reduced. Final payment shall be due after completion of all work, acceptance by the Owner, compliance with all Subcontract obligations, and receipt of final payment from the Owner, which items shall be conditions precedent to the making of final payment to Subcontractor. The Contractor is entitled to proof of payment for labor, material and services used before any payment is due. Material paid for shall belong to the Contractor, but shall remain in the care, custody and control of Subcontractor and be stored at Subcontractor's risk. The Subcontractor shall be responsible at all times for his labor and/or materials until same is accepted by the Owner. Subcontractor shall furnish guarantees and all other documents required by the Prime Contract for the Subcontractor's work, including releases of all claims and liens as a condition

1

precedent for final payment.  Partial releases may be required at the Contractor's option as a condition precedent to any partial payments for work completed and the Contractor may require the Subcontractor to certify and/or exhibit such other evidence that all entities furnishing labor, materials, and equipment under prior requisitions have been paid in full.  Liquidated damages withheld by Owner will be assessed against Subcontractor for delay attributable to Subcontractor's fault.  The Subcontractor shall itemize the Subcontract price as a basis for establishing value of work completed, and partial payments.  Subcontractor agrees that it will not be paid by the Contractor for work and materials in place until ten (10) days after the Contractor's receipt of payment from the Owner.  If the Contractor withholds making payment to the Subcontractor until the Subcontractor has complied with the aforesaid terms and conditions, the Subcontractor shall still diligently proceed with the work as required.

### LIABILITY AND INDEMNITY INSURANCE

6.  The Subcontractor shall procure, at its sole cost and expense, the insurance coverage's set forth below, and shall maintain such coverage's in full force and effect as specified in this Paragraph.  The Subcontractor shall include the Contractor [William V. Walsh] as an additional insured to the insurance policies described below.  The insurance coverage afforded under the policies described herein shall be primary and non-contributing with respect to any insurance carried independently by the Contractor.  All such insurance policies shall indicate that as respects the insured (whether named or otherwise), cross liability and sever ability of interests shall exist for all coverage's provided there under.  In addition, all such insurance policies shall include a waiver of subrogation endorsement in favor of the additional insured.  The insurance specified below shall be placed with insurance companies reasonably acceptable to Contractor, shall be written on an occurrence basis, and shall incorporate a provision requiring the giving of notice to Contractor at least thirty (30) days prior to the cancellation, non-renewal or material modification of any such policies.  The Contractor shall promptly furnish the Contractor with certificates of insurance evidencing the insurance required hereunder, and shall not commence any services under this Agreement until such insurance is obtained.

(i)   Commercial General Liability Insurance.  A broad form Commercial General Liability Insurance Policy in form and substance reasonably acceptable to the Contractor and including, without limitation, appropriate endorsements adding the following coverage's: Premises and Operations Liability; Explosion, Collapse and Underground Damage Liability; Personal Injury Liability (with employee and contractual exclusions deleted); Broad Form Property Damage Liability; Contractual Liability supporting the Contractor's indemnification agreements in this Contract; Completed Operations and Products Liability for a period of not less than three (3) years following the Contractor's acceptance of the Project; and Independent Contractor's Protective Liability.  The Commercial General Liability Insurance Policy must be written with a combined single limit of liability of not less than $1,000,000 for each occurrence of bodily injury and/or property damage and an annual aggregate of liability per project of not less than $2,000,000 for bodily injury and/or property damage, and an annual aggregate of liability of not less than $2,000,000 for Completed Operations and Products Liability.

(ii)  Comprehensive Automobile Liability Insurance.  A Comprehensive Automobile Insurance Policy in form and substance reasonably acceptable to the Contractor [William V. Walsh].  The Comprehensive Automobile Liability Insurance Policy must provide coverage for all owned, hired, rented and non-owned automobiles, and must be written with a combined single limit of liability of not less than $1,000,000 for each occurrence of bodily injury and/or property damage.

(iii) Worker's Compensation Insurance.  A Worker's Compensation Insurance Policy in form and substance reasonably acceptable to the Contractor and in an amount not less than the statutory limits (as may be amended from time to time), including Employees Liability Insurance with limits of liability of not less than (i) $500,000 for bodily injury by accident, each accident, (ii) $500,000 for bodily injury by disease, each employee, and (iii) $500,000 aggregate liability for disease.

(iv)  Property Insurance.  A Property Insurance Policy covering all materials, equipment and other portions of the Work stored off-site or in transit; it being expressly acknowledged and agreed by the Contractor that it shall assume responsibility for any loss or damage to such property.

(v)   Umbrella Liability Insurance.  An Umbrella Liability Insurance Policy in form and substance reasonably acceptable to the Contractor [William V. Walsh] written in excess of the coverage's provided by the insurance policies described above in subsections (i),(ii) and the Employer's Liability in (iii).  The Umbrella Liability Insurance Policy must be written with a combined single limit of liability of not less than $5,000,000 for each occurrence of bodily injury and/or property damage, and an annual aggregate of liability of not less than $5,000,000 for bodily injury and/or property damage.

The Contractor shall not insure nor be responsible for any loss or damage to tools, equipment or other property of any kind owned, rented or leased by the Subcontractors, sub-contractors, or their respective employees or agents, unless covered by the Contractor.

To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, Contractor, Architect, Architect's consultants and agents and employees of any of them from and against all injuries, claims, damages, losses and expenses, including but not limited to attorney's fees, arising directly or indirectly out of the obligations herein undertaken or resulting out of operations conducted by the Subcontractor, the Subcontractor's Sub-subcontractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such injury, claim, damage, loss or expenses is caused in part by a party indemnified hereunder, save and except claims or litigation caused by or resulting from the sole negligence of the party indemnified hereunder.

## BONDS

7.    The Subcontract shall furnish performance and payment bonds in a form satisfactory to the Contractor and in the Department of the Treasury's approved sureties list, in an amount equal to the Subcontract sum, which bonds shall carry the surety's consent to changes in price and time of performance necessary to conform to Prime Contract requirements. Furnishing of said bonds shall be a condition precedent to the Contractor's obligation to release partial payments. Contract price includes the amount shown in **ATTACHMENT B** to cover the Subcontractor's cost for the bond.

## SHOP DRAWINGS, SAMPLES AND DATA SUBMISSIONS

8.    All submittals such as shop drawings, catalogs, samples and material lists required by Prime Contract, which pertain to this work, shall be furnished in a complete and timely manner. Subcontractor shall be responsible for delays because of failure to do so and for any deviation from plans and specifications. All deviations from the Prime Contract documents must be noted clearly on the submittals, and by separate cover letter the Subcontractor shall state reasons for the deviation and refer to the applicable contract provision. The complete set of submissions for this Subcontract work shall be submitted by the Subcontractor to the Contractor within thirty (30) days from the date of this Subcontract, unless otherwise stated in the Contractor's Schedule of Progress. Approval by the Owner or the Contractor does not constitute a waiver or modification of the Prime Contract requirements.

## TIME IS OF THE ESSENCE

9.    Time is of the essence. The Contractor has the right to direct the manner in which the Subcontractor performs its work. Subcontractor shall proceed with the performance of the work at such time and in such sequence as the Contractor may direct and/or as required by the Schedule of Progress, which may be updated and revised from time to time by the Contractor as working conditions require, including overtime or shift work performance as necessary. If overtime or additional shifts are required solely to accelerate project completion through no fault of the subcontractor, it shall be authorized in writing prior to such acceleration effort and be paid for by the Contractor. Payments due may be withheld to insure timely progress and completion of work. The Subcontractor shall be liable for all losses and damages incurred by the Contractor (including consequential damages) due to inexcusable delays of the Subcontractor in the performance of the work, including delay costs not reimbursable from the Owner due to concurrent, inexcusable delays of the Subcontractor.

## EXTENSIONS OF TIME

10.    Subcontractor shall be entitled to an extension of time for performing and completing the work covered by this subcontract upon the same terms and conditions an extension of time is allowable under the Prime Contract, and only to the extent that an extension of time is actually granted to the Contractor by Owner, or its representative under the Prime Contract. The Subcontractor shall give notice of the excusable delay to the Contractor in writing within three (3) calendar days from the beginning of said delay in order that the Contractor may in turn notify the Owner. If notice is not given timely, said excusable delay may be considered waived. The Owner's decision, or its representative's, with regard to the delay, including the assessment of liquidated damages, shall be binding upon and chargeable to the Subcontractor, subject to the disputes procedure provided in the Prime Contract.

## DAMAGES FOR DELAY

11.    The Contractor shall not be independently liable to Subcontractor for any unforeseeable delay or interference occurring beyond the Contractor's control or for delay or interference caused by Owner or other subcontractors or suppliers. Subcontractor shall only be entitled to reimbursement for any damages for delays recovered on its behalf by the Contractor from the Owner or others. The Subcontractor shall have the right, at its expense, to exercise all provisions of the Prime Contract to recover said damages against the Owner. In the event that the Contractor seeks to recover damage for delay against the owner or others and the Subcontractor participates in such claim, the Subcontractor shall be responsible for its pro rata share of any legal expert or other expenses in presenting and/or prosecuting the overall claims. The Contractor shall have the right, at any time and for any reason, to delay or suspend the whole or any part of the work herein. A time extension shall be the sole and exclusive remedy of the Subcontractor for delays or suspensions caused by Contractor, even if the delays or suspensions were: (1) of a kind not contemplated by the parties, (2) amounted to an abandonment of the contract, or (3) were caused by active interference.

## SCHEDULE

12.    The Contractor may schedule this project using CPM Schedule techniques and/or simple bar charts. Subcontractor agrees to meet with the Contractor and to provide the necessary detailed information to properly depict activities, including their costs and duration, at no additional cost to the Contractor. All such data shall be provided within fifteen (15) days of the Contractor's written notice and request. The Contractor may at its option withhold making payments to the Subcontractor until the Subcontractor has provided said information. The Contractor may modify and change the schedule from time to time as it deems appropriate in accordance with actual performance conditions. Subcontractor shall perform the work as directed by such schedules as expeditiously as possible despite any pending disputes. See **ATTACHMENT E** for supplemental schedule information.

## DEFAULT TERMINATION

13.    The following events determined by the good faith judgment of the Contractor shall be deemed a breach of this Agreement by the Subcontractor: Failure to expeditiously prosecute and complete the whole or any part of the work in accordance with the current Schedule of Progress and/or directions from the Contractor; failure to pay for labor and material, payroll taxes, contributions or insurance premiums; interference with the performance of work by others for any reason; an act of bankruptcy or insolvency; or any other material failure to fulfill obligations of this Subcontract or of the Prime Contract concerning the Subcontractor's work or responsibilities. If the Subcontractor breaches the Subcontract, the Contractor may terminate Subcontractor's right to proceed upon three (3) days written notice. In the event that the Contractor believes in good faith that the work is being endangered by the Subcontractor's failure to prosecute the work or take action, such written notice may be omitted and the Subcontractor's performance in whole or in part may be

immediately terminated. The Contractor may then have the work completed and may use Subcontractor's material, supplies, tools and equipment to complete. Subcontractor and its surety shall continue to be liable for all costs to complete and any damages and expenses including reasonable counsel fees, liquidated damages assessed by owner and other liabilities which may result from the default and breach, without waiver of any other rights or remedies available to the Contractor, including right of setoff and collection of any funds which may be due Subcontractor under other subcontracts with the Contractor. If the Contractor wrongfully exercises its default option under this Article, the Subcontractor's remedy shall be solely and exclusively under Article 27, Termination for Convenience.

The Subcontractor agrees that in the event the Contractor is terminated for default by the Owner, all disputes relating to or arising out of the Subcontract shall be stayed pending the final resolution of the Contractor's termination for default in accordance with the administrative and/or judicial disputes procedures in the prime contract. The Subcontractor further agrees that all payment bond actions by the Subcontractor against the Contractor shall be stayed pending the final resolution of the Contractor's termination for default. In the event that the Owner's termination for default of the Contractor is upheld, the Subcontractor agrees that the amount of any recovery the Subcontractor is entitled to from the Contractor shall be limited to the recovery allowed pursuant to Article 27, Termination for Convenience.

## EXTRA WORK

14. The Contractor may at any time direct the Subcontractor to perform extra work or changes under this Subcontract. Only extra work authorized by the Contractor as an extra or change in writing shall be paid for by the Contractor. If the extra work direction does not originate from Owner's direction and there is no prior agreement on price, then Subcontractor shall be paid for the actual direct costs of said work plus fifteen percent (15%) for overhead, profit, supervision and small tools, which will constitute the entire amount due the Subcontractor for the extra work, including any impact or delay effect.

## OWNER CHANGES

15. Changes ordered by Owner shall be performed and paid for in accordance with the terms of the Prime Contract, including all rights of dispute and appeal, provided reservation and exercise of said rights to not interfere with the progress of the work. Payment for Owner changes shall be made in accordance with Paragraph 5, Price and Payment, and payment for Owner changes shall not be due the Subcontractor as a specific condition precedent until the Contractor from the Owner receives said payment.

## CONTRACT INTERPRETATION

16. The Contractor's interpretation of contract requirements shall be binding upon Subcontractor and complied with, except that Subcontractor shall have the right to claim adjustment of the contract because of said interpretation, if said claim is made in writing within forty-eight (48) hours after ruling and direction.

## DISPUTES

17. Disputes arising out of Owner acts, omissions or responsibilities shall be resolved in accordance with the disputes procedures in the Prime Contract. Subcontractor shall have the right to exercise the Contractor's rights at the Subcontractor's sole cost and shall be bound thereby. The Contractor shall have no direct liability to the Subcontractor except to give the Subcontractor the opportunity to exercise the rights in the Prime Contract. The Subcontractor shall be required as a condition precedent to submitting a claim against the Owner to certify its claim in accordance with all certification requirements in the Prime Contract. Subcontractor agrees to indemnify and hold harmless the Contractor for any defects or misrepresentations in its certifications, including any relating to cost or pricing data. In the event that arbitration is provided for in the Prime Contract for disputes between the Owner and the Contractor, Subcontractor specifically agrees to submit its disputes arising out of said Owner acts, omissions or responsibilities in any arbitration proceeding between the Owner and the Contractor. Subcontractor shall be given the opportunity to confer with the Contractor in the selection of arbitrators, unless the dispute is solely one between the Owner and Subcontractor, in which event the Subcontractor may make the selection of arbitrators in the Contractor's name. All disputes between the Contractor and Subcontractor, not involving the Owner's acts, omissions or responsibilities shall, at the contractor's sole option, be resolved by arbitration in accordance with the rules of the American Arbitration Association. Subcontractor specifically agrees that any such arbitration proceedings shall, at the Contractor's sole option, be consolidated with any arbitration proceedings between the Contractor and any other party.

Subcontractor specifically agrees that any dispute with the Owner or the contractor shall not interfere with Subcontractor's progress of its work in any manner, and that Subcontractor shall proceed with its work as ordered, subject to claim. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrators shall be final, and judgment may be entered upon it in any court having jurisdiction thereof. Any such award shall be binding and enforceable against any persons, surety and/or bonding company, which guarantee the performance by the Subcontractor of this Agreement in any manner.

## BACKCHARGES

18. All charges and back charges assessed by the Contractor against the Subcontractor shall be deemed accepted by Subcontractor unless rejected in writing within thirty (30) days. The Contractor is authorized to deduct and offset from any payments due Subcontractor an amount equal to any and all sums, obligations, liabilities, back charges, claims (liquidated or unliquidated) owed by Subcontractor to Contractor arising under this Subcontract or any other contract or agreement between the Subcontractor and the Contractor.

## PLANT AND CLEANUP

19. Subcontractor shall provide its own plant and facilities, including scaffolding and hoists, do its own cleanup, and repair or replace damaged, defective and defaced work caused by its own negligence. The Subcontractor shall cleanup and remove from the site all of its rubbish, debris, etc. on a daily basis, unless the Contractor directs otherwise. Upon completion of the subcontract work, all

4

Subcontractor's materials, equipment, etc. must be immediately removed from the jobsite by Subcontractor. Failure to comply will permit the Contractor to do so and backcharge Subcontractor for the cost. If Subcontractor uses the Contractor's hoist, scaffolding or facilities, it will be responsible for the operating expenses of such equipment when in use for Subcontractor's benefit.

## BANKRUPTCY AND DELINQUENT TAXES

20. In the event of any act of bankruptcy insolvency by the Subcontractor or notice of levy involving delinquent taxes owed by Subcontractor, the contractor shall have the right to withhold payments and apply the same to secure performance of the Subcontract without prejudice to al other rights against Subcontractor or its surety.

## RESPONSIBILITY FOR WORK IN PLACE

21. The Subcontractor shall check all work performed by others necessary to "receive" the Subcontractor's work. Failure to give notice of any discrepancy shall relieve the Contractor of any responsibility therefore. The Subcontractor shall be responsible for all field measurements and shall check elevations and grades to insure proper fitting of its work. It shall not be incumbent upon the Contractor to discover any mistakes, errors, omissions or deviations from the contract requirements in the subcontract drawings, and the Owner's final approval of drawings made by the Subcontractor shall not relieve the Subcontractor from responsibility for unauthorized changes, deviations or omissions or for error of any sort in its drawings.

## LICENSES AND FEES

22. Subcontractor shall be responsible for all taxes, permits, licenses and fees necessary to perform its work, including any increase therein, if any, during the life of the Subcontract.

## LABOR FORCE

23. Subcontractor shall be responsible for performance regardless of any interference of any trades council or other labor or union organization. Any work stoppage by employees which will in the opinion of the Contractor unreasonably delay the work will be a breach of the Subcontract subject to the rights set forth in Paragraph 13. The Subcontractor shall immediately remove from the work such of his employees as the Contractor shall deem incompetent, careless, insubordinate or otherwise undesirable. The Subcontractor shall employ at all times a sufficient number of workmen with sufficient equipment and proper materials which in the opinion of the Contractor shall be required to prosecute the work in a diligent and expeditious manner.

## NONDISCRIMINATION

24. Subcontractor shall not discriminate against any employee or applicant for employment, advancement, transfer, layoff or termination because of race, religion, color, sex or national origin. All Equal Opportunity or affirmative action requirements of the Prime Contract shall be obligations of the Subcontractor.

## SUPERINTENDENCE

25. Subcontractor shall employ full-time on the jobsite a competent Superintendent, satisfactory to the Contractor with full authority to act on Subcontractor's behalf. The Contractor shall have the right to require the Subcontractor to replace the Superintendent if, in the opinion of the Contractor, the Subcontractor's Superintendent is not satisfactorily performing the work.

## PATENT INFRINGEMENT

26. Subcontractor shall indemnify the Contractor from any use or infringement of patents.

## TERMINATION FOR CONVENIENCE

27. Contractor shall have the right to terminate this Agreement for its own convenience for any reason by giving notice of termination effective upon receipt thereof by Subcontractor. Termination for default under Paragraph 13, if wrongfully made, shall be treated as a termination for convenience. Settlement with the Subcontractor shall be accomplished in accordance with the provisions of the Termination for Convenience clause in the Prime Contract. If the Termination for Convenience clause in the Prime Contract is not applicable, the Subcontractor shall only be paid either the actual cost for work and labor in place, plus fifteen percent (15%), or a pro rata percentage of the Subcontract amount equal to the percentage of completion for the Subcontractor's work as approved by the Contractor, whichever is less. Subcontractor shall not be entitled to anticipated profits on unperformed portions of the work

## ASSIGNMENT

28. No assignment hereunder, including an assignment of proceeds due or to become due to the Subcontractor is allowed without prior written approval of the Contractor.

## NOTICES

29. All notices required under this Subcontract or the Prime Contract shall be addressed to Contractor's office located at <u>14674 Rothgeb Drive, Rockville, Md. 20850.</u> Notices required by the various provisions of the Prime Contract (not otherwise dealt with herein) shall be due in the Contractor's office in one-half (½) the time specified in the Prime Contract so that Contractor will have sufficient time to forward its notice within the required period. Failure of Subcontractor to forward notices in a timely manner as required by the various equitable adjustment provisions of the Prime Contract shall operate to waive its rights to any such adjustments if the Owner rejects the claim.

## OWNER APPROVAL

30. This Agreement is contingent upon Subcontractor or its product being approved by the Owner. If a disqualification occurs because of failure to comply with and strictly fulfill the obligations herein, said failure shall be deemed a breach by the Subcontractor. Any other rights of disqualification by Owner shall render this Agreement null and void.

## RECITATION, SEVERABILITY AND WAIVER

31.  Attachments are part of this Agreement. If this Agreement is retained by Subcontractor without executing and returning same within fifteen (15) days, it shall be deemed accepted; however, acceptance in writing is a condition precedent to payment due hereunder. The Subcontractor shall not deal directly with or work directly for Owner. This instrument is the entire Agreement between the parties. If any provision herein is held to be invalid by any competent court, the remaining Agreement shall survive. This Agreement shall control any inconsistency in any documents referred to or incorporated by reference. It is further agreed that no action or failure to act by the Contractor shall constitute a waiver of any breach of any term or condition in the Agreement or any subsequent breach thereof, nor shall such action or failure to act constitute a waiver of any right offered Contractor under this Agreement.

## OSHA

32.  Subcontractor shall comply with OSHA and any other relevant and applicable federal, state and local safety regulations, standards and requirements. Subcontractor shall indemnify Contractor from any failure to comply with these requirements including fines and abatement costs and delays to project. Failure to comply shall be a breach of contract, subject to provisions of Paragraph 13.

## LIQUIDATED DAMAGES

33.  In the event that liquidated damages are assessed against the Contractor and it is determined that Subcontractor is responsible to the Contractor for said liquidated damages, then Subcontractor shall pay to the Contractor liquidated damages in addition to any damages incurred by the Contractor as the result of Subcontractor's failure of performance.

## MECHANIC'S LIENS

34.  Subcontractor hereby waives it right to any mechanic's liens on the property of the Owner to the extent allowed by law.

## EXECUTION

35.  This subcontract must be executed by the Subcontractor and returned to the Contractor within fifteen (15) days of its receipt by the Subcontractor. Until the subcontract is executed and returned to the Contractor, along with any required bonds and certificates of insurance, the Contractor has the right to withhold any payment due the Subcontractor

## GOVERNING LAW

36.  This subcontract shall be governed by the laws of the State where Contractor has its principal office and any actions or lawsuits arising hereunder to the extent permitted by law shall be brought in the District where Contractor's principal office is located without regard to principles of conflict of laws or forum non-convenience.

## ATTACHMENTS

37.  The following attachments are included as part of this contract:

ATTACHMENT A: Prime Contract Documents
ATTACHMENT B: Scope of Work and Schedule of Values. Includes Bond amount, if required.
ATTACHMENT C: Davis-Bacon Wage Rates applicable to this contract
ATTACHMENT D: Subcontract Information Package
ATTACHMENT E: Supplemental Schedule Information

SENATE ASPHALT
Subcontractor

Signature

Kirk D. Junco, Vice President
Name & Title

Date: March 29, 2004

WILLIAM V. WALSH CONSTRUCTION CO., INC
Contractor

Signature

James V. Walsh      CEO
Name & Title

Date:

*Subcontractor to sign and initial each sheet and return both copies of the Subcontract Agreement to the Contractor within fifteen days. The Contractor will then sign and return one copy for the Subcontractor's files.*

ATTACHMENT A

Prime Contract Documents

Subcontractor warrants that it is thoroughly familiar with the site conditions and the Prime Contract Documents (including plans and specifications, general provisions, general and special conditions). The following plans and specifications are made a part of this contract:

Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects (FP-96) Dated 1996

Federal Highway Administration Eastern Federal Lands Highway Division Special Contract Requirements: Project PLH-NACC 25(1)

Section 636 Supplemental Specifications: District of Columbia Department of Public Works Special Contract Requirements: Project PLH-NACC 25(1)

Drawings 99% Plans for Proposed PLH-NACC 25(1) (see cover sheet)

| Sheet Number | |
|---|---|
| A1 | Title Sheet |
| A2 | Conventional Symbols and Abbreviations |
| A3 | Location Map and Construction Signing Plan |
| A4 | Construction and Drainage and Utility Plan Sheet Layout |
| A5 | Signing and Striping, Traffic Control, and Erosion Control Plan Sheet Layout |
| B1-B7 | Typical Sections |
| C1-C6 | Tabulation of Quantities |
| D1-D31 | Schedules and Summaries |
| E1 | Staging Area Plan |
| F1-F4 | Survey Control Information |
| G1 | Alignment Plan and Horizontal Curve Data |
| H1-H28 | Construction Plans and Profiles |
| I0-I15 | Drainage and Utility Plans |
| J1-J15 | Drainage Profiles |
| K1-K17 | Lighting Plans |
| L1-L8 | Barrier Wall Architectural Profiles |
| M1-M8 | Barrier Wall Structural Profiles |
| N1 | Erosion Control Narrative |
| N2-N6 | Erosion and Sediment Control Plans |
| O1-O4 | Signing and Striping Plans |
| P1-P6 | Traffic Signal Plans |
| R1 | Bridge Approach Repairs |
| S1-S7 | Pedestrian Plaza Plan, Bollard and Barrier Wall Details |
| T1-T52 | Standards and Details |
| U1-U22 | Cross Sections |

Initial & Date:

7

ATTACHMENT B

Scope of Work
Lincoln Circle and Approach Way Rehabilitation – Task Order 7

| PAY ITEM/ SPEC. | WORK DESCRIPTION | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 41301x | Asphalt Pavement Milling | 11,696 | m² | $3.25 | 38,012 |
| 41301x | Daniel French Drive 40mm Milling | 0 | m² | $3.25 | 0 |
| 41301x | Bridge Approach Milling | 120 | m² | $3.25 | 390 |
| 41801AD | Superpave Asphalt Concrete, 9.5 mm agg. Type 4 | 2,582 | t | $67.70 | 174,801 |
| 41801AD | Bridge Approach Superpave Asphalt Concrete, 9.5 mm agg. Type 4 | 73 | t | $67.70 | 4,942 |
| 41801AD | Daniel French Drive Superpave Asphalt Concrete, 9.5 mm agg. Type 4 | 168 | t | $67.70 | 11,374 |
| 41801CD | Superpave Asphalt Concrete, 19 mm agg | 524 | t | $65.25 | 34,191 |
| 41801CD | Bridge Approach Superpave Asphalt Concrete, 19 mm agg. | 80 | t | $65.25 | 5,220 |
| 41801CD | Daniel French Drive Superpave Asphalt Concrete, 19 mm agg. | 333 | t | $65.25 | 21,728 |
| 41802CD | Superpave Asphalt Concrete, 19 mm agg. Wedge and Leveling | 2,814 | t | $65.25 | 183,614 |
| | | | | | 474,272 |

Total Contract          $ 476,772*

Scope Notes:
- Price is for all work to be completed in the year 2005
- Senate Asphalt will conduct a winter shutdown for approx. 30 days beginning around February 1, 2004
- This is a unit price proposal based on bid quantities from drawings titled "Rehabilitation of Lincoln Memorial Circle," (including: typical sections, tabulations of quantities, construction plan, profile and traffic control plan) see Attachment A "Prime Contract Documents".
- Proposal includes 9 mobilizations for asphalt laydown & 8 mobilizations for milling. Additional mobilizations are $1,500.00 each.
- Truck and equipment access to be provided by others.
- Prices are not based upon scale wages.
- Specifically excluded: maintenance of traffic operations
- Additional exclusions: winter pavement maintenance, survey/layout, excavation, earthwork, undercut, proofrolling, stonework, patching/utility patching, utility adjustments, sawcut, prime, stone under curb/gutter and concrete flatwork, curb/gutter & concrete flatwork, herbicide, offsite work, fine grading, pavement markings (either temporary or permanent), bond, trails, signs and testing.

*Includes Bond

ATTACHMENT C

Davis-Bacon-Wage Rates

This project requires submission of certified payroll information and is subject to periodic wage rate interviews by Government personnel. The following wage rate decision(s) are applicable to the work under this contract.

General Decision Number  DC 020003  Dated May 24, 2002

ATTACHMENT D

## Subcontract Information Package

I     Requisition Requirements

Ia     Requisition Form

Ib     Subcontract Affidavit, Partial Release and Waiver of Liens

II     Certified Payrolls and Labor Compliance Requirements

IIIa     Affirmative Action and Minority Utilization

IIIb     Non-Discrimination in Employment

IV     IRS Business Regulations

V     Insurance Requirements

VI     Special Project General Conditions, Project Phasing, Safety, Security, Etc.

VII     Sales Tax Requirements

Initial & Date:

ATTACHMENT E

## Supplemental Schedule Information

The Contractor may schedule this project using CPM Schedule techniques and/or simple bar charts. Subcontractor agrees to meet with the Contractor and to provide the necessary detailed information to properly depict activities, including their costs and duration, at no additional cost to the Contractor. All such data shall be provided within fifteen (15) days of the Contractor's written notice and request. The Contractor may at its option withhold making payments to the Subcontractor until the Subcontractor has provided said information. The Contractor may modify and change the schedule from time to time as it deems appropriate in accordance with actual performance conditions. Subcontractor shall perform the work as directed by such schedules as expeditiously as possible despite any pending disputes.

Contract completion is Sept 5, 2005. Onsite work for subcontractors will start approximately March 1, 2004. CPM to be issued for coordination

Initial & Date:

11

# EXHIBIT 2



# SENATE ASPHALT

Proposal To:                                          Date:     17-Apr-06
William V. Walsh Construction Company, Inc.           Bid #:   06-0001
14674 Rothgeb Drive                                   Project Description:
Rockville, Maryland 20850                             Lincoln Circle Rehabilitation-Task Order 7
Attn: Mr. James Walsh                                 Washington, D.C.
                                                      Revised Pricing

We are pleased to quote the following prices in accordance with your request on the above referenced project. We
would like to point out that this quotation is subject to the Terms and Conditions stated on page 2

| Description | Estimated Quantity | Unit Price | Estimated Amount |
|---|---|---|---|
| 41301 – Asphalt Pavement Milling | 11,622 sq M | $4.75 | $55,203.50 |
| 41801AD – Superpave AC 9.5mm agg, Type 4 | 2,722 Mtons | $106.50 | $289,850.40 |
| 41801CD – Superpave AC 19mm agg | 525 MTons | $90.75 | $47,643.75 |
| 41802CD – Superpave AC 19mm agg, wedge/Level | 3,149 MTons | $90.75 | $285,771.75 |

Total Amount ==============================>>>                                   $678,469.40

- Price is for all work to be completed by October 31, 2006.
- This is a unit price proposal based on bid quantities from drawings titled "Rehabilitation of Lincoln Memorial
  Circle," including typical sections, tabulations of quantities, construction plan, profile and traffic control plan.
- Proposal includes 8 mobilizations for asphalt laydown and 7 mobilizations for milling. Additional mobilizations
  are $ 2,500.00 each.
- Truck and equipment access to be provided by others.
- Maintenance od traffic operations are specifically excluded.
- Additional exclusions: winter pavement maintenance, survey/layout, excavation, earthwork, undercutting, proofrlling
  stone work, patching/utility patching, utility adjustments, sawcutting, prime coat, offsite work, pavement markings
  (either temporary or parmanent), bonds, public space permits, trails, driveways, sings and testing.

We thank you for this opportunity to quote on this work. This proposal is valid for 30 days but may be accepted at any later date at
the sole option of Senate Asphalt. Your signing and returning one copy of this proposal will constitute acceptance of our proposal
by you and will be our authorization to proceed with the work when we are notified to proceed. This proposal includes all Terms
and Conditions on page 2 of this document and your signature hereon acknowledges your receipt and agreement to those terms.
This pricing is good for work performed thru October 31, 2006.

ACCEPTED:                                             Senate Asphalt
William V. Walsh Construction Company, Inc.
By:_____                   By: _____

Name:_____                   Name: Robert L. McKeever Jr.

Title:_____ Date:_____                   Title: Plant Manager

6216 Oxon Hill Road; Oxon Hill, MD 20745; PHONE (301) 686-9090; FAX (301) 686-9093

# Terms and Conditions

## RESPONSIBILITIES OF THE OWNER AND/OR CONTRACTORS

1.  Location and adjustments of underground facilities and/or utility structures including manholes, water and gas valves.
2.  Owner shall not subject our work to traffic or other loads in excess of the design capacity.
3.  Senate Asphalt will accept no back charges unless agreed to in writing by both parties in advance.
4.  Obtaining all permits and payment of fees prior to beginning of work by Senate Asphalt.
5.  Damage to above and underground utilities, facilities and other items caused by equipment to carry out work.

## CREDIT AND PAYMENT

1.  Prices quoted are net work invoiced monthly without retainage unless agreed to in writing prior to the start of Senate Asphalt's work.
2.  Payments are due 30 days from invoice date.
3.  If any payment is not made when due, then Senate Asphalt may suspend operations until payment is received. Interest at the rate of one and one-half percent (1 1/2 %) per month shall be charged and paid on all unpaid balances from the due date to the date payment is received.
4.  In the event that Senate Asphalt retains an attorney to recover any monies due under this contract, the owner/contractor agrees to pay attorney fees are hereby established and agreed to as twenty-five percent (25%) of the amount found to be due and owing, which percentage is hereby stipulated as reasonable. Buyer consents to jurisdiction of the Courts of the Commonwealth of Virginia over any dispute arising under this proposal.

## SUBGRADE, SUBBASE, AND/OR BASE COURSES

1.  Drainage not guaranteed on areas having less than 2% grade. No guarantee against rupture and/or displacement.
2.  Pavement designs are not guaranteed.
3.  Depths indicated are to be constructed as an average depth within specified tolerance.
4.  All existing subbase and subgrade to be proof rolled, compacted, dry, in stable condition and plus or minus 0.2 feet of proposed elevation.
5.  Senate Asphalt shall not be responsible for subgrade and/or subbase conditions, compaction thereof; or unmarked utilities.
6.  It is understood that if after being made aware of undesirable subbase and/or subgrade or base course conditions, the owner or contractor insists on the installation of any part of the pavement without authorizing corrective action, Senate Asphalt will not be responsible in any way for any subsequent pavement failures, and will be paid as stated in the contract.
7.  Senate Asphalt shall not be liable for any failure and completion of the work for causes beyond our control, including but not limited to delays or failures caused by Acts of God, weather, suppliers, fuel, raw materials shortages, plant failures, other contractors and/or subcontractors, acts of the owner(s), accidents, or other mishaps affecting this work or other operations in which we are involved, directly or indirectly.

## ADDITIONAL WORK

1.  Additional work beyond our stated scope of work in the original proposal will be negotiated and agreed in writing by an authorized agent prior to the performance of any extra work regardless of the state of completion at the time the work is performed. No deduction to the contract amount may be made on account of defective work unless Seller has been given three (3) business days written notice and has not commenced corrective action.

## SCHEDULING

1.  Senate Asphalt will endeavor to fully cooperate with the progress of the work, and Senate Asphalt shall not be bound to any construction schedule unless agreed to in writing by both parties.
2.  Two weeks notice of availability is required.
3.  It is understood that Senate Asphalt has a winter shutdown for approximately 90 days beginning around December 20. Senate Asphalt shall not be held liable for non-performance during this shutdown period. Any work which may be scheduled or requested by the owner/contractor during this shutdown period without prior consent of Senate Asphalt shall be done at the owner's/contractor's risk and expense.

## ACCEPTANCE

1.  This proposal is valid for 30 days, but may be accepted at any later date at the sole option of Senate Asphalt.
2.  This proposal is not a contract and shall become binding only upon the contractor's acceptance below or upon the contractor commencing performance. This proposal shall be attached and become part of the contract between the parties and may not be modified except by a writing signed by both parties.

Signed and accepted:_____    Date:_____
Proposal void unless second page is signed and accepted.

(Page 2 of 2)

# EXHIBIT 3

**Gina Schaecher**

| | |
|---|---|
| **From:** | RLMcKeever@laneconstruct.com |
| **Sent:** | Monday, November 26, 2007 6:08 PM |
| **To:** | Gina Schaecher |
| **Subject:** | FW: Proposal of 4-17-06 |

---

**From:** James Walsh [mailto:james@walsh-construction.com]
**Sent:** Monday, April 24, 2006 12:29 PM
**To:** MASchiller@laneconstruct.com; rlmckeever@laneconstruct.com
**Cc:** 'Christina Cavey'; 'Clyde Jackson'
**Subject:** Proposal of 4-17-06

Your proposal of 4-17-06 is accepted.

Per our meeting we note the following:

Our plan is to get Henry Bacon drive paved within the next 2 weeks. The price increase will be applied to the quantities for this work.

We still have to provide a formal breakdown for the increase. Please submit a breakdown and backup in the previously requested format (labor, materials, oh, insurance, etc) that allows us to submit to the govt.

We desire to get all the necessary paperwork in place for continuation through the completion of the work. We should have plenty of time to do this if you submit soon.

Christy, please send them a copy of the project schedule.

We will also send a copy of the final paving plan in the next few weeks.

**James V. Walsh, CEO**
**William V. Walsh Construction Co., Inc**
**301-738-1199 (office), 301-738-1177 (fax)**
**www.walsh-construction.com**

---

**Note:**
This message is for the named person's use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any mistransmission. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient. LANE INDUSTRIES and any of its subsidiaries each reserve the right to monitor all e-mail communications through its networks. Any views expressed in this message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them to be the views of any such entity.

**Thank You.**

# EXHIBIT 4

# SENATE ASPHALT

P.O. Box 71080 • Southwest Station
Washington, DC 20024
202-479-1009

Remit To:
965 East Main Street
Meriden, CT 06450

264174

O:    **William V Walsh Construction**
      **14674 Rothgeb Drive**
      **Rockville, Maryland 20850**

DATE:    9/8/2006

| | |
|---|---|
| Project Description: | **Lincoln Circle & Approach Way Rehab - Task Order 7** |
| Project No.: | **C3059020904** |
| Payment Request #: | **5** |
| Work Performed From: | 7/28/2006 |
| To: | 8/31/2006 |
| SA26 Invoice Number: | 631-2 |
| SA Customer Number: | 101243 |

Original Contract:    Unit Price
Approved Changes:    $0.00
Adjusted Contract:    Unit Price

| ITEM # | DESCRIPTION | UNIT PRICE | EARNED TO DATE | | PREV. EARNED TO DATE | | EARNED THIS PERIOD | |
|---|---|---|---|---|---|---|---|---|
| | | | QUANTITY | AMOUNT | QUANTITY | AMOUNT | QUANTITY | AMOUNT |
| 41301 | Asphalt Milling | $4.75 per Sq MT | 3,021.33 | $14,351.32 | 1,857.99 | $8,825.45 | 1,163.34 | $5,525.87 |
| 41801AD | Superpave Asphalt Conc 9.5mm Type 4 | $106.50 per MT | 210.56 | $22,424.64 | 98.72 | $10,513.68 | 111.84 | $11,910.96 |
| 41802CD | Superpave Asphalt Conc 19.0mm | $90.75 per MT | 954.56 | $86,626.32 | 145.16 | $13,173.27 | 809.40 | $73,453.05 |
| | TOTALS | | | $123,402.28 | | $32,512.40 | | $90,889.88 |

County: DC
Last Day Worked: 8/30/2006

Value of this Invoice(99-00)=        $90,889.88

Amount of Retainage(10%)=        $9,088.99

Work Less Retainage=        $81,800.89

# SENATE ASPHALT

P.O. Box 71080 • Southwest Station
Washington, DC 20024
202-479-1009

Remit To:
965 East Main Street
Meriden, CT 06450

264140

TO:  **William V Walsh Construction**
**14674 Rothgeb Drive**
**Rockville, Maryland 20850**

DATE:    6/10/2006

Project Description: **Lincoln Circle & Approach Way Rehab - Task Order 7**
Project No.: **C3059020904**
Payment Request #:    1
Work Performed From:    5/1/2006
To:    5/31/2006
SA26 Invoice Number:    631-1
SA Customer Number:    101243

| | Original Contract: | Unit Price |
|---|---|---|
| | Approved Changes: | $0.00 |
| | Adjusted Contract: | Unit Price |

| ITEM # | DESCRIPTION | UNIT PRICE | EARNED TO DATE | | PREV. EARNED TO DATE | | EARNED THIS PERIOD | |
|---|---|---|---|---|---|---|---|---|
| | | | QUANTITY | AMOUNT | QUANTITY | AMOUNT | QUANTITY | AMOUNT |
| 41301 | Asphalt Milling | $4.75 per Sq MT | 1,857.99 | $8,825.45 | 0.00 | $0.00 | 1,857.99 | $8,825.45 |
| 41801AD | Superpave Asphalt Conc 9.5mm Type 4 | $106.50 per MT | 98.72 | $10,513.57 | 0.00 | $0.00 | 98.72 | $10,513.68 |
| 41802CD | Superpave Asphalt Conc 19.0mm | $90.75 per MT | 145.16 | $13,173.18 | 0.00 | $0.00 | 145.16 | $13,173.27 |
| | TOTALS | | | $32,512.20 | | $0.00 | | $32,512.40 |

County: DC
Last Day Worked: 5/2/2006

| | |
|---|---|
| Value of this Invoice(99-00)= | $32,512.40 |
| Amount of Retainage(10%)= | $3,251.24 |
| Work Less Retainage= | $29,261.16 |

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>f/u/b THE LANE CONSTRUCTION<br>CORPORATION d/b/a SENATE<br>ASPHALT,<br><br>    Plaintiff<br><br>v.<br><br>WILLIAM V. WALSH<br>CONSTRUCTION CO., INC., et al.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:07-CV-01576<br>Judge: Reggie B. Walton |

## DECLARATION OF MARK SCHILLER

I, Mark Schiller, state that I am more than twenty-one (21) years of age, and have personal knowledge of, and am competent to testify with respect to all matters stated herein:

1.    I am District Manager for The Lane Construction Corporation ("Lane"). I have worked for Lane for over 19 years and have served as District Manager since 2003. In my capacity as District Manager, I have personal knowledge of the facts and circumstances surrounding Lane's subcontract for, and performance and applications for payment on, a project known as Lincoln Circle and Approach Way Rehabilitation   (hereinafter the "Project").

2.    On or about April 1, 2004, Lane entered a contract with William V. Walsh Construction Co., Inc. ("Walsh") concerning the Project (hereinafter the "Subcontract"). In 2006, Walsh requested that Lane perform work under the Subcontract. Lane advised that the prices in the Subcontract had expired in 2005, and Lane submitted a revised price proposal to Walsh for the work to be performed in 2006.

3.    Walsh accepted the revised price proposal, and directed Lane to perform work. Lane performed the work as directed by Walsh in 2006, and fully expected payment in accordance with the 2006 prices. Lane did not concede or agree that Lane's price increases were caused by delays to the Project caused by the Owner. Prior to 2006, Lane had performed limited work on the Project and had no basis to assess the cause of any alleged delay to the Project.

4.    Lane did not condition its price increase on Walsh's ability to recover the increased price from McKissack & McKissack of Washington, Inc. ("McKissack") or the Owner. When Walsh asked Lane to perform work in 2006, Lane required a price increase. Lane submitted its increased prices and Walsh accepted the increased prices and directed Lane to commence work. Although Walsh requested that Lane prepare documentation to assist Walsh in its efforts to recover the price increase from McKissack or the Owner, Lane did not agree to forego payment for the price increase if Walsh could not collect the increased price from the Owner. Lane provided a breakdown for Walsh so that Walsh to quantify the work performed at the increased price for its claim, but Lane did not agree only to receive payment for the increased prices if Walsh recovered the price increase from the Owner.

2

5.    Neither I nor Robert McKeever agreed that Lane's increased costs were caused by delays to the Project caused by the Owner.  Lane had no basis upon which to make such a determination.  Lane was aware that Walsh intended to seek reimbursement from the Owner to recover the cost increase, but Lane did not agree to forego payment for the price increase unless Walsh recovered the increase from the Owner.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Execute on:    _____11/29/07_____

_____
Mark Schiller

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA  ) | |
| f/u/b THE LANE CONSTRUCTION  ) | |
| CORPORATION d/b/a SENATE  ) | |
| ASPHALT,  ) | |
|  ) | |
| Plaintiff  ) | |
|  ) | |
| v.  ) | Case No. 1:07-CV-01576 |
|  ) | Judge:  Reggie B. Walton |
| WILLIAM V. WALSH  ) | |
| CONSTRUCTION CO., INC., et al.,  ) | |
|  ) | |
| Defendants.  ) | |

**<u>ORDER</u>**

This matter is before the Court on Defendants' Motion to Dismiss Or In The Alternative To Stay Pending Exhaustion of Mandatory Disputes Procedures.  This Court being apprised of all premises of this matter and having read the parties submissions find that Defendants' Motion to Dismiss Or In The Alternative To Stay Pending Exhaustion of Mandatory Disputes Procedures should be denied.

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss Or In The Alternative Stay Pending Exhaustion of Mandatory Disputes Procedures is denied, and Defendants shall file answers, or other responsive pleadings, to Plaintiff's Amended Complaint within 14 days of the date of this Order.

ENTERED  this _____ day of December, 2007.

_____
United States District Court Judge

Prepared and submitted by:

/s/ Stephen J. Annino, Esquire
Stephen J. Annino, Esquire
Kasimer & Annino, P.C.
7653 Leesburg Pike
Falls Church, Virginia 22043
(703) 893-3914 – Telephone
(703) 893-6944 – Facsimile
sannino@kasannlaw.com
Counsel for Plaintiff The Lane Construction Corporation

Copies provided to:

Nicole L. Campbell, Esq.
Huddles Jones Sorteberg & Dachille, P.C.
10211 Wincopin Circle, Suite 200
Columbia, Maryland 21044
(310) 621-4120 - Telephone
(301) 621-4473 – Facsimile
Campbell@hjpc.com
Counsel for Defendants